U.S. COURT OF APPEALS
RECEIVED
**Oct. 28, 2024**
FIFTH CIRCUIT

**No._____**

# United States Court of Appeals for the Fifth Circuit

---

REGISTERED FUNDS ASSOCIATION,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

On Petition for Review of an Order of the
Securities and Exchange Commission

---

## PETITION FOR REVIEW

---

RORY SKOWRON
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

JEREMIAH WILLIAMS
  *Counsel of Record*
DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 508-4600

*Counsel for Petitioner*

October 28, 2024

# CERTIFICATE OF INTERESTED PERSONS

No._____

REGISTERED FUNDS ASSOCIATION,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are either parents of any petitioner or that own stock in the petitioners.

## A.    Petitioner

1.    Registered Funds Association

2.    Others who are not participants in this matter but may be financially interested in its outcome include investment advisers and registered funds subject to the agency action at issue in this petition.

# CERTIFICATE OF INTERESTED PERSONS
## (continued)

**B.     Attorneys for Petitioners**

Jeremiah Williams
Douglas Hallward-Driemeier
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Rory Skowron
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199

**C.     Respondent**

Securities and Exchange Commission

**D.     Attorney for Respondent**

Megan Barbero
General Counsel
Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549-1090

Dated: October 28, 2024                    Respectfully Submitted,

                                          */s/ Jeremiah Williams*
                                          JEREMIAH WILLIAMS
                                          *Counsel of Record for Petitioner*

# PETITION FOR REVIEW

Pursuant to 5 U.S.C. §§ 702-704, 706, 15 U.S.C. § 80a-42(a), and Federal Rule of Appellate Procedure 15(a), the Registered Funds Association petitions this Court for review of the final order of the Securities and Exchange Commission ("Commission" or "SEC") in *Form N-PORT and Form N-CEN Reporting; Guidance on Open-End Fund Liquidity Risk Management Programs,* Release No. IC-35308, and issued on August 28, 2024. A copy of the order is attached as Exhibit A. The order amends the reporting requirements on Forms N-PORT and N-CEN that apply to certain registered investment companies.

The amendments would impose great harm by limiting an investment company's ability to benefit from the proprietary work product of its investment adviser. Currently, funds must publicly disclose their detailed portfolio holdings on a quarterly basis. The new amendments require monthly public disclosure. This increased frequency would make it very difficult for funds to successfully pursue their investment strategies. In effect, the amendments force funds to make their intellectual capital available to the public for free.

The amendments exceed the Commission's statutory authority. Congress established a strong presumption that semi-annual filing is sufficient and required the Commission to have a compelling justification for any higher frequency. For twenty years, the SEC has required more frequent filing than the baseline established by Congress. It has not adequately explained why an even higher frequency is now needed. In fact, the SEC's longstanding position has been that monthly public filings would be *harmful* to funds. The new monthly requirement is therefore incompatible with Congress's clear intent and with the Commission's own prior statements.

The new amendments were adopted without proper notice and comment, and are otherwise arbitrary, capricious, an abuse of discretion, and contrary to law, all in violation of the Administrative Procedure Act, 5 U.S.C. § 706, and of the Commission's statutory obligation to consider its rules' effects on "efficiency, competition, and capital formation," 15 U.S.C. § 80b-2(c).

1.    Fund performance depends on executing successful investment strategies. Funds spend money on investment professionals and research tools so that they can position themselves to generate

favorable returns in a competitive marketplace. Funds benefit from this intellectual work product.

2.     Fund portfolio holdings contain valuable information about investment strategies. The more frequently such information is publicly disclosed, the harder it is to make successful investments. This is especially true for actively managed funds. Experts studying the effects of the 2004 change from semi-annual to quarterly disclosure found that it harmed actively managed funds: "Although these disclosure rules were meant to help investors make better asset allocation decisions, portfolio disclosure reveals [actively managed] mutual funds' proprietary information, thereby limiting their ability to fully reap the benefits of their information acquisition efforts, decreasing their motivation to collect and trade on private information." Jalal Sani, Nemit Shroff & Hal White, *Spillover Effects of Mandatory Portfolio Disclosures on Corporate Investment*, J. OF ACCT. & ECON., 76 (2023) at 21. The potential harm of monthly disclosure would necessarily be much greater.

3.     Prior to the new amendments, the SEC had a longstanding policy of safeguarding an investment adviser's proprietary work product

3

by limiting how often funds had to disclose their detailed portfolio holdings.

4.     The SEC first required quarterly public disclosure in 2004. *See Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies*, 69 Fed. Reg. 11,243 (Mar. 9, 2004). The SEC considered a higher frequency but decided against it, saying "[W]e take seriously concerns that more frequent portfolio holdings disclosure . . . may expand the opportunities for predatory trading practices that harm fund shareholders." *Id*. at 11,252. The SEC also noted that quarterly reporting "strike[s] an appropriate balance between investors' interest in more frequent portfolio information and the costs associated with disclosing and making that information available to investors, which are ultimately borne by investors." *Id*.

5.     The Commission reiterated its stance on public disclosure in 2016. It issued a rule requiring monthly reporting of portfolio holdings to the SEC, but importantly, required only quarter-end reports to be made public. *See Investment Company Reporting Modernization*, 81 Fed. Reg. 81,870 (Nov. 18, 2016). This maintained the longstanding practice of quarterly public disclosure. The Commission described in detail the

harms of more frequent disclosure—just as it had done in 2004. It explained that "more frequent portfolio disclosure than is currently required could potentially harm fund shareholders" by facilitating "predatory trading practices" such as "frontrunning." *Id*. at 81,909. The Commission found that "more frequent portfolio disclosure may facilitate the ability of non-investors to 'free ride' on a mutual fund's investment research" and allow people to "'copycat' the fund's investment strategies and obtain for free the benefits of fund research and investment strategies that are paid for by fund shareholders." *Id*. at 81,909–910. In 2019, the SEC voted to continue quarterly public disclosure. *See Amendments to the Timing Requirements for Filing Reports on Form N–Port*, 84 Fed. Reg. 7,980 (Mar. 6, 2019).

6.    The Commission reversed this longstanding policy on public disclosure when it passed the new amendments on August 28, 2024. For the first time, the SEC required public disclosure of detailed portfolio holdings on a *monthly* basis. This change directly contradicted the SEC's twenty-year policy of quarterly public disclosure.

7.    The SEC failed to provide a rational justification for this change in policy. Its primary argument was that many funds voluntarily

disclose their detailed portfolio holdings, so these funds must have determined that the benefit to investors outweighs the potential harm. *See Open-End Fund Liquidity Risk Management Programs and Swing Pricing; Form N–PORT Reporting*, 87 Fed. Reg. 77,172 (Dec. 16, 2022). As Commissioner Uyeda noted in voting against the rule, "just because <u>some</u> funds have decided that the benefits of public disclosure outweigh the harm does not mean that we should mandate more frequent disclosure for <u>all</u> funds." *Statement on Form N-Port and Form N-CEN Reporting Amendments*, Aug. 28, 2024 (emphasis in original).

8.    In addition, the Commission's policy change would further limit the choices available to retail investors. Many investment strategies would no longer be feasible for registered funds. Only private funds, which have less onerous disclosure requirements, would be able to profitably execute many investment strategies. Retail investors would be cut off from large segments of the market.

9.    The SEC did not have the statutory authority to make this change in policy. In 15 U.S.C. § 80a-29, Congress adopted a presumption that "semi-annual" (twice per year) filings are sufficient, and it mandated that any increase in frequency would require a compelling justification

that balanced the need for the increase against the costs of additional reporting. Indeed, Congress specifically instructed the Commission to "avoid unnecessary reporting" and to "minimize the compliance burdens" on registered funds if the Commission elects to require filing "more frequently than semiannually." In adopting the new amendments, the Commission did not provide a compelling justification that properly considered the costs to funds that monthly filing would entail. Accordingly, the Commission has not overcome Congress's presumption in favor of semi-annual filing, and the new amendments are in excess of statutory authority.

10.    Moreover, the final rule was very different from the proposed rule, which contained far-reaching provisions that crowded out discussion about filing frequency. The SEC did not provide a separate opportunity to comment on the much narrower final rule.

11.    In adopting the new amendments, the SEC exceeded its statutory authority, reversed a longstanding policy without adequate justification, and deprived the public of adequate notice and comment. The Court should therefore vacate the amendments requiring monthly

public disclosure of portfolio holdings and grant such additional relief as may be necessary and appropriate.

12.    Jurisdiction and venue are proper in this Court under 15 U.S.C. § 80a-42(a) because the petition challenges "an order issued by the Commission under [the Investment Company Act]" and the petitioner has its "principal place of business" in this Circuit. The petition is also timely under 15 U.S.C. § 80a-42(a) because it was filed on October 28, 2024—"within sixty days" of the Commission's "entry" of the order on August 28, 2024, as calculated per Fed. R. App. P. 26(a)(1).


Dated: October 28, 2024                    Respectfully Submitted,

                                           */s/ Jeremiah Williams*
                                           JEREMIAH WILLIAMS
RORY SKOWRON                                   *Counsel of Record for Petitioner*
ROPES & GRAY LLP                           DOUGLAS HALLWARD-DRIEMEIER
Prudential Tower                           2099 Pennsylvania Avenue, N.W.
800 Boylston Street                        Washington, D.C. 20006
Boston, MA 02199                           (202) 508-4600
(617) 951-7000                             jeremiah.williams@ropesgray.com

                    *Counsel for Petitioner*

8

# CERTIFICATE OF ELECTRONIC SUBMISSION

I hereby certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: October 28, 2024                    Respectfully Submitted,

*/s/ Jeremiah Williams*
JEREMIAH WILLIAMS
*Counsel of Record for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, I caused the foregoing Petition for Review to be electronically filed with the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system.

I further certify that on October 28, 2024, pursuant to 28 U.S.C. § 2112(a)(1) and 17 C.F.R. § 201.490, I will cause ten true and correct copies of the foregoing Petition for Review to be served upon the Secretary and Office of the Secretary of the Securities and Exchange Commission via USPS registered mail at the following address.

> Vanessa A. Countryman
> Secretary
> Securities and Exchange Commission
> 100 F. Street NE
> Washington, D.C. 20549-1090

Each copy is being submitted to the Securities and Exchange Commission pursuant to 28 U.S.C. § 2112 by the persons who filed the Petition for Review in the United States Court of Appeals for the Fifth Circuit. There are no parties "admitted to participate in the agency proceedings" for purposes of Federal Rule of Appellate Procedure 15(c)(1) other than the respondent.

Dated: October 28, 2024

Respectfully Submitted,

/s/ Jeremiah Williams

JEREMIAH WILLIAMS
*Counsel of Record for Petitioner*

# Exhibit A

*Conformed to Federal Register version*

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 270 and 274**

**[Release No. IC-35308; File No. S7-26-22]**

**RIN 3235-AM98**

**Form N-PORT and Form N-CEN Reporting; Guidance on Open-End Fund Liquidity Risk Management Programs**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule; guidance.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting amendments to reporting requirements on Forms N-PORT and N-CEN that apply to certain registered investment companies, including registered open-end funds, registered closed-end funds, and unit investment trusts. The amendments will require more frequent reporting of monthly portfolio holdings and related information to the Commission and the public, amend certain reporting requirements relating to entity identifiers, and require open-end funds to report information about service providers used to comply with liquidity risk management program requirements. In addition, the Commission is providing guidance related to open-end fund liquidity risk management program requirements.

**DATES:** *Effective dates*: The amendments to Forms N-PORT and N-CEN, and amendatory instruction 2 to 17 CFR 270.30b1-9, are effective November 17, 2025. Amendatory instruction 3 to 17 CFR 270.30b1-9 is effective May 18, 2026.

*Compliance dates*: The applicable compliance dates are discussed in section II.E.

**FOR FURTHER INFORMATION CONTACT:** Susan Ali, Counsel; Alexis Hassell, Senior Counsel; Frank Buda or Angela Mokodean, Senior Special Counsels; or Brian M. Johnson,

Assistant Director at (202) 551-6792, Investment Company Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-8549.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting amendments to the following rules and forms:

| Commission Reference | | CFR Citation (17 CFR) |
|---|---|---|
| Investment Company Act of 1940 ("Act" or "Investment Company Act")[1] | Rule 30b1-9 | § 270.30b1-9 |
| | Form N-PORT | § 274.150 |
| | Form N-CEN | § 274.101 |

**TABLE OF CONTENTS**

I.  Introduction .................................................................................................................. 3
II.  Discussion .................................................................................................................. 13
    A.  Amendments to Form N-PORT ......................................................................... 13
        1.  Filing Frequency ......................................................................................... 13
        2.  Publication Frequency ................................................................................ 32
        3.  Other Amendments to Form N-PORT ......................................................... 42
    B.  Amendments to Form N-CEN ........................................................................... 47
    C.  Guidance on Open-End Fund Liquidity Risk Management Program Requirements 48
    D.  Technical and Conforming Amendments .......................................................... 57
    E.  Transition Periods .......................................................................................... 57
III.  Other Matters ........................................................................................................... 62
IV.  Economic Analysis .................................................................................................... 63
    A.  Introduction .................................................................................................... 63
    B.  Baseline .......................................................................................................... 65
        1.  Regulatory Baseline .................................................................................... 65
        2.  Affected Entities ......................................................................................... 69

---

[1]    15 U.S.C. 80a-1 *et seq.* Unless otherwise noted, all references to statutory sections are to the Investment Company Act, and all references to rules under the Investment Company Act are to title 17, part 270 of the Code of Federal Regulations [17 CFR part 270].

C.    Benefits and Costs of the Amendments .................................................. 72

1.    Form N-PORT Filing Frequency ................................................. 72

2.    Form N-PORT Publication Frequency ......................................... 80

3.    Amendments to Form N-CEN ...................................................... 89

4.    Entity Identifiers .......................................................................... 90

5.    Other Compliance Costs ................................................................ 90

D.    Effects on Efficiency, Competition, and Capital Formation .................... 92

1.    Efficiency ...................................................................................... 92

2.    Competition ................................................................................... 93

3.    Capital Formation ......................................................................... 95

E.    Alternatives ............................................................................................. 96

1.    Form N-PORT Filing Frequency ................................................. 96

2.    Form N-PORT Publication Frequency ......................................... 97

3.    Other Alternatives ........................................................................ 98

V.    Paperwork Reduction Act ............................................................................ 99

A.    Introduction ............................................................................................. 99

B.    Form N-PORT ......................................................................................... 100

C.    Form N-CEN ........................................................................................... 106

VI.    Final Regulatory Flexibility Analysis ......................................................... 109

A.    Need for and Objectives of the Rule and Form Amendments ................ 110

B.    Significant Issues Raised by Public Comments ...................................... 110

C.    Small Entities Subject to Rule Amendments .......................................... 112

D.    Projected Reporting, Recordkeeping, and Other Compliance Requirements ......... 112

E.    Agency Action to Minimize Effect on Small Entities ............................ 114

Statutory Authority ........................................................................................... 116

## I.  INTRODUCTION

As the primary regulator of the asset management industry, the Commission utilizes information filed in reports of registered investment companies to, among other things, monitor industry trends, identify risks, inform policy and rulemaking, and assist Commission staff in examination and enforcement efforts. For a large segment of registered investment companies ("funds"), reports on Form N-PORT are an important source of information for the Commission

and its staff.[2] These reports provide monthly information about a fund's complete portfolio holdings, as well as related information to help assess a fund's risks, including investment risk (*e.g.*, interest rate risk, credit risk, and volatility risk), liquidity risk, counterparty risk, and leverage.

Separate from the Commission's use of Form N-PORT information, investors also benefit from information about a fund's portfolio holdings to make more informed investment decisions. For instance, portfolio holding information can help investors assess the extent to which their funds have portfolios that overlap, as well as how funds comply with their investment objectives or deviate from those objectives. Investors may benefit from third-party analysis of the information, such as analysis by data aggregators, broker-dealers, investment advisers, and others that provide investment information to fund investors and assist investors in selecting fund investments. Some investors, and particularly institutional investors, may use portfolio holding information directly. We have observed that many funds voluntarily disclose their monthly portfolio holdings on their websites or through third party data aggregators, making additional portfolio information available to assist investors with their investment decisions. However, practices vary, and some funds disclose only quarterly information about portfolio holdings. Furthermore, the portfolio holdings information funds voluntarily disclose is not provided in a standardized format that facilitates efficient analysis and is sometimes available

---

[2]    In this release, we generally use the term "fund" to refer to registrants that currently are required to report on Form N-PORT, including registered open-end funds, registered closed-end funds, and exchange-traded funds ("ETFs") organized as unit investment trusts, and excluding money market funds and small business investment companies. In the context of discussing Form N-CEN, the term "fund" generally refers to registrants that currently are required to report on Form N-CEN, which in addition to the registrants that are required to report on Form N-PORT include money market funds, small business investment companies, and registered unit investment trusts.

only for a fee, and may not include information that Form N-PORT reports include, such as information to help assess a fund's risks like interest rate risk, credit risk, and counterparty risk.

After considering comments as discussed below, the Commission is adopting amendments to Form N-PORT to provide the Commission and the public with timelier information about funds' portfolio investments and, in turn, improve transparency and facilitate better monitoring of these funds. The final amendments will require funds to file Form N-PORT reports for a given month within 30 days of the end of that month. This change will increase the timeliness of the information we receive, which will promote more effective regulatory monitoring and oversight of the fund industry for the benefit of fund investors while balancing the need for timelier information against competing concerns regarding the data's sensitivity and the time funds need to collect and file accurate information. The final amendments will also make monthly Form N-PORT reports available to the public with a 60-day delay to enhance public transparency and its associated benefits for investors. For instance, more frequent public disclosure of funds' portfolios will increase transparency of funds' portfolios and portfolio trends to investors, reducing information asymmetries between funds and investors.

Currently, registered management investment companies and ETFs organized as unit investment trusts are required to file periodic reports on Form N-PORT about their portfolios as of month end.[3] While the reports provide monthly information to the Commission, funds file these reports on a quarterly basis and have up to 60 days after the end of the quarter to file with

---

[3]    *See* rule 30b1-9 and Form N-PORT. Money market funds and small business investment companies are excluded from Form N-PORT reporting requirements.

the Commission. Moreover, the public has access to information for only the third month of each

quarter, and information for the first and second months of each quarter remains confidential.[4]

As adopted in 2016, Form N-PORT would have required funds to file monthly reports

within 30 days of month end.[5] Only reports for every third month were to be available to the

public. In adopting Form N-PORT, the Commission highlighted the utility of monthly portfolio

reporting for fund monitoring, particularly in times of market stress. The Commission also

originally required funds to file each monthly report within 30 days of month end because more

delayed data would reduce the utility of the information to the Commission and lag times of

more than 30 days would make monthly reporting impractical, as reports would overlap with

preparation time.[6]

However, as part of a subsequent Commission assessment of its internal cybersecurity

risk profile, the Commission re-evaluated the filing frequency for Form N-PORT reports. The

then-Chairman also directed the staff to take a number of steps designed to strengthen the

Commission's cybersecurity risk profile, with an initial focus on the Commission's Electronic

Data Gathering, Analysis, and Retrieval ("EDGAR") system as well as the nonpublic

information the Commission collected and held. In December 2017, while these efforts were

ongoing, the Commission determined to postpone the initial reporting of Form N-PORT on

---

[4]     Certain of the reported information, such as information about liquidity and use of derivatives, remains confidential for all months of a quarter. *See* General Instruction F of Form N-PORT.

[5]     *See* Investment Company Reporting Modernization, Investment Company Act Release No. 32314 (Oct. 13, 2016) [81 FR 81870 (Nov. 18, 2016)] ("Reporting Modernization Adopting Release").

[6]     *See id.*, at section II.A.3.

EDGAR by nine months.[7] Subsequently, the Commission adopted an interim final rule to require quarterly filing of monthly information within 60 days of quarter-end.[8]

The Commission also required funds to maintain in their records the information that they are required to report on Form N-PORT no later than 30 days after the end of each month. In making these changes to the filing cadence and recordkeeping requirements, the Commission stated that the filing delay would meaningfully reduce the potential cybersecurity risks arising from the collection and maintenance of sensitive nonpublic data on EDGAR. However, the Commission stated that the staff would continue to monitor and solicit feedback on the data received and the use made (or expected to be made) of such data in furtherance of the Commission's statutory mission, as well as cybersecurity considerations and other matters deemed relevant by staff.[9]

Since that time, the Commission has taken steps to address the impetus for the interim final rule, including by modernizing the EDGAR system that funds use to file Form N-PORT reports. For instance, the Commission has engaged in a multi-year, multi-phase effort to modernize the EDGAR system, including both internal and public-facing components.[10] Further, the Commission has gained additional experience in receiving, maintaining, and protecting sensitive portfolio data on the EDGAR system, including, for example, protecting the existing

---

[7]     *See* Investment Company Reporting Modernization, Investment Company Act Release No. 32936 (Dec. 8, 2017) [82 FR 58731 (Dec. 14, 2017)].

[8]     *See* Amendments to the Timing Requirements for Filing Reports on Form N-PORT, Investment Company Act Release No. 33384 (Feb. 27, 2019) [84 FR 7980 (Mar. 6, 2019)] ("2019 Form N-PORT Timing Amendments") for more detailed background regarding the 2019 Form N-PORT Timing Amendments. *See also* rule 30b1-9.

[9]     *See* 2019 Form N-PORT Timing Amendments, *supra* note 8, at nn.36 to 39 and accompanying text.

[10]    *See* Annual Report on SEC Website Modernization Pursuant to Section 3(d) of the 21st Century Integrated Digital Experience Act (Dec. 2022), available at https://www.sec.gov/files/21st-century-idea-act-report-2022-12.pdf.

nonpublic portions of Form N-PORT and confidential treatment requests for reports on Form 13F.

Market events since adoption of the interim final rule have also reinforced the need for more timely data regarding funds' portfolios, and thereby, the need to reduce the delay in Form N-PORT reporting. In this regard, the delay of Form N-PORT data under the quarterly reporting requirements has limited the Commission's ability to develop a timely and more complete understanding of the market, thereby impeding its ability to respond to market stresses and events as they are developing.

- *Delayed Understanding of COVID-19 Impact on Markets.* Market disruptions related to the COVID-19 pandemic began in March 2020. Funds' reports on Form N-PORT that would reflect these events were not due until June 1, 2020, at the earliest, and some funds' reports were due as late as the end of July 2020.[11] Further, the information available to Commission staff from Form N-PORT reports at the onset of the market disruptions reflected fund portfolios and activities as of several months earlier—ranging from the end of October 2019 to the end of December 2019.[12] Thus, in many cases, the

---

[11] Because reports are due 60 days after the end of a fund's fiscal quarter, deadlines vary based on the fund's fiscal year. *See* Open-End Liquidity Risk Management Programs and Swing Pricing; Form N-PORT Reporting, Investment Company Act Release No. 34746 (Nov. 2, 2022) [87 FR 77172 (Dec. 16, 2022)] ("Proposing Release"), at n.273.

[12] Specifically, Commission staff had information as of Dec. 31, 2019, for funds with fiscal years ending in Mar., June, Sept., or Dec. (around 51% of the total number of funds and representing approximately 56% of aggregate fund assets); information as of Nov. 30, 2019, for funds with fiscal years ending in Feb., May, Aug., or Nov. (around 20% of the total number of funds and representing approximately 20% of aggregate fund assets); and information as of Oct. 31, 2019, for funds with fiscal years ending in Jan., Apr., July, or Oct. (around 29% of the total number of funds and representing approximately 25% of aggregate fund assets). The latest date for which Commission staff had full information for all funds for a given month was Oct. 31, 2019. By Mar. 31, 2020, the Commission received information as of Jan. 31, 2020, for funds with fiscal years ending in Jan., Apr., July, or Oct. The percentage of funds with fiscal years ending in certain months and the percentage of aggregate fund assets are based on fiscal year end data as of Dec. 31, 2023. As a result, these percentages are approximations of the amount of data available in 2020, which at that time also did not include information for funds that are small entities because small entities were not

available information was unlikely to reflect reasonably current portfolios and activities of funds because of the reporting delays. This meant that the monthly filings were not an effective tool to help Commission staff, for example, assess and analyze how the events related to the COVID-19 pandemic were affecting funds or to identify issues for further inquiry. Moreover, Commission staff could not begin to review Form N-PORT information from March 2020 to assess and analyze the effects of the market disruptions more directly until the beginning of June, and the staff did not have full information for all funds until the end of July.

- *Delayed Understanding of Impact on Funds and their Investments from Russia's Invasion of Ukraine.* The Russian invasion of Ukraine began on February 24, 2022. The staff's analysis of this event was impeded by the lack of timelier portfolio information to assess funds' exposures that could be affected by the invasion (*e.g.*, investments in Russian or Ukrainian companies). At that time, the Form N-PORT information available to Commission staff reflected funds' portfolio holdings between the end of September 2021 and the end of November 2021, depending on a fund's fiscal year end. While the staff obtained somewhat timelier December 2021 data for certain funds by March 1, 2022, that data was still several months out of date and was available for only a little over half of funds. By the time the February 2022 data was available to the Commission staff to assess funds' exposures to investments that could be affected by Russia's invasion of Ukraine, the data was several months out of date.

---

required to comply with Form N-PORT reporting requirements until Mar. 1, 2020. *See infra* section IV.B.2 (providing additional information about the breakdown in funds' fiscal year end dates as of Dec. 31, 2023).

- *Delayed Understanding of Funds' Exposures to the London Interbank Offered Rate ("LIBOR") and Readiness for Related Transition.* During the transition away from LIBOR, the lag in the Commission's receipt of Form N-PORT reports hindered the ability to monitor funds' LIBOR exposures and readiness for the transition. Consistent with the above examples, in analyzing funds' readiness for the transition, the portfolio information available to the staff from Form N-PORT reports was approximately two to four months out of date, depending on the fund's fiscal year end, which limited the ability to assess overall exposures and readiness across the fund industry at any given point in time.[13]

- *Delayed Understanding of Market Stress Relating to Particular Issuers or Asset Classes.* The current delays in Form N-PORT information have impeded the staff's ability to develop an accurate understanding of funds' exposures to particular issuers or asset classes that are under stress due to market events or other circumstances (*e.g.*, a market participant experiencing a cyber-attack). For example, the delays limited the staff's ability to assess fund exposures to regional banks in Spring 2023 when certain regional banks became insolvent and concerns about broader contagion led to sizable declines in bank stock prices.[14]

More frequent and more timely Form N-PORT data will allow the Commission to (1) conduct more targeted and timely monitoring efforts; (2) analyze risks and trends more accurately; and (3) better assess the breadth and magnitude of potential impacts of market events

---

[13]    When staff is reviewing Form N-PORT reports at any given time, the data for some filers is generally two months out of date and more outdated for the remaining filers. *See supra* note 12 (discussing the percentage of funds that have quarter ends to their fiscal years on the same or different schedules).

[14]    *See* Financial Stability Oversight Council 2023 Annual Report, *available at* https://home.treasury.gov/system/files/261/FSOC2023AnnualReport.pdf.

and stress affecting particular issuers, asset classes, counterparties, or market participants. The Commission's ability to perform these functions more effectively and efficiently with more frequent and timely data will benefit investors and the markets, including for example during times of market stresses and events. Having more frequent and timely data in these circumstances would, for example, enhance the ability of Commission staff systematically to determine if impacts on funds are isolated or widespread, and to help determine if funds—and particularly a large number of funds—may require emergency action, such as emergency relief from the Commission to permit affected funds to suspend redemptions or market-wide actions coordinated with other Federal agencies. While funds are required to produce monthly data from their records upon Commission staff's request, this has not been an effective or efficient tool. Given that there is insufficient market data to determine which funds to prioritize, it is challenging for Commission staff to determine the appropriate funds from which to request data. It also could be inefficient to analyze on a timely basis data sets based on individual data requests even if Commission staff were able to identify potentially affected funds. As a result, when market events have occurred, Commission staff has encountered limits on its ability to identify the funds most directly affected by the events and to explore potential Commission responses, including the potential benefits or necessity of a response.[15]

In 2022, the Commission proposed to amend Form N-PORT to provide the Commission with timelier portfolio-related information and to provide investors with access to monthly rather than quarterly information.[16] Specifically, the proposal would require all registered investment

---

[15]     We recognize there are tradeoffs in how frequently we require funds to file information on Form N-PORT. While receiving Form N-PORT information within a very short period of time after the end of a given month would further enhance the staff's ability to conduct these types of analyses relative to the final amendments, it also would increase reporting costs, errors, and data sensitivity. *See infra* section II.A.1.

[16]     *See* Proposing Release, *supra* note 11.

companies that report on that form to file monthly reports with the Commission within 30 days of month end. These monthly reports would subsequently be available to the public 60 days after month end.

Commenters expressed differing views on the proposed amendments, as discussed in more detail throughout this release.[17] Some commenters were supportive of requiring funds to file more frequently and providing for greater public transparency.[18] For instance, one commenter suggested the proposed amendments would enhance the Commission's ability to respond to market events due to increased timeliness of data.[19] Some commenters opposed the proposed amendments. For example, some commenters suggested that it would be burdensome for funds to file reports within 30 days.[20] In addition, some commenters expressed concern about more frequent public disclosure resulting in front-running or copycatting of fund strategies.[21]

We are adopting, substantially as proposed, amendments requiring that all registered investment companies that report on Form N-PORT file monthly reports with the Commission within 30 days of month end. Monthly report information will then be publicly available 60 days after month end. These changes are intended to give investors information to make more

---

[17]     The comment letters on the Proposing Release (File No. S7-26-22) are available at *https://www.sec.gov/comments/s7-26-22/s72622.htm*.

[18]     *See, e.g.*, Comment Letter of Better Markets (Feb. 14, 2023) ("Better Markets Comment Letter"); Comment Letter of Dane (Nov. 10, 2022) ("Dane Comment Letter"); Comment Letter of Daniel Hof zum Ahaus (Nov. 10, 2022) ("Hof zum Ahaus Comment Letter"); Comment Letter of Taylor Myers (Feb. 15, 2023) ("Myers Comment Letter").

[19]     *See* Better Markets Comment Letter.

[20]     *See, e.g.*, Comment Letter of T. Rowe Price (Feb. 14, 2023) ("T. Rowe Comment Letter"); Comment Letter of The Charles Schwab Corporation (Feb. 14, 2023) ("Schwab Comment Letter"); Comment Letter of Investment Company Institute (Feb. 14, 2023) ("ICI Comment Letter I"); Comment Letter of BlackRock, Inc. (Feb. 14, 2023) ("BlackRock Comment Letter"); Comment Letter of PIMCO (Feb. 13, 2023) ("PIMCO Comment Letter").

[21]     *See, e.g.*, Comment Letter of Dodge & Cox (Mar. 1, 2023) ("Dodge & Cox Comment Letter I"); ICI Comment Letter I; Comment Letter of PGIM Investments LLC (Feb. 14, 2023) ("PGIM Comment Letter"); Comment Letter of Principal Financial Group (Feb. 14, 2023) ("Principal Comment Letter"); PIMCO Comment Letter.

informed investment decisions and to give the Commission timelier information to conduct comprehensive oversight of an ever-evolving fund industry. We are also adopting conforming amendments and amendments related to certain entity identifiers as proposed. In a change from the proposal, we are not adopting the proposed amendments to require funds to present portfolio holdings in accordance with Regulation S-X more frequently than currently required. We also are not adopting proposed reporting amendments relating to funds' use of swing pricing or to liquidity classifications in this release, as we are not adopting amendments to the underlying rules at this time.

In addition to the Form N-PORT amendments, we are adopting proposed amendments to Form N-CEN to modify certain items related to entity identifiers and require open-end funds that are subject to liquidity risk management program requirements under 17 CFR 270.22e-4 (rule 22e-4) to report certain information about service providers used to fulfill that rule's requirements. Further, we are adopting, as proposed, technical amendments to Form N-PORT and Form N-CEN to update the definition of "exchange-traded fund" in those forms to refer directly to the Commission's exemptive rule for exchange-traded funds. Finally, we are providing guidance related to open-end fund liquidity risk management program requirements.

## II. DISCUSSION

### A. Amendments to Form N-PORT

1. Filing Frequency

We are adopting, as proposed, amendments to rule 30b1-9 and Form N-PORT to require funds to file reports on Form N-PORT on a more timely basis, with changes to both the

frequency with which a fund will file reports on Form N-PORT and when the reports are due.[22] Specifically, rather than filing monthly reports with the Commission on a quarterly basis, funds will be required to file reports on a monthly basis.[23] These monthly filings will be due within 30 days after the end of the month to which they relate, rather than no later than 60 days after the end of the fiscal quarter.[24]

Several commenters supported, or did not oppose, filing monthly reports with greater frequency than currently required.[25] Some commenters expressed that filing information on Form N-PORT with greater frequency would provide more timely information to the Commission, which would enhance the Commission's ability to oversee funds.[26] For example, one of these commenters observed that more current information "would have been beneficial to regulators and policymakers in crafting regulatory and legislative responses to the economic effects of the COVID-19 pandemic."[27] Another stated that "the combination of the quarterly reporting requirement and the 60-day filing delay results in the Commission receiving fund data

---

[22] The amendments also make a conforming edit to the filing instructions for Form N-PORT. *See* amended 17 CFR 274.150(a).

[23] We are also adopting conforming changes to General Instruction A of Form N-PORT and to rule 30b1-9 to remove references to the requirement for a fund to maintain in its records the information that is required to be included on Form N-PORT no later than 30 days after the end of each month. This requirement will no longer be necessary because the information will be filed with the Commission. *See* General Instruction A of amended Form N-PORT; amended rule 30b1-9.

[24] *Id*. As is the case currently, if the due date falls on a weekend or holiday, the filing deadline will be the next business day. *See* General Instruction A of amended Form N-PORT.

[25] *See, e.g.*, Better Markets Comment Letter (supporting monthly reporting and with the proposed 30-day deadline after month end); Dane Comment Letter (same); Comment Letter of Invesco Ltd. (Feb. 13, 2023) ("Invesco Comment Letter") (supporting monthly reporting but suggesting a 45-day deadline after month end); Comment Letter of J.P. Morgan Asset Management (Feb. 14, 2023) ("JP Morgan Comment Letter") ("not oppos[ing]" monthly reporting but suggesting a 60-day filing deadline.). *See also* BlackRock Comment Letter; Hof zum Ahaus Comment Letter; Myers Comment Letter; ICI Comment Letter I; PIMCO Comment Letter.

[26] *See, e.g.*, Better Markets Comment Letter; Dane Comment Letter; Invesco Comment Letter.

[27] Better Markets Comment Letter.

that is stale, impeding the Commission's ability to use Form N-PORT information," and that "[m]onthly Form N-PORT filings would enhance the Commission's ability to effectively oversee funds and monitor their activities."[28]

Some commenters opposed the proposed changes to the filing frequency of Form N-PORT.[29] These commenters stated that a monthly filing cadence would significantly increase burdens on funds and fund service providers, as well as costs to shareholders.[30] Some of these commenters suggested that monthly filing would increase the risk of errors in reported information.[31] In addition, some commenters expressed concern that more frequent reporting would increase the risk that reported information could be misappropriated.[32]

Commenters had varying views on the timeline for filing monthly reports. Some commenters supported the proposed 30-day filing deadline.[33] For example, one commenter stated that Form N-PORT information may be up to five months old by the time it reaches the Commission under the current timeline and that, by comparison, more regular reporting would provide regulators with timely information about funds.[34] Some commenters suggested a shorter filing deadline, such as one week, to reduce the staleness of the data.[35] Several commenters—

---

[28]     Invesco Comment Letter (supporting monthly reporting but suggesting a 45-day deadline after month end).

[29]     *See, e.g.*, Comment Letter of Brighthouse Financial, Inc. (Feb. 13, 2023) ("Brighthouse Comment Letter"); PGIM Comment Letter; Principal Comment Letter; T. Rowe Comment Letter.

[30]     *See, e.g.*, Brighthouse Comment Letter (stating that monthly reporting will increase costs associated with the preparation, review, and filing of Form N-PORT reports; expanded vendor engagements; increased human resources; and developing new systems, processes, and procedures); PGIM Comment Letter; Principal Comment Letter; T. Rowe Comment Letter.

[31]     *See, e.g.*, PGIM Comment Letter; Principal Comment Letter; T. Rowe Comment Letter.

[32]     *See, e.g.*, Principal Comment Letter.

[33]     *See, e.g.*, Better Markets Comment Letter; Dane Comment Letter.

[34]     *See* Better Markets Comment Letter.

[35]     *See* Hof zum Ahaus Comment Letter (suggesting weekly filing deadline with instant publishing); Myers Comment Letter (suggesting a 15-day reporting period if not weekly).

including some commenters that opposed more frequent filing and some that did not—said that, if the Commission requires more frequent filing, then it should provide more time to file, for example, 45 or 60 days after month end.[36] In particular, several commenters expressed that reporting 30 days after month end would not provide funds with enough time to compile, review, correct, and file the data required by Form N-PORT.[37] Some commenters stated that collecting Form N-PORT data can take time in cases where a fund has to engage in manual and time-consuming processes to obtain such information.[38] Some commenters suggested that, although funds currently are required to maintain the information necessary to prepare their reports on Form N-PORT within 30 days after month end, filing this information will involve additional steps that funds do not undertake for recordkeeping, such as data validation and data tagging.[39] Some commenters expressed that the risk of reporting errors would go up if a fund is required to complete additional filing steps on the same 30-day deadline that is required for recordkeeping.[40]

A number of commenters also expressed that requiring monthly reporting within 30 days of month end would overburden funds (including fund internal systems and processes) and

---

[36] *See, e.g.*, T. Rowe Comment Letter (suggesting 60 days); Schwab Comment Letter (suggesting 45 days); BlackRock Comment Letter (suggesting 45 days); ICI Comment Letter I (suggesting 45 days); PIMCO Comment Letter (suggesting 45 days generally and 60 days for any periods for which a Form N-CSR will be filed); Comment Letter of Carol Singer (Dec. 13, 2022) ("Singer Comment Letter") (suggesting 60 days, at least for small reporting entities); Dodge & Cox Comment Letter I (suggesting 60 days).

[37] *See, e.g.*, BlackRock Comment Letter; ICI Comment Letter I*; PIMCO Comment Letter; T. Rowe Comment Letter.

[38] *See* ICI Comment Letter I (suggesting that these concerns are especially acute for funds investing in certain fixed income securities and derivatives to report certain adjustments on the form); *see also* T. Rowe Comment Letter (stating that a portion of monthly Form N-PORT data is gathered from internal systems that, in certain cases, must be manually updated).

[39] *See, e.g.*, ICI Comment Letter I; Invesco Comment Letter.

[40] *See, e.g.*, ICI Comment Letter I; T. Rowe Comment Letter (stating that a 30-day deadline would provide insufficient time for resolving data issues prior to filing, even with increased resources). *See also* BlackRock Comment Letter (expressing that 30 days is not enough for data quality reviews, "which are important for funds (who want to avoid errors) and for the SEC (for which data integrity is important)").

service providers.[41] Some commenters discussed overlap in teams that prepare, review, and file Form N-PORT with those that are involved with other required filings and suggested that a 30-day filing timeline for Form N-PORT would cause strains on these teams.[42] Two commenters suggested that these strains would be pronounced for the months following the end of the reporting period that annual and semiannual reports are due.[43] Some commenters expressed concern that costs associated with filing within a shorter timeframe—such as costs of increased service provider fees, hiring more personnel, upgrading systems, and/or resubmitting filings— would be borne by fund shareholders.[44]

Some commenters suggested that funds need more than 30 days to file Form N-PORT reports due to changes to the reporting requirements of Form N-PORT since the form was adopted and in consideration of additional changes to the reporting requirements that the Commission had proposed. For example, some commenters stated that reporting requirements associated with derivatives and liquidity risk management that were adopted after Form N-PORT was adopted have introduced additional complexity to the form.[45] In addition, some commenters stated that amendments to Form N-PORT that had been proposed in certain other rulemakings, but not adopted at the time of their comment letters, would increase the form's complexity, if adopted.[46] Some commenters also stated that other proposed amendments to Form N-PORT in

---

[41]     *See, e.g.*, Comment Letter of Fidelity Investments (Feb. 14, 2023) ("Fidelity Comment Letter"); ICI Comment Letter I; Singer Comment Letter; T. Rowe Comment Letter; Invesco Comment Letter.

[42]     *See, e.g.*, Singer Comment Letter; T. Rowe Comment Letter. *See also* ICI Comment Letter I.

[43]     *See* PIMCO Comment Letter (suggesting extending the Form N-PORT timeline to 45 days after month end generally and 60 days for any periods for which a Form N-CSR will be filed); Singer Comment Letter.

[44]     *See, e.g.*, ICI Comment Letter I; Principal Comment Letter.

[45]     *See, e.g.*, BlackRock Comment Letter; PIMCO Comment Letter.

[46]     *See, e.g.*, BlackRock Comment Letter; PIMCO Comment Letter; ICI Comment Letter I; Invesco Comment Letter.

the Proposing Release, such as those requiring Regulation S-X compliant presentations of portfolio schedules for additional months, would introduce complexity and necessitate more time to produce.[47]

Some commenters opposed the proposed requirement that funds file Form N-PORT reports on a monthly basis within 30 days of the end of the reporting period because of concerns about data security.[48] In particular, these commenters expressed concerns about the possibility of confidential and proprietary nonpublic information reported on Form N-PORT being misappropriated as a result of unauthorized access to such information.[49] Some commenters expressed concerns about the Commission's ability to protect and maintain Form N-PORT data based on a 2022 SEC Office of Inspector General report, which indicated that the Commission must make certain enhancements to be deemed "effective" under the Federal Information Security Modernization Act reporting metrics for agency information security programs.[50] Most commenters expressing concern about data security stated that a somewhat longer filing deadline (*i.e.*, 45 or 60 days after month end) would reduce the risks associated with a data breach.[51] Some commenters stated that a longer filing deadline would reduce risks associated with a

---

[47]    *See, e.g.*, T. Rowe Comment Letter; Singer Comment Letter; ICI Comment Letter I. These commenters also raised similar concerns with respect to proposed reporting requirements that we are not adopting (including information about the application of swing pricing), as we are not adopting amendments to the relevant underlying rules at this time. *See supra* paragraph following note 21.

[48]    *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I; Invesco Comment Letter; Principal Comment Letter.

[49]    *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I; Invesco Comment Letter.

[50]    *See* ICI Comment Letter I; Invesco Comment Letter.

[51]    *See, e.g.*, Dodge & Cox Comment Letter I (suggesting 60 days); ICI Comment Letter I (suggesting 45 days); Invesco Comment Letter (suggesting 45 days).

breach because the Commission would retain a fund's nonpublic portfolio-related information for less time, which would decrease the likelihood of misappropriation in the event of a breach.[52]

A few commenters suggested that the proposed amendments would pose particular burdens for certain types of funds. For instance, a few commenters expressed concern about additional burdens for registered closed-end funds.[53] One of these commenters requested that we revise the proposed reporting period for closed-end funds because certain closed-end funds may not calculate a net asset value ("NAV") on a monthly basis or, due to the assets they hold, may calculate their NAV on a significant delay, and therefore the proposal may cause certain closed-end funds to change their valuation processes because of the proposed requirement to report the fund's NAV in each monthly report.[54] Another commenter indicated that the shorter filing timeline would especially burden funds with complex investment strategies, such as alternative funds.[55]

After considering comments, we are adopting, as proposed, amendments to rule 30b1-9 and Form N-PORT requiring funds to file reports on Form N-PORT on a monthly basis within 30 days after the end of the month to which they relate. Monthly reporting rather than quarterly reporting will provide more frequent and timely information to the Commission. More frequent and timely reporting of portfolio holdings information to the Commission will enable us to further our mission to protect investors by assisting the Commission and its staff in carrying out its regulatory responsibilities related to the asset management industry. These responsibilities

---

[52] *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I; Invesco Comment Letter.

[53] *See, e.g.*, Comment Letter of Neuberger Berman Group LLC (Feb. 14, 2023) ("Neuberger Berman Comment Letter"); PGIM Comment Letter.

[54] *See* Neuberger Berman Comment Letter.

[55] *See* Fidelity Comment Letter.

include examination, enforcement, and monitoring of funds; formulation of policy; and the staff's review of fund registration statements and disclosures.[56]

As an example, and as discussed above and in the Proposing Release, recent market stress events, such as the beginning of the COVID-19 pandemic and Russia's invasion of Ukraine, have further reinforced the Commission's need for timely data regarding funds' portfolios and the liquidity of those portfolios. The current months-long delay between the end of the month to which the information relates and when the Commission receives Form N-PORT data has limited the Commission staff's ability to develop a more complete understanding of the market on a timely basis, which is particularly important during major market events. During these events, staff assess and identify how the events are affecting funds and, as needed, develop appropriate regulatory responses. For example, and as discussed above, having more frequent and timely data during market stress events would enhance the ability of Commission staff systematically to determine if impacts on funds are isolated or widespread. This in turn could inform whether regulatory relief or other emergency actions, like emergency relief to allow funds to suspend redemptions, may be necessary and on what scale (*e.g.*, whether relief should be given to all or a large portion of funds or, instead, staff should conduct targeted outreach to only a handful of potentially affected funds). Further, stale data also can impede our ability to contribute fully to interagency collaboration often necessary to fashion appropriate responses to market events. During a major market event, more timely data would better inform whether

---

[56]     *See* Reporting Modernization Adopting Release, *supra* note 5, at section IV.A. We note that receiving more timely data will allow the staff to include more timely data in the staff's Registered Fund Statistics public report, which provides to the public aggregated summary statistics derived from Form N-PORT data. Having more timely data in these public reports will provide investors and other data users with aggregate data that is more reflective of then-current fund portfolio information.

coordinated interagency government actions may be necessary, and if so, the scale and parameters of those actions.

Other available means for acquiring timely data have not been an effective substitute for moving from a quarterly filing requirement to a monthly filing requirement. While, as some commenters pointed out, funds currently are required to produce monthly data upon request by the Commission staff, any such production would be done on an individual basis.[57] Making individual requests requires Commission staff to determine the appropriate funds from which to collect data, which can be particularly challenging when Commission staff is responding to market events and may not have the market data necessary to determine quickly which funds to prioritize in responding to the event. Moreover, effectively assessing the impact of a market event generally requires comprehensive data across funds, for example to assess the extent funds or areas of the market may be affected and to evaluate those impacts in the context of the market as a whole. This analysis is facilitated by timely reports on Form N-PORT and often cannot be efficiently assembled in a timely manner from individual requests to funds even if the Commission were able to determine the funds or types of funds most likely to be affected. As a result, we are not retaining the quarterly filing cadence as some commenters suggested.

The requirement we are adopting for funds to file Form N-PORT reports within 30 days of month end is consistent with the Commission's historical determination that access to Form N-PORT information no later than 30-days following month end is important to further our mission to protect investors. When the Commission adopted Form N-PORT, it considered some commenters' requests for a monthly reporting deadline of 45 or 60 days after month end. The Commission declined to provide additional time, stating that it would reduce the utility of

---

[57]     *See, e.g.*, ICI Comment Letter (citing rule 30b1-9).

21

portfolio information to the Commission and would make monthly reporting impractical, as reports would overlap with preparation time.[58] When the Commission adopted the interim final rule to move to a quarterly filing requirement, it required funds to maintain the Form N-PORT data in their records 30 days after the end of each month to ensure that the Commission can receive more timely information, when necessary.[59] The Commission stated that the ability to collect information in a timely fashion through examination authority, and evaluate such information for compliance with the Federal securities laws, is essential to its mission of protecting investors and securities markets.[60]

Our experience with recent market events supports and highlights our original position that more immediate access to Form N-PORT information is important to our mission, and at the same time highlights weaknesses in an approach that relies on receiving more timely Form N-PORT information through staff requests for records of individual funds. As a general matter, any delays in receipt of information can affect the Commission's and the staff's ability to use Form N-PORT information to carry out the Commission's regulatory function for the asset management industry.[61] We are providing funds with 30 days to file information after the end of a given month to balance our need for timely information with considerations about the time and costs for funds to gather and file information accurately, as well as the sensitivity of the filed information.

---

[58]     *See* Reporting Modernization Adopting Release, *supra* note 5, at paragraph accompanying n.461.

[59]     *See* 2019 Form N-PORT Timing Amendments, *supra* note 8, at paragraph following n.34.

[60]     *See id.* at paragraph accompanying n.43.

[61]     These functions include examination, enforcement, and monitoring of funds; formulation of policy; and the staff's review of fund registration statements and disclosures.

The requirement to file Form N-PORT reports within 30 days of month end builds on the existing regulatory framework, as funds are already required to adhere to the 30-day deadline for recordkeeping purposes.[62] Thus, funds currently are required to gather and record the data within 30 days of month end, and fund records must be accurate. The costs involved with the final amendments, therefore, are limited to those associated with a more compressed time period to both gather the data and undertake additional processes associated with filing the data, such as data validation and tagging. As discussed below, the costs a fund will incur will turn on a variety of factors, including the extent to which the fund uses manual or automated processes in connection with its Form N-PORT reports, the complexity of the fund's strategy, the extent to which the fund uses a service provider to help prepare or file the reports, and how the fund currently maintains its records of information for the reports.

Overall, we recognize that filing the recorded information within the 30-day deadline will likely increase burdens for funds (including fund internal systems and processes) and service providers relative to the current quarterly filing requirement or a monthly filing requirement with a longer filing delay (*e.g.*, 45 or 60 days). For instance, even though currently the information must be accurately gathered and recorded within 30 days, with a 30-day filing deadline, we recognize that funds must engage in additional processes associated with filing this information, and for funds that retain a service provider to file reports on behalf of the fund or otherwise help prepare Form N-PORT reports, there will be less time for coordination between the fund and service provider. Funds and their service providers also may need to collect the required information more quickly than they currently do to provide additional time to prepare the information for filing or for coordination among funds and service providers prior to filing. To

---

[62]     *Id.*

the extent that funds and their service providers need to collect the required information more quickly for these purposes, this will present more challenges for funds and service providers that currently use manual processes to obtain some information, as opposed to funds and service providers that are able to pull data in a completely automated manner from internal systems. Similarly, it likely will present more challenges for funds with more complex strategies and their service providers in comparison to those with less complex strategies. In addition, we understand that increased costs may be passed on to fund shareholders.

We understand that the need to file Form N-PORT reports on a monthly basis, rather than a quarterly basis, will increase the workload of personnel or service providers that focus specifically on filing-related processes. We also recognize that the fund's adviser may be working to meet other regulatory reporting obligations during the same period it is working to prepare monthly Form N-PORT reports, as commenters suggested. This effect may be more pronounced at certain times of the year, such as around the time a fund's annual proxy voting report is due or, as some commenters suggested, annual and semiannual shareholder reports are due.[63] As a result, the fund's adviser may need to make changes to timely meet all reporting obligations, such as increasing the use of service providers for reporting purposes or improving efficiency in the reporting process by, for example, updating internal systems and/or reducing the use of manual processes.

Some funds may also incur increased costs to transition from quarterly filing to monthly filing as a result of the requirement to file Form N-PORT reports in an eXtensible Markup

---

[63] *See supra* note 43. We considered providing additional time to file Form N-PORT reports for any period for which annual or semiannual reports on Form N-CSR are due, as one commenter suggested. *See* PIMCO Comment Letter. However, because funds file Form N-CSR reports at different points in the year, such an approach generally would result in the Commission not having as timely access to all funds' portfolio information for any month of the year.

Language ("XML") based structured data language. For purposes of Form N-PORT, funds do not manually enter fund data through, for example, a pre-formatted web form, and must submit the information in an XML-based structured data language. While funds are not required to store their records in an XML structured data language, the Commission has stated that doing so would facilitate the filing of Form N-PORT reports.[64]

In considering the burdens and costs associated with the final amendments, we believe that commenters have overstated the extent to which Form N-PORT reporting burdens have increased since the Commission initially adopted the requirement in 2016 to file reports on Form N-PORT within 30 days of month end. A few commenters mentioned reporting changes related to liquidity risk management.[65] The Commission adopted the bulk of the liquidity-related reporting requirements on the same day it adopted Form N-PORT in 2016.[66] Since the Commission adopted Form N-PORT, liquidity-related amendments to the form have not had significant effects on the form's reporting burdens.[67] Some commenters suggested that derivatives-related changes to the reporting requirements have added complexity to the form. However, the derivatives-related reporting the Commission added in 2020 generally requires

---

[64]     *See* 2019 Form N-PORT Timing Amendments, *supra* note 8, at text following n.34.

[65]     *See, e.g.*, BlackRock Comment Letter; PIMCO Comment Letter.

[66]     *See* Investment Company Liquidity Risk Management Programs, Investment Company Act Release No. 32315 (Oct. 13, 2016) [81 FR 82142 (Nov. 18, 2016)] ("Liquidity Rule Adopting Release"), at n.120.

[67]     *See* Investment Company Liquidity Disclosure, Investment Company Act Release No. 33142 (June 28, 2018) [83 FR 31859 (July 10, 2018)] (removing from Form N-PORT the requirement to report aggregate liquidity classification information, adding a requirement to report holdings of cash and cash equivalents, and allowing funds to report multiple liquidity classification categories for a single position under specified circumstances). As the Commission discussed in its economic analysis, funds would no longer incur costs associated with reporting an aggregate liquidity profile, and the costs of reporting holdings of cash and cash equivalents was not expected to be significant because funds already needed to keep track of their cash and cash equivalents for valuation purposes. *Id.*, at paragraph accompanying n.146. The amendment to allow funds to report multiple liquidity classifications for a single investment is optional and, as the Commission previously recognized, a fund could choose not to use this option if it had negative consequences. *Id.*, at paragraph accompanying n.168.

funds to report information they are already required to have for purposes of complying with 17 CFR 270.18f-4 (rule 18f-4).[68]

Some commenters expressed concern about potential reporting burdens associated with other amendments to Form N-PORT that had been proposed but not yet adopted at the time of the comments. These commenters primarily discussed potential reporting burdens associated with a Commission proposal related to the names rule, 17 CFR 270.35d-1 (rule 35d-1).[69] The Commission has subsequently adopted amendments to Form N-PORT associated with the names rule, with modifications to the proposed requirements (*e.g.*, requiring less frequent and a reduced amount of names-related information compared to the proposal) that should reduce costs compared to that proposal.[70]

Similarly, while some commenters expressed concerns that proposed Form N-PORT changes in the Proposing Release would make compliance with the 30-day deadline overly burdensome, we are not adopting many of the proposed changes to Form N-PORT cited by the commenters.[71] In particular, in a change from the proposal, we are not requiring funds to file Regulation S-X compliant portfolio disclosure 10 times per year instead of two times per year.[72]

---

[68]     *See* Use of Derivatives by Registered Investment Companies and Business Development Companies, Investment Company Act Release No. 34084 (Nov. 2, 2020) [85 FR 83162 (Dec. 21, 2020)], at section II.G.1 (requiring funds that are limited derivatives users under rule 18f-4 to report information about their derivatives exposures and requiring funds that are subject to the limit on fund leverage risk in the rule to provide VaR information). *See* Items B.9 and B.10 of Form N-PORT.

[69]     *See, e.g.*, BlackRock Comment Letter; PIMCO Comment Letter; ICI Comment Letter I; Invesco Comment Letter. One commenter also suggested that a Commission proposal that would require enhanced disclosure about environmental, social, and governance investment practices would increase the complexity of Form N-PORT. *See* PIMCO Comment Letter. However, that proposal did not include amendments to Form N-PORT, and the Commission has not adopted that proposal at this time. *See* Enhanced Disclosure by Certain Investment Advisers and Investment Companies About Environmental, Social, and Governance Investment Practices, Investment Company Act Release No. 34594 (May 25, 2022) [87 FR 36654 (June 17, 2022)].

[70]     *See* Investment Company Names, Investment Company Act Release No. 35000 (Sept. 20, 2023) [88 FR 70436 (Oct. 11, 2023)] ("Names Rule Adopting Release"), at sentence accompanying n.391.

[71]     *See, e.g.*, T. Rowe Comment Letter; Singer Comment Letter; ICI Comment Letter I.

[72]     *See* Proposing Release, *supra* note 11, at section II.E.1.d.

26

In addition, in another change from the proposal, funds will not be required to report swing pricing-related information on Form N-PORT because we are not adopting the proposed requirements related to swing pricing.[73]

We also recognize that requiring funds to file monthly Form N-PORT reports within 30 days of month end may increase the risk of reporting errors relative to the current quarterly filing requirement or a monthly reporting requirement with a longer filing delay (*e.g.*, 45 or 60 days), as funds will be required to both gather the data and prepare it for filing within 30 days whereas today they must gather and record accurate data for recordkeeping purposes on this timeline. To reduce the risk of errors in the filing process, and to mitigate costs more generally, we are providing an extended implementation period during which funds will be able to update their Form N-PORT reporting processes to prepare for the requirement to file monthly information within 30 days of month end. In particular, funds may seek to enhance the efficiency of fund filing processes and potentially reduce the risk of filing-related errors, such as ways to reduce any manual steps or ways to streamline interactions with any service providers. To the extent that funds are able to improve their processes in a cost-effective manner to gather data, such as by reducing manual processes, this will provide additional time to prepare the data for filing within the 30-day period and reduce the likelihood of reporting errors. To the extent a fund identifies an error in its report after the filing deadline, it can file an amendment to correct the error, as currently permitted.[74]

Overall, the Commission's historical view has been that there is not a significant burden differential between maintaining required information in a fund's records and filing that

---

[73] *See id*.

[74] *See* General Instruction A of Form N-PORT.

information on Form N-PORT.[75] We acknowledge that the amendments will likely introduce some burdens, as discussed above, but these burdens are unlikely to be significant given that funds are already required to maintain records of the information Form N-PORT requires within the same 30-day deadline in which the amendments will require funds to file Form N-PORT reports.

Further, we do not believe that extending the filing deadline to 45 or 60 days after month end, or retaining the current quarterly filing cadence, is warranted to address data security, including misappropriation, concerns. As the Commission has previously stated, it employs an array of actions to safeguard and protect the confidentiality and security of all information reported to EDGAR, which includes data reported on Form N-PORT.[76] In addition, the Commission has engaged in a multi-year, multi-phase effort to modernize the EDGAR system, including both internal and public-facing components.[77] The Commission also has gained additional experience in receiving and maintaining sensitive portfolio data on the EDGAR system. This experience includes, for example, the existing nonpublic portions of Form N-

---

[75]    *See* 2019 Form N-PORT Timing Amendments, *supra* note 8, at n.67 and accompanying text (stating that increasing the Form N-PORT filing delay and requiring funds to maintain in their records the information that is required to be included on Form N-PORT no later than 30 days after the end of each month likely would not meaningfully change the costs for submitting the form and keeping records, but adding that to the extent it is more efficient for fund groups to submit all three monthly filings in one batch at quarter-end, costs may be marginally reduced by the shift from a monthly to a quarterly filing requirement). *See also* Investment Company Reporting Modernization, Investment Company Act Release No. 32936 (Dec. 8, 2017) [82 FR 58731 (Dec. 14, 2017)], at paragraph accompanying n.56 (stating that the cost savings for large fund groups associated with a delay in submitting Form N-PORT and a delay in preparing funds' systems to accommodate the XML Form N-PORT format requirement would be minimal because during the delay the large fund groups were still required to compile the information that is required to be included in Form N-PORT).

[76]    *See* Annual Report on SEC Website Modernization Pursuant to Section 3(d) of the 21st Century Integrated Digital Experience Act (Dec. 2022), available at https://www.sec.gov/files/21st-century-idea-act-report-2022-12.pdf.

[77]    *Id.*

PORT, which are subject to controls and systems designed to protect their confidentiality, as well as confidential treatment requests for reports on Form 13F.[78]

We also recognize that the Commission, like all Federal agencies, faces persistent and increasingly sophisticated malicious cyber-attacks that threaten the agency's technology systems and infrastructure. If successful, a cyber-attack could expose registrants' and other market participants' data. In this regard, the Commission is continuously working to improve its efforts to identify, deter, protect against, detect, and respond to these threats and actors. In addition, the Commission reports on required information technology security metrics and cybersecurity incidents to the appropriate oversight entities, including the SEC Office of Inspector General, the Office of Management and Budget ("OMB"), and the Cybersecurity and Infrastructure Security Agency ("CISA").[79]

Considering that the information funds are required to report has not significantly changed since 2016 when the Commission adopted a requirement to report monthly information within 30 days of month end and funds are currently required to accurately maintain in their records the same monthly information required by Form N-PORT within 30 days of each month end, the costs of filing monthly Form N-PORT information within 30 days of month end will be justified by the benefits of timelier information for the staff's oversight purposes, particularly in connection with market events.

---

[78] *See, e.g.*, Electronic Submission of Applications for Orders under the Advisers Act and the Investment Company Act, Confidential Treatment Requests for Filings on Form 13F, and Form ADV-NR; Amendments to Form 13F, Investment Company Act Release No. 34635 (June 23, 2022) [87 FR 38943 (June 30, 2022)], at section II.C.

[79] *See* 44 U.S.C. 3554(b)(7), 3555. *See also* OMB M-24-04, Fiscal Year 2024 Guidance on Federal Information Security and Privacy Management Requirements (Dec. 4, 2023).

The requirement to file Form N-PORT reports within 30 days of month end will apply to all funds required to report on the form, and we are not providing a different reporting timeline for certain types of funds, such as closed-end funds. Based on staff experience, it is our understanding that most closed-end funds strike their NAVs on at least a monthly basis.[80] We understand that some closed-end funds may not calculate NAVs on a monthly basis due to the assets they hold, or they may calculate their NAVs with a significant delay. These funds can strike their NAVs for Form N-PORT reporting purposes by using the internal methodologies consistent with how they currently report internally and to current and prospective investors.[81] These funds currently are required to maintain a NAV in their monthly records and report the monthly records on Form N-PORT within 60 days of quarter end. Thus, the amendments are not changing the information these funds must collect and instead are changing the deadline by which required information must be filed with the Commission.

We recognize that a few commenters recommended a shorter filing deadline than we are adopting, with one commenter stating that requiring funds to report on Form N-PORT 30 days after month end will not provide the Commission with data that is timely in light of the speed with which markets change. While receiving information within a shorter period of time would enhance the staff's ability to use Form N-PORT information, particularly during periods of market stress, we are adopting a 30-day filing requirement because information with that degree of delay is still useful to meet the Commission's and the staff's needs, and requiring reporting

---

[80]    *See* Reporting Modernization Adopting Release, *supra* note 5, at n.460 and accompanying text (stating that, "[b]ased upon staff experience, it is [the Commission's] understanding that most closed-end funds strike their NAV on at-least a monthly basis," but that funds that do not do so may report information on Form N-PORT by using their internal methodologies consistent with how they report internally and to current and prospective investors under General Instruction G of Form N-PORT).

[81]    *See* General Instruction G of Form N-PORT; Reporting Modernization Adopting Release, *supra* note 5, at n.460 and accompanying text.

within a shorter window would involve more substantial costs and increase the risk of errors in the reported information. In contrast, the 30-day filing deadline we are adopting aligns with the current timeline for funds to maintain records of Form N-PORT information, which mitigates the costs and risks of errors, in comparison to a shorter deadline, because funds already gather and record the required information within 30 days. Requiring funds to file more quickly than 30 days also could present greater data security risks because the confidential portfolio data maintained on EDGAR would be more sensitive. As a result of these considerations, we are adopting a 30-day filing timeline to balance the benefits and costs of timelier availability of information.

We recognize that there are tradeoffs regarding the timeframe in which funds must file portfolio-related information on Form N-PORT. The more frequently and more quickly this information is filed, the more likely it is to reflect reasonably current portfolio information, which enhances the Commission staff's ability to oversee and monitor funds' activities. More frequent and more timely data allows Commission staff to conduct more targeted and prompt monitoring, such as identifying funds that hold securities of issuers that may be under stress or affected by wider stress events. It also would allow Commission staff to analyze risks and trends more accurately, including allowing Commission staff to better understand risks and trends as they develop and change. Finally, more frequent and more timely data would allow Commission staff to better assess potential impacts of market events affecting particular issuers, asset classes, counterparties, or market participants, including to analyze the potential impact of a market event and inform whether emergency action by the Commission or coordinated interagency action may be appropriate as discussed above. In turn, effective regulatory oversight ultimately benefits investors.

At the same time, filing information more frequently and quickly increases the costs and the potential for errors in the filed information and, for funds that do not publicly disclose their portfolio holdings within 30 days of month end, increases the sensitivity of the filed information and the associated risks of misappropriation. Conversely, less frequent and longer filing periods reduce the utility of the information for staff oversight and monitoring activities and decrease the benefits of these activities for investors, while also reducing costs, errors, and data sensitivity. After considering these tradeoffs, we have determined that, on the whole, reporting monthly information within 30 days of month end—including alignment with current recordkeeping requirements—appropriately balances these competing concerns.

2.   Publication Frequency

We are adopting, as proposed, amendments making funds' monthly reports on Form N-PORT public 60 days after the end of the month.[82] Currently, only the report for the third month of every quarter is made public upon filing, due 60 days after the end of that month. This means the amount of data made available to investors on Form N-PORT in a given year will triple as a result of the amendments. Thus, these amendments will enhance the ability of investors to review and monitor information about their funds' portfolios. Certain information reported on Form N-PORT is currently nonpublic, even in the report for the third month of the quarter that is otherwise publicly available.[83] This aspect of the form remains unchanged by the amendments,

---

[82]   *See* General Instruction F of amended Form N-PORT.

[83]   The Commission does not intend to make public the information reported on Form N-PORT with respect to a fund's highly liquid investment minimum (Item B.7), derivatives transactions (Item B.8), derivatives exposure for limited derivatives users (Item B.9), median daily VaR (Item B.10.a), median VaR Ratio (Item B.10.b.iii), VaR backtesting results (Item B.10.c), country of risk and economic exposure (Item C.5.b), delta (Items C.9.f.v, C.11.c.vii, or C.11.g.iv), liquidity classification for individual portfolio investments (Item C.7), or miscellaneous securities (Part D), or explanatory notes related to any of those topics (Part E) that is identifiable to any particular fund or adviser. *See* General Instruction F of amended Form N-PORT.

and that information—which includes liquidity classifications for individual portfolio investments—will remain nonpublic in individual reports. However, Commission staff may publish aggregate or other anonymized information about the nonpublic elements of reports on Form N-PORT.[84]

Comments on the proposal to increase publication frequency were mixed. Several commenters expressed general support for the proposal because it would increase transparency.[85] For example, one commenter expressed that the burden on fund administrative staff in implementing increased Form N-PORT reporting requirements does not justify the corresponding lack of transparency based on the commenter's beliefs about the sophistication of funds' systems.[86] Some commenters that supported the publication of each month's Form N-PORT preferred a publication delay shorter than 60 days. These commenters generally stated that the information would be stale and less useful to investors if delayed by 60 days.[87] For example, one of these commenters pointed to the extent to which markets can move over a 30-day period in suggesting more rapid public disclosure, while another urged that concerns about copycatting should not impede more rapid public disclosure.[88]

---

[84] *See* General Instruction F of Form N-PORT.

[85] *See, e.g.*, Comment Letter of Brad (Nov. 16, 2022) ("Brad Comment Letter"); Comment Letter of Mathieu Charbonneau (Nov. 10, 2022) ("Charbonneau Comment Letter"); Dane Comment Letter; Myers Comment Letter; Comment Letter of Derek Saucie Raulz (Nov. 16, 2022) ("Raulz Comment Letter"); Comment Letter of Yonatan Gershon (Nov. 20, 2022) ("Gershon Comment Letter").

[86] *See* Dane Comment Letter.

[87] *See, e.g.*, Hof zum Ahaus Comment Letter (suggesting a one-week delay between the end of the month and filing that month's Form N-PORT report and instant publication after filing); Comment Letter of Gregory Brandano (Nov. 11, 2022) ("Brandano Comment Letter") (suggesting a five-day delay); Gershon Comment Letter; Myers Comment Letter (suggesting a lag time before a report is available to the public of either 15 days or a week).

[88] Hof zum Ahaus Comment Letter; Myers Comment Letter.

Some commenters opposed the proposed amendments.[89] These commenters generally favored maintaining the existing Form N-PORT publication schedule of every third month, with a 60-day delay.[90] Some commenters expressed that more frequent public disclosure would not benefit fund shareholders.[91] For example, one commenter suggested that shareholders of its open-end funds would not benefit from monthly publication of Form N-PORT data since the funds currently disclose their portfolio holdings on a public website every month. This commenter stated that publication of portfolio information on a fund website is better tailored to providing investors with timely information.[92] Another commenter expressed that monthly reports on a 60-day lag only offer incrementally more useful information compared to quarterly reports.[93] Another commenter suggested that public disclosure of monthly Form N-PORT reports was inconsistent with the Commission's recent determination to exclude the list of a fund's portfolio holdings from tailored shareholder reports.[94]

Some commenters stated that publicizing each month's Form N-PORT information, rather than every third month's information, could increase the risk of predatory trading by other market participants and ultimately harm funds and their shareholders.[95] Some commenters expressed that publicizing portfolio holdings on a monthly basis could result in other market participants being able to use automated tools to reverse-engineer portfolio decisions to engage

---

[89]    *See, e.g.*, Dodge & Cox Comment Letter I; Comment Letter of Intercontinental Exchange, Inc. (Feb. 14, 2023) ("ICE Comment Letter"); PGIM Comment Letter; Principal Comment Letter.

[90]    *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I; PGIM Comment Letter.

[91]    *See, e.g.*, ICE Comment Letter; Principal Comment Letter; ICI Comment Letter I.

[92]    *See* Principal Comment Letter.

[93]    *See* ICE Comment Letter.

[94]    *See* ICI Comment Letter I.

[95]    *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I; JP Morgan Comment Letter; PGIM Comment Letter; Principal Comment Letter.

34

in predatory behavior such as front-running or free-riding.[96] One of these commenters indicated that, since the adoption of Form N-PORT, artificial intelligence use has increased, which this commenter believed could increase the risk that more frequent publication of Form N-PORT reports would lead to predatory trading.[97] Some commenters expressed that the decision by certain funds to not disclose portfolio holdings information publicly indicated that each of these funds has determined that disclosing such information is not appropriate for the fund.[98] For example, one of these commenters asserted that it does not voluntarily disclose more portfolio holdings information than required to protect the fund's intellectual property for the benefit of investors.[99] The commenter also expressed that actively managed value funds tend to build and liquidate positions over time, so these funds may be particularly vulnerable to predatory trading as a result of more frequent disclosure of portfolio holdings.[100] In addition, the commenter stated that while it tries to time its purchases of new investments to avoid being active in the market at the time it is required to disclose its portfolio, moving to a monthly disclosure schedule would make this more difficult.[101] The commenter asserted that this likely would increase trading costs borne by shareholders by exposing investment decisions before they are fully implemented or resulting in condensed buying activity that affects the fund's ability to maintain an optimal degree of price discipline.[102]

---

[96]     *See* JP Morgan Comment Letter. *See also* ICI Comment Letter I.

[97]     *See* ICI Comment Letter I.

[98]     *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I.

[99]     Dodge & Cox Comment Letter I.

[100]    *See* Dodge & Cox Comment Letter I; Comment Letter of Dodge & Cox (July 12, 2023) ("Dodge & Cox Comment Letter II").

[101]    Dodge & Cox Comment Letter II.

[102]    *Id.*

After considering the comments, we have determined that publication of information collected on Form N-PORT with a 60-day delay appropriately balances the benefits to investors of receiving additional data on portfolio holdings while mitigating the concerns raised by commenters about predatory trading. The benefits to fund investors and other users of Form N-PORT reports include assisting investors in making more informed investment decisions.[103] For instance, institutional investors or data analysts assisting retail investors could directly use the monthly information to evaluate portfolios and assess the potential for returns and risks of a particular fund. As another example, data aggregators, broker-dealers, investment advisers, and others that provide investment information to fund investors will have more data and in some cases more recent data to use in generating analyses for investors that in turn can help investors to monitor better the extent to which their investment portfolios overlap and to assess how a fund is complying with its stated investment objective, including deviations from that objective (*i.e.*, style drift). In addition, more standardized portfolio disclosures may allow data aggregators and financial professionals to provide information and advice that makes investors better informed about managerial skill by reducing the imbalance of information between fund investors and managers.[104]

Although some comments stated that the monthly information would not benefit fund shareholders, having monthly Form N-PORT data available in a standardized format in a single, centralized database will enable investors and other users to analyze the reported data more efficiently than they might otherwise be able to if the data were reported across various platforms

---

[103]    *See* Proposing Release, *supra* note 11, at section II.E.1.b.

[104]    *See infra* note 234 and accompanying text (discussing related academic research). Further, more frequent reporting of portfolio holding information may improve investors' ability to select between fund managers, allowing them to make better investment allocation decisions. *See infra* note 235 to 236 and accompanying text for discussion of academic research on this topic.

and in a non-standardized format. In addition, as discussed in the Proposing Release, many funds voluntarily disclose their monthly portfolio holdings on their websites or through third party data aggregators, making additional portfolio information available to assist investors with their investment decisions, whether by accessing the information directly or benefitting from third-party analysis of the information.[105] Further, most ETFs currently provide full portfolio holdings on their websites every business day as required by 17 CFR 270.6c-11 (rule 6c-11).[106] We recognize that more frequent publication of fund data could also lead to adverse effects on funds by, for example, increasing the likelihood of predatory trading for some funds.[107] However, these adverse effects, which are mitigated by certain aspects of the final amendments, are justified by the benefits discussed throughout this release.

Despite commenters' concerns, the 60-day delay before the publication of Form N-PORT reports will help deter predatory trading. With the 60-day delay, even if an actively managed fund began to build a position on the last day of the month, that position would not be publicly disclosed on Form N-PORT until approximately two months later. The fund would have that additional two months to continue to build (or shrink) its position without public knowledge of the fund's position. This time period would expand to nearly three months if the fund acquired the position in the beginning of a given month. The same is also true in situations where a fund is exiting a position it previously disclosed.

---

[105]     *See* Proposing Release, *supra* note 11, at paragraph accompanying n.289.

[106]     17 CFR 270.6c-11(c)(1)(i). A small number of "nontransparent" ETFs have received exemptive orders from the Commission permitting them not to disclose their portfolio holdings on a daily basis. As of Dec. 2023, there were an estimated 49 nontransparent ETFs. Several of these nontransparent ETFs voluntarily disclose their complete portfolios on a monthly basis with a one-month lag.

[107]     *See infra* section IV.C.2.

In addition, the form's existing treatment of miscellaneous securities will help deter predatory trading. When a fund is building a new position in an instrument, the fund may treat that instrument as a miscellaneous security for up to one year if the position does not exceed 5% of the fund and has not been previously disclosed to the public, meaning that information about the fund's position in that instrument remains nonpublic for that period.[108] The ability to report certain newly acquired positions as miscellaneous securities is designed to guard against the premature release of information about these positions and thus deter front running or other predatory trading practices.

In addition, as discussed in the Proposing Release, many funds have decided to voluntarily provide portfolio holdings on their websites on a monthly basis, often delayed 30 days.[109] In addition, many funds now provide monthly information about their portfolio holdings to third party data aggregators that users may access for a fee, generally with a lag of 30 to 90 days.[110] The increase in funds publicly disclosing monthly portfolio holdings has decreased the impact that a requirement for quarterly Form N-PORT holdings information has on the mix of information available to the public, and a monthly, rather than a quarterly, Form N-PORT disclosure regime is now consistent with many funds' existing practice of disclosing portfolio holdings on a monthly basis. Further, these existing disclosure practices—by both passive funds and active funds—suggest that many funds have concluded that the risks of predatory trading,

---

[108]   Specifically, Form N-PORT permits funds to report as "miscellaneous securities" an aggregate amount of portfolio investments that does not exceed 5% of the total value of the fund's portfolio investments, provided that the securities included in this category are not restricted, have been held for not more than one year prior to the end of the reporting period of the related report, and have not previously been reported by name to the shareholders, or set forth in any registration statement, application, or report to shareholders or otherwise made available to the public. *See* Parts C and D of Form N-PORT.

[109]   *See, e.g.*, *infra* note 230 (discussing a paper estimating that, at year-end 2019, approximately 56% of U.S. equity mutual funds' portfolio disclosures were voluntary monthly disclosures).

[110]   *Id.*

including those risks resulting from the increased use of advanced technology since Form N-PORT was adopted, are justified by the benefits to investors of more information. The amendments will place monthly portfolio holdings data in a single location in a standardized format and timeline that all investors can access without charge so that they may analyze the reported data.

We acknowledge that some funds do not publish monthly portfolio holdings information. We also understand that publishing monthly Form N-PORT portfolio holdings information may result in a higher risk of predatory trading for certain kinds of funds as compared to other funds; for example, funds that are more likely to build or liquidate their positions over a longer time horizon. As discussed above, however, the approach under the final amendments increases the frequency of fund reporting while seeking to minimize the risks of exposing funds to predatory trading by delaying public reporting by 60 days and allowing funds to designate certain investments as miscellaneous securities that will not be disclosed publicly.

In addition, the Investment Company Act requires that all information filed with the Commission pursuant to the Act or any rule or regulation thereunder be made available to the public, unless the Commission makes a required finding.[111] Specifically, the Commission must find that public disclosure is neither necessary nor appropriate in the public interest or for the protection of investors. We are not making this finding with respect to disclosing funds' monthly portfolio holding information in Form N-PORT reports publicly. As discussed above, monthly portfolio holding information will benefit investors by allowing them to make more informed investment decisions. In addition, there is evidence of investor demand for this information in that many funds voluntarily provide their monthly portfolio holdings either free of charge to the

---

[111]    *See* section 45(a) of the Investment Company Act.

public or to investors willing to pay a premium to third-party platforms to access such information.

The final amendments will not, however, affect the treatment of certain information that funds report on Form N-PORT but that is not made available to the public in any reports.[112] In addition, information filed with the Commission on Form N-PORT will remain nonpublic until 60 days after the end of the month to which the information relates. This delay is necessary or appropriate in the public interest and for the protection of investors to mitigate the risk of predatory trading and associated costs for fund shareholders. For this reason, we are not revising the proposed approach to make Form N-PORT information available to the public within a shorter time horizon, as some commenters suggested.[113]

We disagree with the commenter that suggested that public reporting of monthly portfolio holdings on Form N-PORT is inconsistent with the Commission's determination to remove the schedule of investments from shareholder reports, as these disclosures serve different purposes.[114] Shareholder report requirements are designed to result in concise and visually engaging reports to shareholders that highlight key information that is particularly important for retail investors to assess and monitor their fund investments.[115] To this end, the Commission adopted a layered approach, with annual and semiannual shareholder reports providing a graphical representation of holdings to permit all shareholders to monitor and assess their

---

[112]    *See* General Instruction F of amended Form N-PORT. For example, certain information about a fund's liquidity classifications, derivatives transactions, and miscellaneous securities will remain nonpublic.

[113]    *See supra* note 87.

[114]    *See supra* note 94.

[115]    *See* Tailored Shareholder Reports for Mutual Funds and Exchange-Traded Funds; Fee Information in Investment Company Advertisements, Investment Company Act Release No. 34731 (Oct. 26, 2022) [87 FR 72758 (Nov. 25, 2022)] ("Tailored Shareholder Reports Adopting Release"), at section I.B.

ongoing investment in the fund in a concise, easy to understand pictorial format, while preserving access to the complete schedule of investments in Form N-CSR for shareholders that find this broader information useful.[116] In retaining the availability of a fund's schedule of portfolio investments, the Commission stated that this information is designed to enable shareholders to make more informed asset allocation decisions by allowing them to monitor better the extent to which their investment portfolios overlap and to assess how a fund is complying with its stated investment objective, including any deviations.[117]

Similar to Form N-CSR, Form N-PORT information is more relevant to financial professionals and investors who desire more in-depth information to make more informed asset allocation decisions. In addition, retail investors may consume information reported on Form N-PORT indirectly through other data users, such as fund analysts or other financial professionals. Thus, the amendments may benefit various types of investors by providing monthly Form N-PORT information in a structured format and in a single, centralized database that lends itself to data analysis. Giving investors access to monthly Form N-PORT information will improve investors' ability to monitor the portfolios of their funds in a systematic fashion and assist investors in choosing the investment products that most closely align with their desired levels of risk, asset exposures, and liquidity profiles.[118] This may result from investors, and particularly institutional investors, using Form N-PORT information directly to evaluate fund portfolios and assess the potential for returns and risks of a particular fund(s), while other investors may experience these benefits indirectly through third-party analysis of the information.

---

[116]     *See id.* at section II.C.1.a.

[117]     *See id.* at text accompanying n.400.

[118]     *See* Proposing Release, *supra* note 11, at section II.E.1.b.

3.   Other Amendments to Form N-PORT

In addition to the proposed amendments requiring more timely reporting of information and enhancing public transparency of funds' portfolio information, we proposed a few additional amendments to Form N-PORT. The additional amendments included amendments to certain existing items to account for the amendments to make monthly Form N-PORT information available to the public and amendments related to certain entity identifiers. We are generally adopting these changes as proposed, except we are not adopting the proposed amendments to require funds to present portfolio holdings in accordance with Regulation S-X more frequently than currently required.

We proposed amendments requiring a fund to attach its complete portfolio holdings in accordance with Regulation S-X, within 60 days of the end of the reporting period for each month (except for the last month of a fund's second and fourth fiscal quarters). We proposed the amendments to conform with the requirement that funds file their Form N-PORT structured portfolio schedules on a monthly basis and to make the monthly disclosure more useable for investors. After considering comments, we are not adopting the proposed amendments at this time.

Several commenters opposed the proposed amendments.[119] Some commenters expressed concerns that these amendments would result in significant burdens for funds and additional costs to fund shareholders, with no commensurate benefits to shareholders.[120] For example, some

---

[119]   *See, e.g.*, Brighthouse Comment Letter; Comment Letter of Capital Research and Management Company (Feb. 14, 2023) ("Capital Group Comment Letter"); ICI Comment Letter I; Invesco Comment Letter; JP Morgan Comment Letter; Principal Comment Letter; Comment Letter of SIFMA Asset Management Group (Feb. 14, 2023) ("SIFMA AMG Comment Letter").

[120]   *See, e.g.*, Capital Group Comment Letter; ICI Comment Letter I (stating that, because a Regulation S-X compliant schedule of investments is not necessary for fund shareholders to understand a fund's portfolio holdings, requiring the schedule of investments on a monthly basis would provide little benefit to

commenters indicated that most funds use "T+1" accounting to record their day-to-day transactions and these funds would therefore need to convert their daily T+1 accounting records into a trade-date based Regulation S-X compliant presentation, which would be extremely time consuming.[121] In addition, some commenters expressed that the amendments are not necessary because portfolio holdings information is already in the public domain.[122] For example, one commenter stated that this Regulation S-X compliant portfolio holdings information overlaps substantially with the information within Part C of Form N-PORT.[123] Some commenters also stated that portfolio holdings information is already available on fund websites.[124] Some commenters also questioned the existence of investor demand for more frequent Regulation S-X compliant portfolio holdings information.[125]

Some of the commenters that opposed more frequent reporting of Regulation S-X compliant portfolio holdings suggested alternatives involving the use of Part C, which contains portfolio holdings information in a structured, XML format.[126] For example, one commenter suggested that, instead of providing additional Regulation S-X compliant reporting, the Commission might require funds to post on their websites unstructured extracts that are based on

---

investors); SIFMA AMG Comment Letter.

[121] *See, e.g.*, Capital Group Comment Letter; ICI Comment Letter I; SIFMA AMG Comment Letter.

[122] *See, e.g.*, Capital Group Comment Letter; ICI Comment Letter I; Invesco Comment Letter.

[123] *See* Invesco Comment Letter.

[124] *See, e.g.*, BlackRock Comment Letter; Invesco Comment Letter.

[125] *See, e.g.*, ICI Comment Letter I; Principal Comment Letter (stating that only a small percentage of its website visitors review the existing Regulation S-X compliant schedules of investments); T. Rowe Comment Letter (stating that its funds' shareholders have not expressed a preference for Regulation S-X compliant schedules).

[126] *See, e.g.*, ICI Comment Letter I; JP Morgan Comment Letter.

Part C information.[127] Some other commenters suggested that the Commission create a tool on the SEC website to extract Part C information and present it in an easily readable manner.[128]

Commenters raised issues that merit additional consideration before any further Commission action that might provide investors access to monthly Regulation S-X compliant portfolio schedules. We are persuaded by commenters who expressed that the benefits of the proposed requirement may not justify the costs, particularly given the costs and time currently involved with presenting the fund's portfolio investments in a manner that is compliant with Regulation S-X and the other sources of portfolio information available to investors. Thus, we are not adopting the proposed requirement that a fund attach its complete portfolio holdings in accordance with Regulation S-X, within 60 days of the end of the reporting period for each month (except for the last month of a fund's second and fourth fiscal quarters).

We are adopting, as proposed, requirements that a fund report certain return and flow information only for the month that the Form N-PORT report covers, rather than requiring that information for the preceding three months.[129] The Commission currently requires return and flow information for the preceding three months in a single report to provide investors access to monthly data for a given quarter, since investors currently have access to Form N-PORT reports only for the third month of each quarter.[130] Because our amendments to the publication frequency of Form N-PORT reporting will give investors access to monthly Form N-PORT reports, we are adopting, as proposed, amendments changing the period for which a fund must

[127]    *See* JP Morgan Comment Letter.

[128]    *See, e.g.*, BlackRock Comment Letter; ICI Comment Letter I.

[129]    *See* Item B.5 and Item B.6 of amended Form N-PORT.

[130]    *See* Reporting Modernization Adopting Release, *supra* note 5, at paragraphs accompanying nn.225, 232, and 250.

report return and flow information to align with monthly public reporting. Two commenters addressed the proposed amendments to align return and flow reporting with the publication frequency of Form N-PORT and were supportive of the proposed amendments.[131]

We are adopting, as proposed, amendments to Part D of Form N-PORT regarding miscellaneous securities to align with the amendments requiring public availability of monthly Form N-PORT reports. Form N-PORT currently contemplates that detailed information about miscellaneous securities, which would remain nonpublic, would only be included in reports filed for the last month of each fiscal quarter.[132] This is because currently all information reported on Form N-PORT for the first and second months of each quarter is nonpublic, which means there is no need for funds to designate any of their investments for those reporting periods as miscellaneous securities. The amendments to Part D remove the language that limits reporting of nonpublic information about individual miscellaneous securities holdings to reports filed for the last month of each fiscal quarter.[133]

The amendments to Part D will allow funds in their monthly Form N-PORT reports to report publicly the aggregate amount of miscellaneous securities held in Part C, while requiring funds to provide more detailed information in Part D about the individual holdings in the miscellaneous securities category to the Commission on a nonpublic basis. Although the shift from quarterly to monthly public reporting is intended to improve public transparency of funds' portfolio holdings, treating information related to miscellaneous securities as nonpublic may serve to guard against the premature release of those securities positions and thus help deter

---

[131]     *See* Comment Letter of Guidestone (Feb. 13, 2023); ICI Comment Letter I.

[132]     *See* Part D of Form N-PORT.

[133]     *See* Part D of amended Form N-PORT.

front-running and other predatory trading practices. As a result, public disclosure of individual miscellaneous securities continues to be neither necessary nor appropriate in the public interest or for the protection of investors.[134] At the same time, it is important for the Commission to receive more detailed information about miscellaneous securities holdings so the Commission has a complete record of a fund's portfolio for monitoring, analysis, and checking for compliance with Regulation S-X. The only commenter that addressed this part of the proposal stated that it did not object to these conforming amendments if the amendments increasing the publication frequency of Form N-PORT are adopted.[135]

In addition, we are adopting, as proposed, amendments to certain items and definitions related to entity identifiers in the form. Specifically, we are amending the definition of LEI in the form to remove language providing that, in the case of a financial institution that does not have an assigned LEI, a fund should instead disclose the RSSD ID assigned by the National Information Center of the Board of Governors of the Federal Reserve System, if any.[136] Instead of classifying an RSSD ID as an LEI for these purposes, the amendments will require funds to identify specifically whether they are reporting an LEI or an RSSD ID, if available.[137] The amendments will not change the circumstances in which a fund is required to report an LEI or an RSSD ID, if available. The change is designed to improve consistency and comparability of information funds report about the instruments they hold, including issuers of those instruments

---

[134]     *See* Reporting Modernization Adopting Release, *supra* note 5, at section II.A.2.h.

[135]     *See* ICI Comment Letter I.

[136]     *See* General Instruction E of amended Form N-PORT.

[137]     *See* Items B.4, C.1, C.10, and C.11 of amended Form N-PORT.

and counterparties to certain transactions. The only commenter that addressed this part of the proposal stated that it did not oppose this aspect of the proposal.[138]

### B. Amendments to Form N-CEN

We are adopting amendments to Form N-CEN as proposed, except we are not adopting the proposed amendment to remove swing pricing disclosure from Form N-CEN. Specifically, we are adopting, as proposed, amendments to Form N-CEN to require funds that are subject to the liquidity rule (rule 22e-4) to identify and provide certain information about service providers a fund uses to fulfill the requirements of that rule. We are also adopting the proposed changes related to entity identifiers. The only commenter that addressed the proposed Form N-CEN amendments that we are adopting was supportive.[139]

The adopted amendments will require a fund to: (1) name each liquidity service provider; (2) provide identifying information, including the legal entity identifier, if available, and location, for each liquidity service provider; (3) identify if the liquidity service provider is affiliated with the fund or its investment adviser; (4) identify the asset classes for which that liquidity service provider provided classifications; and (5) indicate whether the service provider was hired or terminated during the reporting period.[140] This information will allow the Commission and other participants to track certain liquidity risk management practices.[141]

Because liquidity classification services have become more widely used, the amendments require information about whether and which liquidity service providers are used, for what purpose, and for what period. Among other things, this information will help us better

---

[138]    *See* ICI Comment Letter I.

[139]    *See* Myer Comment Letter.

[140]    *See* Item C.22 of amended Form N-CEN.

[141]    *See* Liquidity Rule Adopting Release, *supra* note 66, at n.973.

understand potential trends or outliers in funds' liquidity classifications reported on Form N-PORT; for example, by analyzing classification trends of specific vendors, we may distinguish patterns in how classifications might differ due to vendor models or data. Finally, consistent with our proposed amendments to the definition of LEI in Form N-PORT, we are adopting, as proposed, changes in Form N-CEN to separate the concepts of LEIs and RSSD IDs.[142]

### C. Guidance on Open-End Fund Liquidity Risk Management Program Requirements

In 2016, the Commission adopted the liquidity rule, which requires open-end funds to adopt and implement liquidity risk management programs.[143] The rule is designed to promote effective liquidity risk management, thereby reducing the risk that funds will be unable to meet their redemption obligations and mitigating dilution of the interests of fund shareholders.[144] The liquidity rule requires: (1) assessment, management, and periodic review of a fund's liquidity risk; (2) classification of the liquidity of each of a fund's portfolio investments into one of four prescribed categories—ranging from highly liquid investments to illiquid investments—including at-least-monthly reviews of these classifications and reporting of monthly classifications on Form N-PORT; (3) determination and periodic review of a highly liquid investment minimum for certain funds; (4) limitation on illiquid investments; and (5) board oversight.

Since the liquidity rule was implemented, Commission staff has monitored funds' liquidity classifications and observed funds' liquidity risk management programs in practice, including during the market stress event in March 2020. In 2022, the Commission proposed

---

142    *See* Items B.16, B.17, C.5, C.6, C.9, C.10, C.11, C.12, C.13, C.14, C.15, C.16, C.17, C.22, D.12, D.13, D.14, E.2, F.1, F.2, F.4, and Instructions to Item G.1 of amended Form N-CEN.

143    *See* 17 CFR 270.22e-4; Liquidity Rule Adopting Release, *supra* note 66.

144    *See* Liquidity Rule Adopting Release, *supra* note 66, at paragraph accompanying n.112.

certain amendments to the liquidity rule and, as stated in the Proposing Release, took into account staff outreach.[145] While the Commission is not adopting amendments to the liquidity rule at this time, we are providing guidance for funds subject to the liquidity rule to address questions raised through outreach and monitoring. The guidance relates to the frequency of classifying the liquidity of fund investments, the meaning of "cash" in the rule, and determining and reviewing highly liquid investment minimums.

*Frequency of classification.* The liquidity rule requires funds to review liquidity classifications more frequently than monthly if changes in relevant market, trading, and investment-specific considerations are reasonably expected to materially affect one or more of the fund's investment classifications.[146] Under the rule, liquidity classifications are the basis for monitoring a fund's ongoing compliance with the 15% illiquid investment limit and with the fund's highly liquid investment minimum. The Commission staff observed in fund outreach multiple instances where, at the time of outreach, funds were not prepared to review classifications intra-month in response to changes in relevant market, trading, and investment-specific considerations. The rule requires funds to adopt and implement policies and procedures reasonably designed so that the funds can conduct the required intra-month review of liquidity classifications if such changes in relevant market, trading, and investment-specific conditions have occurred.

Such policies and procedures generally should identify, for example, the type of information a fund will use to identify relevant intra-month changes and to review liquidity classifications intra-month, as well as the timeliness of that information. If a fund lacks

---

[145]    *See* Proposing Release, *supra* note 11, at n.14 and accompanying text.

[146]    *See* 17 CFR 270.22e-4(b)(1)(ii).

information or uses stale information that does not reflect current conditions, it may not be able to identify when intra-month reviews of liquidity classifications are required under the rule. As the Commission has previously stated, the requirement to review a fund's classification determinations intra-month based on market conditions or other developments helps a fund determine whether its holdings are consistent with its highly liquid investment minimum, as well as the rule's limit on illiquid investments.[147]

The Commission has previously provided examples of changes in market, trading, and investment-specific considerations that funds may wish to consider.[148] In addition to those prior examples, with respect to the requirement to consider intra-month changes in investment-specific considerations, funds generally should consider reviewing liquidity classifications if changes in portfolio composition are reasonably expected to materially affect one or more investment classifications. For example, if a fund substantially increases the size of its position in an investment, the fund may reasonably anticipate trading a larger size of that investment, which could materially and adversely affect the liquidity classification of that investment if a lack of market depth for a larger trade size makes it difficult to sell the investment within a particular time frame without the sale causing a significant change in market value. For similar reasons, funds generally should consider classifying newly acquired investments intra-month if acquiring a particular investment is reasonably expected to result in material changes to the liquidity profile of a fund, particularly changes to the fund's liquidity profile that may cause a shortfall below a fund's highly liquid investment minimum or cause the fund to exceed the rule's limit on illiquid investments.

---

[147]     *See* Liquidity Rule Adopting Release, *supra* note 66, at paragraph accompanying n.579.

[148]     *See id.*, at paragraph accompanying n.581.

***Meaning of cash.*** To determine whether an investment can be classified as highly liquid or moderately liquid, the liquidity rule requires a fund to consider the time in which it reasonably expects an investment to be "convertible to cash" (*i.e.*, sold and settled) without significantly changing the market value of the investment.[149] The liquidity rule also includes other references to "cash."[150] As the Commission has previously stated, the term "cash" in the liquidity rule means U.S. dollars and does not include foreign currencies or cash equivalents.[151] Thus, funds would need to consider conversion to U.S. dollars when classifying an investment. In addition, non-U.S. dollar currencies are investments that would need to be classified considering conversion to U.S. dollars.[152] Commission staff have observed some international funds considering the time in which an investment would be convertible to a different currency other than U.S. dollars as the relevant period for determining when an investment is convertible to cash, even though the funds pay cash redemptions in U.S. dollars. Commission staff also have observed some funds classifying any currency as a highly liquid investment, regardless of the

---

[149]    *See* 17 CFR 270.22e-4(a)(3) (defining convertible to cash) and (a)(6) and (a)(12) (defining highly liquid investment and moderately liquid investment).

[150]    *See* 17 CFR 270.22e-4(a)(6) (defining highly liquid investment to include cash) and (a)(9) (defining in-kind exchange traded fund); 17 CFR 270.22e-4(b)(1)(i)(C) (requiring funds to consider holdings of cash and cash equivalents, as applicable, to assess, manage, and periodically review a fund's liquidity risk).

[151]    *See* Liquidity Rule Adopting Release, *supra* note 66, at n.848 (stating that cash means cash held in U.S. dollars and would not include, for example, cash equivalents or foreign currency). The release also provided an example in which the period of time it took to repatriate or convert a foreign currency to dollars factored into the analysis of how quickly a foreign security could be settled. *See id.*, at paragraph accompanying n.379.

[152]    The liquidity rule requires a fund to classify the liquidity of each of its portfolio investments. *See* 17 CFR 270.22e-4(b)(1)(ii). For purposes of the rule, cash (*i.e.*, U.S. dollars) is always classified as a highly liquid investment, while other investments are classified based on whether they are reasonably expected to be convertible to cash, or to be sold or disposed of, within the identified number of days. When the Commission proposed the liquidity rule, it proposed to require funds to classify each position in a portfolio asset. *See* Open-End Fund Liquidity Risk Management Programs; Swing Pricing; Re-Opening of Comment Period for Investment Company Reporting Modernization Release, Investment Company Act Release No. 31835 (Sept. 22, 2015) [80 FR 62273 (Oct. 15, 2015)], at n.160 and accompanying text. When the Commission adopted the liquidity rule, it modified the rule to refer to "investments" to make it clear that the classification requirement is not limited to portfolio assets, and funds also must classify investments that are liabilities. *See* Liquidity Rule Adopting Release, *supra* note 66, at n.114.

amount of time it would take to convert that currency to U.S. dollars, because the definition of highly liquid investment refers to cash.

To consider the time in which an international currency investment would be convertible to U.S. dollars, a fund would consider the amount of time it is reasonably expected to take to convert a reasonably anticipated trade size of that currency into U.S. dollars under current market conditions without significantly changing the currency exchange rate. Relevant factors for these purposes generally include, for example, the presence of currency controls, the presence of an active market in forward or spot contracts exchanging the currency for U.S. dollars, and any delays in currency conversions driven by market structure or operations.

In general, funds should not base liquidity determinations in an international jurisdiction on the ability to sell, dispose of, or settle an investment into the local currency without also considering the ability to convert the local currency into U.S. dollars for purposes of paying shareholder redemptions.[153] When considering the time in which an international investment (other than an international currency) would be convertible to U.S. dollars, funds generally should take into account two considerations: (1) reasonable expectations of the period of time in which an international non-currency investment can be sold and settled in the local market without significantly changing the market value of the investment; and (2) reasonable expectations of the period of time in which any international currency received upon settlement can be converted to U.S. dollars without significantly changing the currency exchange rate. For purposes of assessing the period of time for a currency conversion under the second

---

[153]    *See* Liquidity Rule Adopting Release, *supra* note 66, at paragraph accompanying n.380 (discussing a fact pattern involving international investments and stating that the settlement period for such an investment includes the timeframe in which an international currency received from the sale of an international investment can be repatriated or converted to dollars).

consideration, it would be reasonable for a fund to assume that it initiates a hypothetical currency conversion at the same time as the hypothetical sale of the international investment under the first consideration. That is, a fund is not required under the liquidity rule to assume that it can initiate a currency conversion only after the sale and settlement of the international investment.[154] For example, if a fund reasonably expects it could sell and settle a reasonably anticipated trade size of an international investment within three business days without significantly changing the market value of the investment under the first consideration, and the fund reasonably expects that the international currency it would receive upon settlement could likewise be converted to U.S. dollars within the same three business day period without significantly changing the currency exchange rate under the second consideration, it would be reasonable for the fund to classify the international investment as highly liquid.

In the event of currency controls or similar scenarios in another jurisdiction, a fund's investments in the relevant jurisdiction, including holdings of the local currency, could become illiquid. Under the liquidity rule, an illiquid investment is an investment that the fund reasonably expects cannot be sold or disposed of in current market conditions in seven calendar days or less without the sale or disposition significantly changing the market value of the investment.[155] For these purposes, if a fund does not reasonably expect to be able to convert the local currency into U.S. dollars within seven calendar days because of currency controls or otherwise, then the local currency should be classified as an illiquid investment. This is because if a fund instead focused on its ability to use the local currency in the local market (*e.g.*, its ability to use the currency to

---

[154]     We understand that, in practice, funds may initiate currency conversions before the sale of an international investment settles, which allows a fund to complete the conversion to U.S. dollars more quickly than if it did not initiate the currency conversion until settlement of the underlying sale.

[155]     *See* 17 CFR 270.22e-4(a)(8).

acquire other investments in that market within 7 calendar days), without considering the time it would take to transfer the currency to U.S. dollars, the resulting classification of the currency would over-estimate the fund's liquidity and its ability to meet redemption requests. Further, other investments in that jurisdiction that would be sold or disposed of in exchange for the illiquid local currency also should be classified as illiquid investments. This is because, upon the sale of the investment, it would convert into an illiquid currency investment. As such, classifying these investments as highly liquid, moderately liquid, or less liquid would not be reasonable because they will convert into an illiquid currency.

When a fund's investments (including currency holdings) in a jurisdiction with currency controls or similar restrictions are illiquid, the fund might exceed the rule's 15% limit on illiquid investments.[156] In that case, selling the underlying illiquid investment may be a necessary step to reducing the illiquidity of the fund's portfolio, but it would cause the fund to hold a currency that is an illiquid investment. However, if upon the receipt of the illiquid currency the fund takes reasonable steps to convert that currency to U.S. dollars or to purchase investments that will be convertible to U.S. dollars, these actions would reduce the illiquidity of the fund's portfolio.[157] Accordingly, when a fund converts an illiquid international investment into an illiquid local currency as a step toward reducing the fund's illiquid investments, we would not consider the fund as acquiring the illiquid currency in violation of the rule's prohibition on acquiring illiquid investments in excess of the rule's 15% limit.[158]

---

[156] *See* 17 CFR 270.22e-4(b)(1)(iv) (providing that no fund or in-kind ETF may acquire any illiquid investment if, immediately after the acquisition, the fund or in-kind ETF would have invested more than 15% of its net assets in illiquid investments that are assets).

[157] We recognize that currency controls or similar restrictions could limit a fund's ability to convert the currency to U.S. dollars expeditiously.

[158] *See* 17 CFR 270.22e-4(b)(1)(iv)(A) (providing that, if a fund or in-kind ETF holds more than 15% of its net

If a fund exceeding the 15% limit on illiquid investments instead were to retain the illiquid currency for purposes of its investment strategy or use the illiquid currency to purchase additional investments that are likewise illiquid (*e.g.*, due to the currency controls), that would be inconsistent with the rule's prohibition on acquiring illiquid investments. As a result, funds that exceed the rule's 15% limit generally should consider taking reasonable steps such that an illiquid currency received from the sale of an investment will not be used for purposes of a fund's investment strategy or to acquire illiquid investments (*e.g.*, by identifying the illiquid currency for conversion to U.S. dollars or for purchase of non-illiquid investments).[159]

***Highly liquid investment minimums.*** The liquidity rule requires funds that do not primarily hold assets that are highly liquid investments to have a highly liquid investment minimum.[160] The highly liquid investment minimum requirement is intended to increase the likelihood that a fund will be prepared to meet redemptions without significant dilution of remaining investors' interests in the fund. The Commission has previously provided guidance on how a fund should determine its highly liquid investment minimum, and the rule requires funds to consider specific factors, as applicable.[161] We are reiterating and highlighting certain of this guidance, and particularly focusing on funds with portfolios that are on the lower end of the liquidity spectrum. The Commission previously has underscored the importance of a highly

---

assets in illiquid investments that are assets, the person(s) designated to administer the liquidity risk management program must report this occurrence to the board of directors within one business day, and such report must include, among other things, an explanation of how the fund or in-kind ETF plans to bring its illiquid investments that are assets to or below the 15% threshold within a reasonable period of time).

[159] The guidance in this paragraph relates only to the rule's prohibition on acquiring illiquid investments in excess of the rule's 15% limit. The guidance does not affect the classification of the illiquid currency, which would be classified as an illiquid investment regardless of how the fund intends to use the foreign currency.

[160] *See* 17 CFR 270.22e-4(b)(1)(iii).

[161] *See* Liquidity Rule Adopting Release, *supra* note 66, at section III.D.2.

liquid investment minimum that considers a fund's particular risk factors. For example, the Commission has stated that, when considering a fund's investment strategy and portfolio liquidity, a fund that invests significantly in less liquid or illiquid investments, such as a bank loan fund, generally should consider establishing a highly liquid investment minimum that is higher than that of a fund that is more liquid.[162] In addition, funds with investment strategies that have had greater volatility of flows than other investment strategies—or that are reasonably expected to have greater volatility in reasonably foreseeable circumstances—would generally need highly liquid investment minimums that are higher than funds whose strategies tend to entail less flow volatility.[163] Further, while a line of credit or similar arrangement can facilitate a fund's ability to meet unexpected redemptions and can be taken into consideration when determining its highly liquid investment minimum, we continue to believe that liquidity risk management is better conducted primarily through construction of a fund's portfolio.[164]

While the goal of the highly liquid investment minimum is to increase the likelihood that a fund will be better prepared to meet redemptions without significant dilution, we are not dictating how a portfolio manager meets redemptions. For instance, as the Commission has previously stated, the requirement does not mean that a fund should only, or primarily, use its most liquid investments to meet shareholder redemptions.[165] In addition, the requirement does not mean that a fund must continuously maintain a specific level of highly liquid assets and

---

[162]   *See, e.g.*, *id.*, at paragraph accompanying n.680; Proposing Release, *supra* note 11, at n.100 (stating that the vast majority of bank loan investments reported by open-end funds are classified as less liquid).

[163]   *See* Liquidity Rule Adopting Release, *supra* note 66, at paragraph accompanying n.680.

[164]   *See id.*, at text accompanying n.688; *see also id.*, at paragraph accompanying n.259 (noting that, in some situations, borrowing arrangements may not be beneficial to a fund's liquidity risk management to the extent that the fund's use of borrowings to meet redemptions leverages the fund at the expense of non-redeeming investors who would effectively bear the costs of borrowing and the increased risk to the fund created by leverage).

[165]   *See* Liquidity Rule Adopting Release, *supra* note 66, at n.661 and accompanying text.

cannot use those assets to meet redemptions. The only consequence under the liquidity rule of a fund dropping below its highly liquid investment minimum is the triggering of the fund's shortfall policies and procedures, which must include notifying the fund's board of the shortfall at the board's next regularly scheduled meeting or, if the shortfall continues for more than seven consecutive calendar days, notifying the board and filing a confidential report with the Commission on Form N-RN within one business day.[166]

### D. Technical and Conforming Amendments

We proposed to make technical and conforming amendments to the definition of ETF in Forms N-CEN and N-PORT that would replace language in each definition that refers to "an exemptive rule adopted by the Commission" with a direct reference to rule 6c-11, the Commission's exemptive rule for ETFs. Commenters did not address the proposed amendments. We are adopting these technical amendments as proposed.[167]

### E. Transition Periods

The Commission proposed for funds to have a compliance period of 12 months from the effective date of the final amendments to Forms N-PORT and N-CEN. In a change from the proposal, however, we are adopting an extended effective date (instead of an extended compliance period), under which the final amendments will become effective on November 17, 2025, that is, a date that we anticipate will be approximately the same as the end of the 12-month compliance period that we proposed. The extended effective date will result in greater uniformity

---

[166]    *See* 17 CFR 270.22e-4(b)(1)(iii)(A)(*3*); Part D of Form N-RN.

[167]    *See* General Instruction E of amended Form N-PORT; General Instruction E of amended Form N-CEN.

among funds with respect to the filing cadence and public availability of Form N-PORT during the transition period.[168]

We are also adopting a tiered approach by providing an additional six-month compliance period for smaller entities to comply with the final amendments to Form N-PORT.[169] As a result, larger entities will be required to comply with the Form N-PORT amendments for reports filed on or after the November 17, 2025, effective date, and smaller entities will be required to comply with these amendments for reports filed on or after May 18, 2026. We are adopting this tiered approach to provide existing funds with adequate time to prepare to come into compliance with the final amendments to Form N-PORT. During the additional six-month compliance period, smaller entities that have not yet begun to file monthly reports on Form N-PORT will continue to be subject to requirements under rule 30b1-9 to maintain records of Form N-PORT information

---

[168]    Under the proposed 12-month compliance period, some funds might have voluntarily complied with the final amendments in advance of the ultimate compliance date. While early compliance would provide the Commission and the public with at least a subset of Form N-PORT data earlier or on a more frequent basis, the potential for inconsistency in practice during the compliance period would make it difficult for the Commission to intake, and both the Commission and the public to utilize, that data in a systematic way. Adopting a single effective date will achieve the dual purpose of providing funds with sufficient time to comply with the final amendments and the Commission and public the ability to meaningfully utilize the data.

[169]    For purposes of the final rules' transition periods, larger entities are funds that, together with other investment companies in the same "group of related investment companies" (as such term is defined in 17 CFR 270.0-10) have net assets of $1 billion or more as of the end of the most recent fiscal year, and smaller entities are funds that together with other investment companies in the same "group of related investment companies" have net assets of less than $1 billion as of the end of the most recent fiscal year. This standard is consistent with prior Commission approaches for tiered compliance dates based on asset size for rules affecting registered investment companies. *See, e.g.*, Reporting Modernization Adopting Release, *supra* note 5; Liquidity Rule Adopting Release, *supra* note 66; Inline XBRL Filing of Tagged Data, Securities Act Release No. 10514 (June 28, 2018) [83 FR 40846 (Sept. 17, 2018)]. In our experience, this threshold is a reasonable means of distinguishing larger and smaller entities for purposes of tiered compliance dates for rules affecting investment companies. We estimate that, as of Dec. 2023, 77% of registered investment companies would be considered to be larger entities. These larger entities hold approximately 98.7% of aggregate assets of registered investment companies. These estimates are based on data reported in response to Items B.5, C.19, and F.11 on Form N-CEN.

within 30 days after month end.[170] For Form N-CEN, all funds will be required to comply with those amendments for Form N-CEN reports filed on or after November 17, 2025.

We generally proposed a one-year compliance period for amendments to Forms N-PORT and N-CEN for all funds that would be subject to the amendments, regardless of asset size.[171] We solicited comment on whether the transition period should be shorter or longer, and whether it should be the same for all funds. The Proposing Release contained additional proposed amendments that are not being adopted at this time, including certain reporting amendments (*e.g.*, reporting certain swing pricing- and liquidity-related information on Form N-PORT) and significant non-reporting amendments (*e.g.*, requirements to use swing pricing and implement a hard close requirement, as well as amendments to the liquidity rule). For the proposed non-reporting amendments, we separately proposed 12- and 24-month compliance periods, depending on the relevant amendment.

We received several comments about the proposed compliance period, but many of those commenters focused specifically on the compliance periods for the proposed non-reporting amendments that we are not adopting at this time. We received a few comments about the compliance period as it relates to the final amendments, but the context of the letters suggests that commenters were likely envisioning having to engage in implementation efforts for the full scope of the proposal during the same period.

---

[170]   Amendments to rule 30b1-9 requiring funds to file monthly reports within 30 days of month end will be effective Nov. 17, 2025. However, in light of the tiered transition period that will allow smaller entities to continue to file on a quarterly basis until May 18, 2026, we are amending rule 30b1-9 to maintain the recordkeeping requirement for these funds until May 18, 2026. If a fund begins to file monthly reports within 30 days of month end before that date, it will not be required to maintain records under the rule beginning with the first month it files a monthly report on Form N-PORT at that frequency.

[171]   We proposed a 24-month compliance period for swing pricing-related amendments to Forms N-PORT and N-CEN. As discussed above, we are not adopting those amendments.

Some commenters, as a general matter, stated that the proposed amendments are substantial and complex and that more time is needed.[172] These commenters were commenting on the Proposing Release as a whole. One commenter stated that an appropriate compliance period would depend on what the Commission ultimately adopts. This commenter also suggested that the Commission should provide smaller funds with more time to comply with any final amendments to ease compliance burdens, as smaller funds can leverage the experiences and learnings gained by larger funds going first.[173] Another commenter stated the transition period must be considered in the context of other recently adopted Commission rules that will also have concurrent compliance periods.[174]

One commenter requested a 30-month transition period for all updated reporting requirements.[175] This comment referred to all reporting requirements, including those that we are not adopting in this release. Another commenter stated that a one-year compliance date is insufficient and recommended a 24-month transition to allow time for the industry to improve their processes and for vendors to adjust their systems, including adjustments to align with amendments to the liquidity classification process and associated reporting requirements (*e.g.*, reporting liquidity classifications of individual investments), neither of which will be necessary under the final amendments.[176] This commenter stated that, as a third-party provider of information for some funds' Form N-PORT reports, it anticipated that some funds using its

---

[172]    *See, e.g.,* Comment Letter of Federated Hermes, Inc. (Feb. 14, 2023) ("Federated Hermes Comment Letter"); Capital Group Comment Letter; Comment Letter of Morgan Stanley Investment Management Inc. (Feb. 14, 2023) ("Morgan Stanley Comment Letter").

[173]    *See* ICI Comment Letter I.

[174]    *See* Morgan Stanley Comment Letter.

[175]    *See* Fidelity Comment Letter.

[176]    *See* ICE Comment Letter.

services would need additional time to improve their processes around month-end holdings compilation and preparation of the requests they submit to the provider.

After consideration of comments, we are adopting an extended effective date of longer than 12 months for both Form N-PORT and Form N-CEN, and we are providing an additional compliance period of six months beyond the effective date for smaller entities to comply with the final amendments to Form N-PORT.[177] We are adopting this tiered approach to provide existing funds with adequate time to prepare to come into compliance with the final amendments. Smaller entities will benefit from having an additional six months to come into compliance with the final amendments for Form N-PORT and will potentially benefit from the lessons learned by larger entities during that time period. We are not providing additional time for smaller entities for Form N-CEN due to the limited changes.

While some commenters suggested that additional time is needed, commenters were, in part, anticipating the need for more time in consideration of the potential for overlapping implementation of the other proposed amendments, which we are not adopting at this time. Funds are already required to produce monthly data upon request by Commission staff and required to adhere to the 30-day deadline for collecting the required information for recordkeeping purposes. We also are not significantly increasing the amount of information funds are required to report. The compliance period that we are adopting should allow funds

---

[177]    With respect to the compliance period, one commenter requested that the Commission consider interactions between the proposed rule and other recent Commission rules. *See supra* note 174. In determining compliance dates, the Commission considers the benefits of the amendments as well as the costs of delayed compliance dates and potential overlapping compliance dates. For the reasons discussed throughout the release, to the extent that there are costs from overlapping compliance dates, the benefits of the rule justify such costs. *See infra* section IV for a discussion of the interactions of the final amendments with certain other Commission rules.

sufficient time to make updates to processes and technologies to produce and submit the data on a monthly basis and incorporate the additional amendments that we are adopting.

## III. OTHER MATTERS

Pursuant to the Congressional Review Act, the Office of Information and Regulatory Affairs has designated the final amendments as a "major rule" as defined by 5 U.S.C. 804(2). The Commission considers the provisions of the final amendments to be severable to the fullest extent permitted by law. "If parts of a regulation are invalid and other parts are not," courts "set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together." *Bd. of Cnty. Commissioners of Weld Cnty.* v. *EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023); see *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 294 (1988). "In such an inquiry, the presumption is always in favor of severability." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990). Consistent with these principles, while the Commission believes that all provisions of the final amendments are fully consistent with governing law, if any of the provisions of these amendments, or the application thereof to any person or circumstance, is held to be invalid, the Commission intends that such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application. In particular, the Form N-PORT amendments relating to filing frequency operate independently from the amendments to publication frequency in that the Commission's use of more timely information operates independently from publication of that information. Additionally, the amendments to Form N-PORT operate independently from the amendments to Form N-CEN.

## IV. ECONOMIC ANALYSIS

### A. Introduction

Reports on Form N-PORT are an important source of information for the Commission and its staff. This information helps the Commission monitor industry trends, identify risks, inform policy and rulemaking, and assists the staff in examination and enforcement efforts. Currently, the Commission receives reports on Form N-PORT on a quarterly basis, 60 days after the end of the relevant quarter, with each quarterly report containing month-end information for each month in the quarter. The current delay between the end of the month to which the information relates and when the Commission receives Form N-PORT data with this information has limited the Commission staff's ability to develop a more complete understanding of the market on a timely basis, which is particularly important during major market events. Separate from the Commission's use of information reported on Form N-PORT, investors also benefit from information about funds' portfolios because it aids them in making more informed investment decisions. However, investors do not currently have access to uniform portfolio holdings of every registered fund for each month; rather, they have access to Form N-PORT portfolio data for only the third month of the quarter, which may hamper their ability to assess the portfolio composition trends of funds they invest in.[178]

The Commission is adopting amendments to Form N-PORT that require timelier and more frequent reporting of Form N-PORT information to the Commission, more frequent public disclosure, and amendments to Form N-CEN that introduce new reporting requirements in

---

[178]   Monthly portfolio holdings of certain open-end and closed-end funds may also be available on funds' websites, as well as for a fee through third-party data aggregators. Voluntary disclosures of monthly portfolio holdings that are currently publicly available may be inconsistent across funds and over time and may vary in format, presentation, or ease of access.

connection with liquidity service providers.[179] Together, these amendments will improve regulatory oversight of investment companies' activities and benefit market participants by increasing transparency of funds' portfolio data. This, in turn, will enhance the ability of investors to review and monitor information about their funds' portfolios and aid them in making more efficient portfolio allocation decisions.

The Commission has considered the economic effects of the amendments.[180] Where possible, we have attempted to quantify the economic effects. In some cases, however, we are unable to quantify the economic effects because we lack the information necessary to provide a reasonable and reliable estimate. For example, the final amendments could reduce the amount of time and effort investors require to make an investment decision. We do not have data on the extent to which the final amendments would reduce the amount of time and effort investors require to make an investment decision. In addition, because the final amendments facilitate the evaluation and comparison among registered funds, we may observe a change in investment across the affected funds. We do not have data that would allow us to estimate the extent to

---

[179]  We are also adopting technical and conforming amendments to certain existing items to account for the amendments to make monthly Form N-PORT information available to the public and amendments to certain entity identifiers. In addition, we are making technical and conforming amendments to the definition of ETF in Forms N-CEN and N-PORT that would replace language in each definition that refers to "an exemptive rule adopted by the Commission" with a direct reference to rule 6c-11, the Commission's exemptive rule for ETFs. We do not anticipate any economic effects to result from these technical and conforming amendments.

[180]  Section 2(c) of the Act and section 3(f) of the Exchange Act direct the Commission, when engaging in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in, or consistent with, the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation. In addition, section 23(a)(2) of the Exchange Act requires the Commission, when making rules under the Exchange Act, to consider among other matters the impact that the rules would have on competition, and prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act. The analysis below addresses the likely economic effects of the amendments, including the anticipated benefits and costs of the amendments and their likely effects on efficiency, competition, and capital formation. The Commission also discusses the potential economic effects of certain alternatives to the approaches taken in this release.

which we may observe such a change. Further, the broader economic effects, such as those related to efficiency, competition, and capital formation, are inherently difficult to quantify with any degree of certainty. For example, it is inherently difficult to quantify with certainty the degree to which investors would reallocate their portfolios as a result of the final amendments and consequent effects of this reallocation on competition in the registered fund sector. Our inability to quantify certain costs, benefits, and effects does not imply that such costs, benefits, or effects are less significant. Nevertheless, as described more fully below, the Commission is providing both a qualitative assessment and quantified estimate of the economic effects, where feasible.

## B. Baseline

### 1. Regulatory Baseline

The regulatory baseline against which the costs, benefits, and the effects on efficiency, competition, and capital formation of the final rules are measured consists of the current state of the securities markets and the current regulatory framework with respect to registered management investment companies and ETFs organized as unit investment trusts ("funds").[181]

Funds are required to file periodic reports on Form N-PORT about their portfolios and each of their portfolio holdings as of month end. Currently, funds file these reports on a quarterly basis, with each report due 60 days after the end of a fund's fiscal quarter. While each report includes month-end portfolio information for each month in the relevant fiscal quarter, only information about portfolio holdings for the third month of each fiscal quarter is made available to the public upon filing, while information for the first and second month of each fiscal quarter

---

[181]     *See supra* note 2.

remains confidential. Funds are also currently required to maintain the data Form N-PORT requires within 30 days of a month end for recordkeeping purposes.[182]

A fund may report certain portfolio holdings as miscellaneous securities, meaning that information about these holdings would remain nonpublic for up to a year, provided that the combined value of the positions reported as miscellaneous securities does not exceed 5% of the total value of a fund's investments and that these positions have not been previously disclosed to the public.[183]

Part F of Form N-PORT also requires a fund to attach a complete schedule of portfolio holdings for the end of the first and third quarters of the fund's fiscal year, presented in accordance with Regulation S-X, within 60 days after the end of the reporting period. Further, ETFs, including actively managed ETFs, generally are currently required to provide full portfolio holdings on their websites every business day.[184] A small number of "non-transparent" ETFs have received exemptive orders from the Commission permitting them not to disclose their portfolio holdings on a daily basis. Monthly portfolio holdings of certain funds may also be available on their websites, as well as through third-party data aggregators (typically for a fee), generally on a lagged basis (*e.g.,* 15, 30, 45, or more days after a month end). However, such more frequent publication and/or aggregation by third parties of portfolio data is voluntary.

Registered investment companies, other than face amount certificate companies,[185] must also report census-type information to the Commission annually on Form N-CEN. Required

---

[182]     *See* rule 30b1-9.

[183]     *See supra* note 108 for a detailed description of this provision.

[184]     *See* rule 6c-11(c)(1)(i).

[185]     A face-amount certificate company is a type of company that issues to investors debt securities of a specified value.

information includes, among other things, certain identifying information about fund service providers, such as the fund's custodian, transfer agent, pricing service, and others. Finally, on both Form N-PORT and Form N-CEN, funds are required to provide the LEI as part of the identifying information for certain entities, including issuers of portfolio securities, counterparties to certain transactions, and service providers. The current definition of LEI in Forms N-PORT and N-CEN provides that, in the case where a fund is reporting information about a financial institution and the financial institution does not have an assigned LEI, a fund should instead disclose the RSSD ID assigned by the National Information Center of the Board of Governors of the Federal Reserve System, if any.[186]

In addition, the economic analysis appropriately considers existing regulatory requirements, including recently adopted rules, as part of the economic baseline against which the costs and benefits of the final amendments are measured.[187] Some commenters requested that the Commission consider interactions between the economic effects of the proposal and other recent Commission proposals.[188] However, the best assessment of how the world would look in the absence of the proposed or final action typically does not include recently proposed actions, because that would improperly assume the adoption of those proposed actions. Therefore, the

---

[186]    *See* General Instruction E of Form N-PORT and General Instruction E of Form N-CEN.

[187]    *See, e.g.*, *Nasdaq* v. *SEC*, 34 F.4th 1105, 1111-15 (D.C. Cir. 2022). This approach also follows SEC staff guidance on economic analysis for rulemaking. *See* SEC Staff, *Current Guidance on Economic Analysis in SEC Rulemaking* (Mar. 16, 2012), *available at* https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf ("The economic consequences of proposed rules (potential costs and benefits including effects on efficiency, competition, and capital formation) should be measured against a baseline, which is the best assessment of how the world would look in the absence of the proposed action."); *id.* at 7 ("The baseline includes both the economic attributes of the relevant market and the existing regulatory structure.").

[188]    *See, e.g.*, ICI Comment Letter I; PIMCO Comment Letter; BlackRock Comment Letter; Morgan Stanley Comment Letter; Comment Letter of Center for Capital Markets Competitiveness, U.S. Chamber of Commerce (July 25, 2023) ("CCMC Comment Letter"); Comment Letter of Investment Company Institute (Aug. 17, 2023) ("ICI Comment Letter II").

Commission has considered three adopted rules mentioned by the commenters: the Names Rule

Adopting Release,[189] the Settlement Cycle Adopting Release,[190] and the Tailored Shareholder

Reports Adopting Release.[191] In addition, the Commission also considered the Customer

Notification Adopting Release.[192] These adopted rules are part of the baseline against which this

economic analysis considers the benefits and costs of the final amendments.

---

[189]    Names Rule Adopting Release, *supra* note 70. The amendments broaden the scope of the requirement for certain funds to adopt a policy to invest at least 80% of the value of their assets in accordance with the investment focus that the fund's name suggests, and include other changes to enhance the protections this requirement is designed to provide; require enhanced prospectus disclosure for terminology used in fund names; and impose related notice, recordkeeping, and reporting requirements. The compliance date for the final amendments is Dec. 11, 2025, for larger entities and June 11, 2026, for smaller entities. *See id.* at sections II.H, IV.D.3.

[190]    Shortening the Securities Transaction Settlement Cycle, Exchange Act Release No. 96930 (Feb. 15, 2023) [88 FR 13872 (Mar. 6, 2023)] ("Settlement Cycle Adopting Release"). The rules and rule amendments adopted in the Settlement Cycle Adopting Release shorten the standard settlement cycle for most broker-dealer transactions from two business days after the trade date to one business day after the trade date. To facilitate an orderly transition to a shorter settlement cycle, a new rule also establishes requirements related to completing allocations, confirmations, and affirmations no later than the end of trade date for the processing of institutional transactions subject to the rule; requires registered investment advisers to make and keep records of each confirmation received, and of any allocation and each affirmation sent or received, with a date and time stamp for each allocation and affirmation indicating when it was sent or received; and requires clearing agencies that provide a central matching service to establish, implement, and enforce policies and procedures reasonably designed to facilitate straight-through processing and to file an annual report regarding progress with respect to straight-through processing. With certain exceptions, the rule had a compliance date of May 28, 2024. *See id.* at section VII.

[191]    Tailored Shareholder Reports Adopting Release, *supra* note 115. The Commission amended the requirements for annual and semiannual shareholder reports provided by mutual funds and exchange-traded funds to highlight key information for investors. The Commission also adopted amendments to the advertising rules for registered investment companies and business development companies to promote more transparent and balanced statements about investment costs. The compliance date for all of these amendments was July 24, 2024. *See id.* at section II.J.

[192]    Regulation S-P: Privacy of Consumer Financial Information and Safeguarding Customer Information, Investment Company Act Release No. 35193 (May 15, 2024) [89 FR 47688 (Jun. 3, 2024)] ("Customer Notification Adopting Release"). The Commission amended Regulation S-P to require brokers, dealers, funding portals, investment companies, registered investment advisers, and transfer agents registered with the Commission or another appropriate regulatory agency to adopt written policies and procedures for incident response programs to address unauthorized access to or use of customer information. These must include procedures for providing timely notification to individuals affected by an incident involving sensitive customer information with details about the incident and information designed to help affected individuals respond appropriately. Among other things, the amendments also extended to transfer agents the requirements to safeguard customer records and information, and they broadened the scope of the information covered by those requirements. The compliance date for larger entities is Dec. 3, 2025, and June 3, 2026, for smaller entities. *See* Customer Notification Adopting Release, section II.F.

2.   Affected Entities

The amendments to the filing and public disclosure frequency of Form N-PORT reports will affect all registered funds that are currently required to file reports on Form N-PORT. Table 1 below lists registered fund counts along with their aggregate net assets by type.[193]

---

[193]   Form N-CEN provides census-type information about registered funds, while Form N-PORT provides detailed information about fund activities. Because Form N-PORT does not include information about fund types, we use information reported on Form N-CEN to estimate the number of affected funds for each type of fund. We use information reported to the Commission for each fund as of Dec. 31, 2023, incorporating filings and amendments to filings received through Aug. 1, 2024. Net assets are monthly average net assets during the reporting period identified on Item C.19.a of Form N-CEN and validated with Bloomberg (for ETFs). Current values are based on the most recent filings and amendments, which are based on fiscal years and are therefore not synchronous. Submissions of Form N-CEN reports are required on a yearly basis. Therefore, these estimates do not include newly established funds that have not completed their first fiscal year and, therefore, have not filed on Form N-CEN yet. These estimates also do not account for the funds that have been terminated since the last Form N-CEN report was filed. Therefore, the estimates for the number of funds and their net assets may be over- or under-estimated.

Table 1. Funds Required to File Form N-PORT by Type, as of Dec. 31, 2023.

| Fund Type | TOTAL | |
|---|---|---|
| | Number | Net assets, $ trillion |
| 1. Open-end funds registered on Form N-1A: | | |
| -- a. Mutual funds required to file Form N-PORT[1] | 8,810 | $ 21.10 |
| -- b. ETFs:[2] | 3,048 | $ 6.38 |
| ----- i.  non-transparent ETFs[3] | 49 | $ 0.01 |
| ----- ii. daily website disclosure required[4] | 2,999 | $ 6.38 |
| 2. Closed-end funds registered on Form N-2[5] | 684 | $ 0.36 |
| 3. ETFs that are UITs registered on Form N-8B-2[6] | 4 | $ 0.75 |
| 4. Variable annuity separate accounts registered on Form N-3[7] | 15 | $ 0.23 |
| Total | 12,561 | $ 28.82 |

Notes:

1. Mutual funds are identified as those funds reported in Item B.6.a of Form N-CEN that are not identified as ETFs in Item C.3.a.i of Form N-CEN. Money market funds are excluded from the number of mutual funds, as they are not required to file Form N-PORT. We use information reported in Item C.3.g of Form N-CEN to identify money market funds and exclude 327 money market funds that hold approximately $6.31 trillion in net assets from the total number of mutual funds in order to estimate the number of mutual funds required to file Form N-PORT.

2. ETFs registered as open-ended funds are identified on Item C.3.a.i of Form N-CEN. UIT ETFs and exchange-traded managed funds are excluded from these ETF totals and presented in a separate line item.

3. Non-transparent ETFs are not subject to daily website disclosure of their portfolio holdings. The estimate for the number of non-transparent ETFs is based on the staff analysis of funds that have been granted exemptive relief to operate actively managed ETFs that do not provide daily portfolio transparency (non-transparent ETFs).

4. ETFs identified on Item C.3.a.i of Form N-CEN excluding 49 non-transparent ETFs. Among the ETFs required to disclose their portfolio holdings daily on their websites, we identify 960 in-kind ETFs that hold approximately $1.84 trillion in net assets, based on Item E.5 of Form N-CEN.

5. Closed-end funds are identified on Form N-CEN, Item B.6.b.

6. UIT ETFs are identified in Form N-CEN Item B.6.g, and are also reported in Item E of Form N-CEN. These include 3 in-kind ETFs and 1 not in-kind ETF.

7. Variable annuity separate accounts are identified on Form N-CEN, Item B.6.c.

We estimate that there are 12,561 funds currently required to file reports on Form N-PORT that hold approximately $28.82 trillion in assets (approximately 82% of registered funds' assets). Different types of affected funds may be affected differently by the amendments to Form N-PORT. Among the affected funds, there are 8,810 mutual funds that represent approximately 73% of the affected funds' assets, 3,048 ETFs registered as open-end funds that represent

approximately 22.1% of the affected funds' assets, 684 closed-end funds that represent

approximately 1.2% of the affected funds' assets, 4 ETFs registered as unit investment trusts that

represent approximately 2.6% of assets of all affected funds, and 15 variable annuity separate

accounts that represent approximately 0.8% of assets of all affected funds. Among the ETFs

registered as open-end funds, 49 are non-transparent ETFs with assets of $0.01 trillion in assets

and 2,999 are ETFs for which daily website portfolio disclosure is required, with assets of $6.38

trillion.

Table 2 below lists affected fund counts along with their aggregate net assets by fiscal

year end.[194] Among the affected funds, there is variation in the fiscal year end. The most

common fiscal year end used by the affected funds is December (27.9% of funds), the second

most common fiscal year end is October (18.4% of funds), and March is the third most common

fiscal year end (8.8% of funds).

Table 2. Registered Funds by Fiscal Year End, as of Dec. 31, 2023.

| Fiscal Year End | Number of Funds | | Net Assets | |
|---|---|---|---|---|
| | # | % of total | $, trillion | % of total |
| 31-Jan | 189 | 1.5% | $ 0.59 | 1.9% |
| 28-Feb | 414 | 3.3% | $ 1.94 | 6.1% |
| 31-Mar | 1,092 | 8.7% | $ 2.92 | 9.2% |
| 30-Apr | 517 | 4.1% | $ 0.84 | 2.7% |
| 31-May | 638 | 5.1% | $ 1.13 | 3.6% |
| 30-Jun | 788 | 6.3% | $ 1.21 | 3.8% |
| 31-Jul | 637 | 5.1% | $ 1.11 | 3.5% |
| 31-Aug | 1,072 | 8.5% | $ 2.40 | 7.6% |
| 30-Sep | 1,093 | 8.7% | $ 3.54 | 11.2% |

[194]   We use information reported on Form N-PORT to the Commission for each fund as of Dec. 31, 2023, incorporating filings and amendments to filings received through Aug. 1, 2024. Fiscal year is reported in Item A.3.a of Form N-PORT. Net assets are reported in Item B.1.c of Form N-PORT. We note that the total number of the affected funds in this table (12,598 funds) differs from the number based on the Form N-CEN data in Table 1 (12,598 funds) because Form N-PORT is submitted on a less delayed basis compared to Form N-CEN; thus, it may include newly established funds that have not completed their first fiscal year and, therefore, have not filed the Form N-CEN yet, as well as funds that have been terminated since the last Form N-CEN was filed.

| | | | | | |
|---|---|---|---|---|---|
| 31-Oct | 2,328 | 18.5% | $ | 5.30 | 16.7% |
| 30-Nov | 385 | 3.1% | $ | 0.78 | 2.4% |
| 31-Dec | 3,445 | 27.3% | $ | 9.95 | 31.4% |
| TOTAL | 12,598 | 100.0% | $ | 31.72 | 100.0% |

The amendments to Form N-CEN will affect all registered investment companies that are required to file reports on Form N-CEN. Based on Form N-CEN filing data as of December 31, 2023, there are 2,749 such registrants. In addition, certain amendments will only affect registered investment companies with funds that are subject to the liquidity rule. We estimate that there are 1,257 registrants that have funds subject to the liquidity rule.[195]

### C. Benefits and Costs of the Amendments

#### 1. Form N-PORT Filing Frequency

The Commission is adopting the requirement for funds to file Form N-PORT reports within 30 days of month end, as proposed. This amendment will provide the Commission with more timely information about funds' portfolio holdings and therefore enhance the Commission's ability to oversee such funds. Some commenters agreed with this assessment.[196] For example, one commenter stated that monthly Form N-PORT filings would enhance the Commission's ability to effectively oversee funds and monitor their activities.[197] More frequent and more timely Form N-PORT data will allow the Commission to conduct more targeted and timelier monitoring efforts, to analyze risks and trends more accurately, and to better assess the

---

[195] Registrants required to file Form N-CEN are identified in Form N-CEN Item B.1.c. Some funds, such as in-kind ETFs, while subject to the liquidity rule, are not subject to the liquidity classification requirements of the liquidity rule. Therefore, to the extent that some of the estimated 1,257 registrants only have funds that are in-kind ETFs, the number of affected registrants may be overestimated.

[196] *See, e.g.*, Better Markets Comment Letter; Dane Comment Letter; Invesco Comment Letter; BlackRock Comment Letter; Hof zum Ahaus Comment Letter; Myers Comment Letter; ICI Comment Letter I; PIMCO Comment Letter.

[197] Invesco Comment Letter.

breadth and magnitude of potential impacts of market events and stress affecting particular issuers, asset classes, counterparties, or market participants.[198] For example, if a fund's portfolio is affected by a particular market stress event, the Commission will be better equipped to assess the severity of such an event and frame potential regulatory responses in a timelier manner. For example, having less delayed Form N-PORT data during market stress events would enhance the ability of the Commission staff to determine if impacts on funds are isolated or widespread and respond appropriately.[199] One commenter supported this view and stated that more current information "would have been beneficial to regulators and policymakers in crafting regulatory and legislative responses to the economic effects of the COVID-19 pandemic."[200]

In addition, the Commission would be able to better identify areas in need of more timely regulatory oversight and assessment, which should increase both the efficiency and effectiveness of its programs and, thus, increase investor protection. Fund investors will benefit, as timelier portfolio information will help the Commission to assess risks as they emerge and address them with appropriate regulatory responses, if any, thereby reducing potential investor harm and market disruptions.

The amendment requiring funds to file Form N-PORT reports monthly within 30 days of the month end will introduce new costs to the affected funds. In the Proposing Release, we stated that we did not expect these costs to be substantial, as funds are already required to adhere to the 30-day deadline after each month for recordkeeping purposes pursuant to rule 30b1-9.[201] We also

---

[198]     *See also supra* section I.

[199]     *See also* section II.A.1 for additional discussion of benefits of increased filing frequency to the regulatory function of the Commission.

[200]     *See* Better Markets Comment Letter.

[201]     Rule 30b1-9.

stated that, to the extent it is less efficient for fund groups to submit on a monthly basis instead of in one batch after a quarter-end, the costs borne by fund groups may marginally increase under the amendment. Some commenters disagreed with this assessment, stating that the amendments would lead to additional cost because it would compress the time available to compile, review, correct, and file the data required by Form N-PORT.[202] Some commenters also stated that submission on a monthly basis would be less efficient for fund groups and indicated that monthly filing would increase burdens on funds and fund service providers and costs to shareholders.[203]

We recognize that, although funds currently are required to maintain the information necessary to prepare their reports on Form N-PORT within 30 days after each month end, there are additional steps that service providers and/or advisers currently take prior to the filing of Form N-PORT with the Commission. In particular, some commenters stated that filing this information involves additional steps that funds do not undertake for recordkeeping, such as data validation and data tagging.[204] Therefore, the amendments will introduce costs related to performing these steps more frequently. This, in turn, may lead to increased costs related to service provider fees, hiring more personnel, and upgrading systems, which may be borne by fund shareholders.[205] Specifically, as one commenter stated, a monthly reporting regime would increase costs associated with the preparation, review, and filing of Form N-PORT reports and

---

[202]   *See, e.g.*, BlackRock Comment Letter; ICI Comment Letter I*;* PIMCO Comment Letter; T. Rowe Price Comment Letter.

[203]   *See, e.g.*, Brighthouse Comment Letter; PGIM Comment Letter; Principal Comment Letter; T. Rowe Price Comment Letter.

[204]   *See, e.g.*, ICI Comment Letter I; Invesco Comment Letter.

[205]   *See, e.g.*, ICI Comment Letter I; Principal Comment Letter; T. Rowe Price Comment Letter.

funds would need to expand vendor engagements, increase human resources, and develop new systems, processes, and procedures.[206]

One commenter stated that some funds estimate that filing Form N-PORT monthly would result in an additional cost of $5,000 per fund per year.[207] Another commenter provided an estimate of the joint ongoing internal staffing costs of $900,000 per year after meeting accelerated filing requirements and supporting the proposed increase in filing frequency of Regulation S-X compliant portfolio information on Part F of Form N-PORT.[208] This estimate appears to reflect the total cost for the fund group (and not per fund) and given that the commenter stated that it manages 197 funds that file Form N-PORT,[209] the average per fund cost for this commenter is approximately $4,569 per year. Consistent with these commenters' assessment, we estimate the average cost increase due to the final amendments for funds that use third-party vendors to prepare Form N-PORT to be around $6,100 per fund per year,[210] and around $4,940 per fund per year[211] for funds that process filings internally.

---

[206]     *See* Brighthouse Comment Letter.

[207]     *See* SIFMA AMG Comment Letter.

[208]     *See* T. Rowe Price Comment Letter. Because we are not adopting the amendments to Part F to require more frequent reporting of Reg. S-X compliant schedules of investments, and the commenter did not separately provide a cost for the acceleration of the filing deadline, this numerical estimate should be adjusted down.

[209]     *See id.*

[210]     The estimate is based on the following calculations: $2,100 (blended hourly rate for a compliance attorney and a senior programmer at $420 for 5 hours) + $4,000 (costs for external services) ≈ $6,100. The estimate of 5 hours reflects an initial time cost of 6 hours, annualized over a 3-year period, with an estimated ongoing annual time cost of 3 hours. Salaries for estimates in the Economic Analysis are derived from SIFMA's Management & Professional Earnings in the Securities Industry 2013, modified to account for an 1,800-hour work-year and inflation, and multiplied by 5.35 to account for bonuses, firm size, employee benefits and overhead. *See* Table 3 (and accompanying footnotes, which contain additional details about these estimates).

[211]     The estimate is based on the following calculations: $2,940 (blended hourly rate for a compliance attorney and a senior programmer at $420 for 7 hours) + $2,000 (costs for external services) ≈ $4,940. The estimate of 7 hours reflects an initial time cost of 6 hours, annualized over a 3-year period, with an estimated ongoing annual time cost of 5 hours. *See* Table 3 (and accompanying footnotes, which contain additional details about these estimates).

Some commenters stated that the costs of moving from quarterly to monthly reporting may be more significant for certain funds. For example, commenters stated that funds that use third parties to provide certain information for Form N-PORT reports may incur higher costs, relative to funds that prepare Form N-PORT reports internally, in order to improve processes around month-end holdings compilation and preparation of the requests they submit to the provider.[212] Consistent with our estimates above, we agree with the commenters that funds that use third-party providers may experience higher costs ($6,100 per fund per year) compared to funds that prepare Form N-PORT internally ($4,940 per fund per year).

Another commenter stated that certain closed-end funds may experience larger costs because these funds may not calculate NAV on a monthly basis or may calculate it with a significant delay, due to the assets they hold, and therefore the amendment may cause these closed-end funds to change their valuation processes in order to be able to report the fund's NAV in each monthly Form N-PORT report.[213] We disagree with the commenter for the reason that funds are currently required to maintain in their records monthly information they are required to report on Form N-PORT within 30 days of each month, including NAVs, and therefore funds would not have to change their valuation procedures. Rather, closed-end funds that do not calculate their NAVs on a monthly basis for any other purpose than Form N-PORT reporting will be able to continue relying on General Instruction G[214] to produce their NAVs. Therefore,

---

[212]     *See* ICE Comment Letter.

[213]     *See* Neuberger Berman Comment Letter.

[214]     *See* General Instruction G of Form N–PORT; Reporting Modernization Adopting Release, *supra* note 5, at n.460 and accompanying text (stating that, "based upon staff experience, it is [the Commission's] understanding that most closed-end funds strike their NAV on at-least a monthly basis," but that funds that do not do so may report information on Form N-PORT by using their internal methodologies consistent with how they report internally and to current and prospective investors under General Instruction G of Form N-PORT).

we do not estimate the filing cost increase to be different for closed-end funds compared to other types of affected funds.

One commenter indicated that the shorter filing timeline would especially burden funds with complex investment strategies, such as alternative funds.[215] Some commenters also highlighted that collecting Form N-PORT data may take substantial time for funds that engage in manual processes to obtain certain of this information, such as funds investing in certain fixed income securities or derivatives; and therefore, the data included in Form N-PORT reports may come from multiple sources.[216] One commenter stated that, as a result, it is not feasible to simply download the relevant data from the fund accounting agent's system for the purposes of populating Form N-PORT.[217] While we recognize that the amount of data currently required to be filed on each Form N-PORT is substantial, the amendments to Form N-PORT will not change the data items that need to be prepared and reviewed or change the effort it takes for certain funds to collect data included in Form N-PORT. In addition, while we recognize that funds with complex investment strategies or funds that currently use manual processes to obtain certain Form N-PORT information, as opposed to funds with less complex strategies and funds that are able to pull data in a completely automated manner, at present may generally experience higher costs associated with collecting such information, the current recordkeeping requirements call for the Form N-PORT information to be collected within 30 days after month end. Therefore, we do not expect that the accelerated filing deadline would change the current costs of collecting data for Form N-PORT, as suggested by the commenters. Rather, the amendments will align the

---

[215]    *See* Fidelity Comment Letter.

[216]    *See, e.g.*, ICI Comment Letter I; T. Rowe Price Comment Letter.

[217]    *See* T. Rowe Price Comment Letter. This commenter also stated it currently prepares and reviews approximately 1.4 to 2.0 million data points across the 197 funds for each monthly report within Form N-PORT.

deadline for filing information with the deadline by which funds are already required to record such information, thereby increasing the costs of filing-related activities, such as data tagging. Therefore, we do not estimate the filing cost increase to be different for these types of funds compared to other types of affected funds. However, to the extent that certain funds, such as those belonging to smaller fund groups that may not experience economies of scale, may need to prepare recordkeeping data more quickly than they currently do in order to provide additional time for filing-related activities, these funds may experience higher costs related to accelerating their processes around preparation and transmission of the data for filing.

In addition, we recognize that funds' advisers could be working to meet other regulatory reporting obligations during the same period they will be working to prepare monthly Form N-PORT reports and that there may be overlap in teams that prepare, review, and file Form N-PORT reports with those that are involved with other required filings. Some commenters indicated that such overlap may hinder these teams.[218] Two commenters suggested that these strains would be pronounced for the months following the end of the reporting period that annual and semiannual reports are due.[219] While we acknowledge that fund groups may use the same staff and service providers in the filing processes for Form N-PORT and other forms, such as Forms N-MFP, N-CSR, N-CEN, 24F-2, and CPO-PQR, funds generally should already have enough operational separation in preparation of information required by each form due to the different nature of data items required by various forms and because funds are already required to gather and accurately record Form N-PORT information within 30 days of month end. However, we acknowledge that some funds may need to make operational changes and incur

---

[218]    *See, e.g.*, Singer Comment Letter; T. Rowe Price Comment Letter; *see also* ICI Comment Letter I.

[219]    *See, e.g.*, PIMCO Comment Letter; Singer Comment Letter.

additional costs in order to timely meet all reporting obligations, such as increasing the use of service providers for reporting purposes or improving efficiency in the reporting process by updating internal systems to improve processes around preparing and transmission of N-PORT data for filing, for example, by reducing manual processes.[220]

Some commenters were concerned that the risk of reporting errors would go up if a fund is required to complete additional filing steps on the same 30-day deadline that is required for recordkeeping.[221] For example, one commenter stated that a 30-day deadline would provide insufficient time for resolving data issues prior to filing, even with increased resources.[222] Another commenter expressed that 30 days is not enough for data quality reviews.[223] While we recognize that funds may expend more resources to minimize errors in their Form N-PORT filings due to the accelerated filing deadline, which may lead to operational inefficiencies, we do not expect these costs to be significant relative to the baseline because funds are currently required to have accurate information within 30 days of month end for recordkeeping purposes.[224] To the extent that additional processes associated with filing will be more condensed under the amendments, the risk of reporting errors (*e.g.*, an error in XML tagging), relative to the current quarterly filing requirement may increase. However, if a fund identifies an error in its report after the filing deadline, it can file an amendment to correct the error, as

---

[220]   The costs associated with any such changes would be covered by our cost estimates above. *See supra* notes 210 and 211.

[221]   *See, e.g.*, ICI Comment Letter I; T. Rowe Price Comment Letter; BlackRock Comment Letter; Invesco Comment Letter.

[222]   *See* T. Rowe Price Comment Letter.

[223]   *See* BlackRock Comment Letter.

[224]   *See* General Instruction A of Form N-PORT.

currently permitted. The extended implementation period will provide the affected funds with time to adjust their Form N-PORT reporting processes in order to minimize errors.

Lastly, to the extent that nonpublic information the Commission will receive on Form N-PORT reports could be subject to a data breach, unauthorized access could harm shareholders by expanding the opportunities to exploit the information, as highlighted by some commenters.[225] We recognize that the Commission, faces persistent and increasingly sophisticated malicious cyber-attacks that threaten the agency's technology systems and infrastructure that, if successful, could expose registrants' and other market participants' data. However, the Commission is continuously working to improve its efforts to identify, deter, protect against, detect, and respond to these threats and actors and it employs an array of actions to safeguard and protect the confidentiality and security of all information reported to EDGAR, which includes data reported on Form N-PORT.[226]

2. Form N-PORT Publication Frequency

The Commission is adopting the amendment which will make funds' reports on Form N-PORT public on a monthly basis 60 days after the end of each monthly reporting period. This data, which will be reported at a monthly rather than quarterly frequency, will benefit fund investors and other users of Form N-PORT reports by increasing transparency of funds' portfolios, thereby enhancing the ability of investors to review and monitor information about their funds' portfolios (directly or through analyses performed by third-party data aggregators). Some commenters disagreed that a requirement of more frequent public disclosure would benefit

---

[225] *See, e.g.*, Dodge & Cox Comment Letter I; ICI Comment Letter I; Invesco Comment Letter; Principal Comment Letter.

[226] *See supra* note 76 and accompanying text for additional discussion.

investors.[227] For example, one commenter expressed that, since its funds currently disclose portfolio holdings on a public website every month and disclosing portfolio holdings on a fund's website is a better tailored approach to ensuring appropriate information is made available to retail investors, their shareholders would not benefit from monthly publication of Form N-PORT data.[228] We disagree with this assessment; more frequent public disclosure will benefit investors. Consistent information that is available for all funds is a public good.[229] Each fund benefits to some extent from their own disclosure, but they do not internalize the full benefits, which are realized to the greatest extent when all funds disclose consistent and comparable information. For that reason, private market incentives, as currently exist, lead to under-provision of the information, compared to what would be useful for the fund investors. Below, we describe specific ways in which the information will be more comparable and useful.

First, while we continue to recognize that certain funds do currently provide monthly portfolio holdings on their websites or publish this information via a data aggregator, not all funds provide such disclosure.[230] Moreover, voluntary disclosures that are currently available on funds' websites may not include other information that Form N-PORT reports include, such as market-wide information about funds' total and net assets, liabilities, returns, flows, as well as information to help assess a fund's risks, including for example interest rate risk, credit risk, and

---

227    *See, e.g.*, ICE Comment Letter; Principal Comment Letter; ICI Comment Letter I.

228    *See* Principal Comment Letter.

229    "Public good" is an economics term. It describes a good that is both non-excludable and non-rivalrous, meaning that its use cannot be limited to paying customers and that it can be simultaneously used by more than one consumer. *See* Paul A. Samuelson, *The Pure Theory of Public Expenditure*, 36 THE REVIEW OF ECONOMICS AND STATISTICS 387–389, (Nov. 1954).

230    For example, one recent paper looks at the coverage of the monthly portfolio data across three mutual fund databases for the period 2004-2019 and estimates that at year-end 2019, 56% of portfolio disclosures for US-based equity mutual funds reflect voluntary monthly portfolio disclosures. *See* James J. Li, Weili Ge & Lu Zheng, *The Economics of Voluntary Portfolio Disclosure* (Sept. 1, 2023), *available at* SSRN: *https://ssrn.com/abstract=557186* (retrieved from SSRN Elsevier database).

counterparty risk. In addition, voluntary disclosures of monthly portfolio holdings that are currently publicly available may be inconsistent across funds and over time and may vary in format, presentation, or ease of access.[231] As a result, gathering voluntarily disclosed data for the purposes of historical analysis of fund portfolios or comparisons of funds with similar portfolios could be burdensome. Although such analyses are more frequently performed by third parties, such as brokers, data analysts, and investment advisers, the results of these analyses ultimately benefit investors because investors or their financial professionals utilize them in investment allocation decisions. However, fund portfolio analyses are currently limited by the inconsistent availability of current and historical portfolio data across various databases that consolidate mandatory and voluntary fund portfolio disclosures,[232] which can negatively impact investors who rely on these analyses in their investment allocation decisions. Therefore, monthly Form N-PORT portfolio disclosure will benefit the public by increasing availability of portfolio data for those funds that do not currently provide monthly disclosures on a voluntary basis and by improving consistency of disclosures, as well as decreasing the costs of accessing and aggregating these disclosures in a uniform structured format for those funds that already provide voluntary monthly disclosures. As a result, users of Form N-PORT data who wish to aggregate or compare historical fund portfolios will be able to do so more efficiently and at a lower cost, which will ultimately benefit investors.

---

[231]    For example, if a portfolio is presented in a PDF format, one would need special software to convert such data from text to structured data, which may be costly.

[232]    For example, one academic paper estimates that about 58% of newly founded U.S. equity mutual fund share classes in the CRSP mutual fund database from 2008 to 2015 cannot be matched to the Thomson Reuters mutual fund holdings database. *See* Qifei Zhu, *The Missing New Funds,* 66 MGMT. SCI. 1193-1204 (2020).

Second, because currently different funds can adhere to different fiscal years, and the portfolio information is required to be publicly disclosed only for the third month in the fiscal-year quarter, investors and other Form N-PORT users cannot access same-month portfolio data for similar funds that use different fiscal years. For example, if Fund A has a fiscal year end in December (27.9% of affected funds) and Fund B has a fiscal year end in October (18.4% of affected funds), investors and other Form N-PORT users can see Fund A's portfolio data only for March, June, September, and December; and are able to see Fund B's portfolio data only for January, April, July, and October.[233] However, market events can occur in any month; and, therefore, investors in funds (and data analysts and financial professionals assisting them) whose third month of a fiscal-year quarter does not align with the month during which a market event occurs do not currently have access to that month's portfolio data, making it impossible to compare portfolio trends of funds with similar strategies during stress events. For example, investors in funds with a fiscal year end in October are not able to access Form N-PORT portfolio data for March 2020, which covers a period of significant market stress. Therefore, monthly publication of portfolio information will help ensure that investors and other Form N-PORT users have access to consistent historical portfolio information for all the affected funds, which will help with historical analysis of fund portfolios and comparisons of funds with similar portfolios, ultimately benefitting investors by helping them make more informed investment allocation decisions.

Third, monthly portfolio disclosure may benefit investors by decreasing agency problems that may exist in the registered fund sector. For example, because fund managers might vary the risk of a fund portfolio in hope of achieving higher portfolio returns ("risk shifting") to attract

---

[233]    *See* Table 2.

investors, which may result in temporary departure from the fund's investment strategy, the

presence of information asymmetry (*i.e.*, investors and other users of Form N-PORT not having

access to portfolio holdings information on a frequent basis), may further incentivize this risk

shifting behavior. As another example, information asymmetry may contribute to managers

engaging in return smoothing to depict fund portfolios as less risky (*i.e.*, having lower volatility).

Thus, to the degree that these tactics are present in the mutual fund sector, a reduction of

information asymmetry resulting from more frequent public portfolio holdings disclosure would

reduce the incentives for risk shifting and return smoothing behavior of fund managers,

benefitting fund investors. For example, a recent working paper analyzes the 2016 adoption of

Form N-PORT reporting requirements and suggests that standardized portfolio disclosures

decreased information asymmetry between fund investors and managers, showing that, as a

result of the 2016 reporting requirements, fixed-income fund managers (who generally have

incentives to display lower volatility) became less likely to engage in return smoothing, and

equity managers became less likely to engage in risk shifting.[234] However, some academic

studies of the earlier 2004 regulatory change from mandatory semiannual to quarterly reporting

of mutual fund holdings suggest that the 2004 regulatory change did not result in a reduction of

portfolio pumping, window dressing, and style drift.[235] Although these studies do not find a

---

[234]   *See* Ki-Soon Choi, *The Role of Portfolio Disclosures in Mutual Funds* (working paper revised Aug. 2
        2023), *available at* SSRN: *https://ssrn.com/abstract=4283140* (retrieved from SSRN Elsevier database).
        The paper identifies equity and fixed-income funds with the size between $30 million and $10 billion that
        have at least one Form N-Q and one Form N-PORT during the period between 2017 and 2021, using CRSP
        Mutual Fund Database.

[235]   *See, e.g.,* Xiangang Xin, P. Eric Yeung & Zilong Zhang, *Wrong Kind of Transparency? Mutual Funds'
        Higher Reporting Frequency, Window Dressing, and Performance*, 62 J. Acct. Rsch. 737-81 (2024). This
        study looks at the effects of 2004 regulation and the results suggest that the 2004 change from semiannual
        to quarterly portfolio reporting exacerbated signal manipulations, such as window dressing, by fund
        managers. The study suggests that, because elevated window dressing under higher reporting frequency is
        associated with an increase in trading costs and lower fund performance, investors can identify low-skill
        managers more quickly and penalize them in the form of withdrawals. *See, e.g, also* Ji-Woong Chung,

decrease in such tactics as a result of more frequent disclosure mandated in 2004, the studies do suggest that higher reporting frequency improves investors' ability to sort among good and bad fund managers because these tactics could be associated with higher trading costs, and, consequently, lower fund performance.[236] This, in turn, allows investors to make better investment allocation decisions.

The increased publication frequency may increase certain costs for some funds.[237] In particular, because the final amendments will reduce the maximum potential time that a fund currently can use to build a position in a security without publicly disclosing the acquisition of the initial stake in this security from approximately five months to approximately three months[238] for those securities that do not qualify to be reported as a miscellaneous securities, the risks related to copycatting or free-riding by other market participants may increase.[239] For

---

Koren M. Jo, Sejin Kang & Jaeouk Kim, *Intended Consequences of More Frequent Portfolio Disclosure* (Mar. 2, 2024), *available at* SSRN: *https://ssrn.com/abstract=4086186* (retrieved from SSRN Elsevier database). The authors study the impact of the 2004 regulation, which mandated mutual funds to increase their portfolio disclosure frequency from semiannual to quarterly, on actively managed U.S. domestic equity funds. The results show an improvement in capital allocation efficiency, as measured by the return predictability of money flows, due in large part to institutional investors' ability to avoid underperforming funds. The results also suggests that investors of mutual funds in the treated group become better able to predict future fund performance compared to those in the control group, implying that the new regulation provided investors with incrementally valuable information.

[236]    *See id.*

[237]    *See also* Proposing Release, at section III.C.4.b.

[238]    For example, under the baseline, if a fund starts building a position in a security in the beginning of its fiscal quarter, it may spread the purchases of this security over approximately five months before the quarter-end position will be reflected in the public disclosure 60 days after the quarter-end. This means that a fund can finish building this position in five months without other investors seeing the fund's initial allocation towards the security. In contrast, under the final amendments, the time a fund would have to build a position without publicly disclosing it would shorten to approximately three months – because the position at the end of the first month would become publicly disclosed 60 days after the month end, unless it qualified to be reported as a miscellaneous security.

[239]    As discussed in more detail below, some commenters expressed concern about more frequent public disclosure resulting in front-running or copycatting of fund strategies. Academic literature suggests that funds, including mutual funds, may be subject to free-riding or copycatting. While the existing literature on the effects of free-riding/copycatting on performance is primarily focused on funds other than mutual funds, there is a limited number of studies of copycatting behavior in the context of mutual funds and their

example, under the final amendments, assuming it takes a fund more than three months to build a

position in a security, its acquisition cost may increase 60 days after the one-month mark (which

would be up to two months sooner compared to the baseline) because other market participants

would be able to see that the fund acquired a new security and may copy the trade. Such copycat

trades could inflate the price of the security, thereby increasing the trading costs of further

purchases of this security for the fund, which will be passed onto the fund's investors in the form

of lower cost-adjusted fund returns.[240]

---

portfolio disclosures. *See, e.g.,* Roberto Stein, *'Smart' copycat mutual funds: on the performance of partial imitation strategies,* 8 FINANCIAL INNOVATION 92 (2022). This paper looks at actively managed, open-end mutual funds that invest primarily in domestic equities during the period between 2000 and 2006 and construct a "copycat score" for each fund. The author suggests that mandated portfolio disclosures are being actively exploited by some traders, and that both funds that copycat and funds that are being copycatted consistently outperform other funds, which implies that a trading strategy that follows publicly reported holdings of actively managed funds can earn similar returns. *See also, e.g.,* Blake Phillips, Kuntara Pukthuanthong, and P. Raghavendra Rau, *Detecting Superior Mutual Fund Managers: Evidence from Copycats* 86–321 (Dec. 22, 2014), *available at* SSRN *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2496452*. The paper studies the sample of actively managed, domestic mutual funds that report monthly frequency returns and net assets during the period between 1991 and 2013. Importantly, this study defines copycat funds as those that replicate the entire portfolio of another fund, rather than holdings of individual securities. The authors conclude that although copied funds are harmed by copycatting behavior in terms of deflected flows, the magnitude of this harm remained relatively constant across regulatory regimes (i.e., before and after the 2004 change in the reporting requirements). However, both studies do not seem to differentiate copycatting activities from coincidental trades. Another paper uses Form 13F data for both mutual funds and other funds (primarily hedge funds) between 2003 and 2017 and corrects for this issue. The authors find that copycat companies are able to identify profitable trades that outperform other trades disclosed by the copycatted companies by 5.5% annually. However, because this study comingles mutual funds and other funds, it is unclear whether results apply to the affected funds. *See* Cao, Sean Shun, et al., *Copycat skills and disclosure costs: Evidence from peer companies' digital footprints,* Journal of Accounting Research 59.4 (2021): 1261-1302. Another recent study also examines the costs of Form 13F disclosure, focusing on hedge funds and pension funds, and finds that additional disclosure may harm portfolio returns over time. The study suggests that long-term stock investors are being harmed on a risk-adjusted return basis, because copycats cause long-term stock investors to experience excess volatility in their returns without higher returns. *See* David Kwon, *The Differential Effects of the 13f Disclosure Rule on Institutional Investors* (working paper, May 5, 2022), *available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4095482* (retrieved from SSRN Elsevier database). *Also see* Reporting Modernization Adopting Release, *supra* note 5, at section III.B.3 for review of less recent academic literature.

[240]    *See id.*

Some commenters urged that concerns about copycatting should not impede more rapid public disclosure.[241] We agree with these commenters because we expect that the above effects would be limited to a small universe of funds: for example, active funds that build substantial positions in multiple securities over a longer than 2-to-3-months timeframe in order to avoid market impact from their trades, and for which the 5% limit on miscellaneous securities may be binding. In particular, with the 60-day delay, even if an actively managed fund began to build a position on the last day of the month, that position would not be publicly disclosed on Form N-PORT until approximately two months later. The fund could use those two months to continue to build its position without public knowledge of the fund's position.[242]

As an initial matter, when a fund is building a new position in an instrument, it can choose to treat that instrument as a miscellaneous security for up to one year, which would remain nonpublic for that period, to the extent that this instrument has not been previously been made public by name and to the extent that the addition of this instrument would stay within the 5% limit on aggregate positions in miscellaneous securities.[243] Therefore, the ability to keep certain new investments confidential for a longer period mitigates concerns about copycatting or free-riding for the majority of funds.

In addition, the 60-day delay in public disclosure also mitigates the concerns about an increase in copycatting risk for actively managed funds, relative to the copycatting risk due to the current public disclosure requirements, because the information relied on to identify undervalued securities to build new positions can become known to the market or otherwise incorporated into

---

241    Hof zum Ahaus Comment Letter; Myers Comment Letter.

242    The same would be true for a fund exiting an existing position.

243    *See* section II.A.2 for additional discussion; *see also* section IV.B.1.

the security's price over the course of the 60-day delay. Traders attempting to copycat trades of actively managed funds on a 2-to-3 months delay will therefore have limited opportunity to enter into positions at advantageous prices, which may reduce incentives to copy the trades of an actively managed fund in the first place. In fact, such copycatting activity on a 2-to-3 months delay may also facilitate price discovery to the benefit of the disclosing fund and its investors. While a fund would benefit the most from any price increase in the underlying security when copycat trades occur after the fund has finished building its entire position in this security, any early disclosure of the fund's position that leads to copycatting may result in price appreciation affecting the part of the position already built sooner than would otherwise be the case. While there will still be costs in the cases where funds cannot fully establish their positions before the required disclosures become public, those costs will be mitigated by price appreciation affecting the part of the position already built prior to the disclosures.

Nonetheless, we recognize an increase in risk for a small universe of funds. For example, one commenter[244] stated that hedge funds and algorithmic traders seek to capitalize on proprietary trading decisions of fund managers by looking for information about the trading activity of large funds[245] and that this commenter does not disclose portfolio holdings for any of its funds more frequently than required in order to protect its funds' intellectual property for the benefit of investors.[246] Although some funds build positions over time to reduce market impact

---

[244]    *See* Dodge & Cox Comment Letter I; Dodge & Cox Comment Letter II.

[245]    Other commenters generally expressed that other market participants could use automated tools to reverse-engineer portfolio decisions, harming funds and their shareholders. *See, e.g.*, ICI Comment Letter I; JP Morgan Comment Letter; PGIM Comment Letter; Principal Comment Letter.

[246]    *See* Dodge & Cox Comment Letter I. The same commenter also stated that, since 2007, the prices of new holdings in one of its funds have, on average, increased approximately twice as much as the average increase in S&P 500 constituents on the day of the fund's quarterly portfolio disclosures. *See* Dodge & Cox Comment Letter II.

of their trades, such trading behavior in combination with quarter-end disclosure and varying fiscal year starts may be strategic rather than preventative (against market impact), which may negatively impact fund investors because trades are not necessarily made at the time when new information about the fundamental value of a security is learned by a fund manager. For example, one commenter stated that it tries to time purchases of new investments to avoid being active in the market at the time it makes public disclosures.[247] Consistent with the commenter's description, a recent academic paper suggests that funds may engage in managing their position building around required disclosure dates, which may lead to non-trivial positive or negative effects on fund portfolio informativeness and informativeness of prices.[248] To the extent that this behavior is present among some fund managers, requiring monthly disclosure may mitigate these effects, benefitting investors.

3.   Amendments to Form N-CEN

We are also adopting amendments to Form N-CEN to identify and provide certain identifying information about service providers a fund uses to fulfill the requirements of rule 22e-4.[249] This information will help the Commission oversee funds' liquidity risk management practices, as well as provide additional transparency about service providers to investors and

---

[247]   *See* Dodge & Cox Comment Letter II.

[248]   *See* T.A. Gormley, Z. Kaplan & A. Verma, *More Informative Disclosures, Less Informative Prices? Portfolio and Price Formation Around Quarter-Ends*, 146 J. FIN. ECON. 665-88 (Nov. 2022). The paper analyzes trade-level data of certain funds during 1998-2008 and reports trading patterns around required SEC disclosure dates. The paper documents that funds execute different types of trades around quarter-end dates, which is when most funds record positions for subsequent disclosures. The findings suggest that funds shift the timing of planned trades in response to upcoming disclosures. In particular, funds are more likely to start new trading campaigns after the quarter-end and more likely to complete existing trading campaigns before the quarter-end. The results suggest that although funds trade into positions which tend to make portfolio disclosures more informative about future holdings, these trades may simultaneously decrease price informativeness for underlying securities because trading in these securities around disclosure dates may not necessarily be driven by changes in their intrinsic values.

[249]   We did not receive any comments about costs and benefits of this amendment.

other data users. Funds should already maintain the information they will be required to report under this amendment in the ordinary course of their business. Therefore, we do not expect that funds will experience substantial cost increases as a result of this amendment. In particular, we estimate that the changes to Form N-CEN will result in costs of around $420 per filer per year.[250]

### 4. Entity Identifiers

The Commission is amending as proposed the definition of LEI in Forms N-PORT and N-CEN to remove language providing that, in the case of a financial institution that does not have an assigned LEI, a fund should instead disclose the RSSD ID assigned by the National Information Center of the Board of Governors of the Federal Reserve System, if any. Instead of classifying an RSSD ID as an LEI for these purposes, the amendments will require funds to identify specifically whether they are reporting an LEI or an RSSD ID.[251] The amendments will not change the circumstances in which a fund is required to report an LEI or an RSSD ID, if available. Rather, these amendments will help the Commission and market participants identify entities related to funds' counterparties and issuers of funds' holdings more efficiently. We do not expect that the amendments to separate the concepts of LEI and RSSD ID more clearly in the form will change the burdens of the current form, as the form already requires a fund to report the RSSD ID, if any, if a financial institution does not have an assigned LEI.

### 5. Other Compliance Costs

Some commenters stated that the Commission should consider the cumulative costs of implementing the proposed amendments and other recent Commission rules and proposed

---

[250]    The estimate is based on the following calculations: blended hourly rate for a compliance attorney and a senior programmer at $420 for 1 hour = $420. The 1-hour estimate reflects an initial time cost of 1.5 hours, annualized over a 3-year period, with an estimated ongoing annual time cost of 0.5 hours. *See* Table 4 (and accompanying footnotes, which contain additional details about these estimates).

[251]    We did not receive any comments about costs and benefits of this amendment.

rules.[252] The Commission has considered interactions between the economic effects of the proposal and other recent Commission proposals that culminated in the Names Rule Adopting Release,[253] the Settlement Cycle Adopting Release,[254] the Tailored Shareholder Reports Adopting Release,[255] and the Customer Notification Adopting Release.

Consistent with its long-standing practice, the Commission's economic analysis in each adopting release considers the incremental benefits and costs for the specific rule—that is, the benefits and costs stemming from that rule compared to the baseline. The Commission acknowledges the possibility that complying with more than one rule in the same time period may entail costs that could exceed the costs if the rules were to be complied with separately. One of the rules has a compliance date that occurred before the effective date of the final amendments,[256] such that there is no overlap in transition periods. The other rules overlap in part with the final amendments, but the compliance dates adopted by the Commission are spread out over an approximately two-year period from 2024 to 2026, which could limit the number of implementation activities occurring simultaneously.[257] The Commission has tiered compliance dates to provide necessary time for large and small entities to comply with these final amendments and other recently adopted rules with compliance dates in close proximity.[258]

---

[252]    *See supra* section IV.B.

[253]    *See* ICI Comment Letter I; PIMCO Comment Letter.

[254]    *See* BlackRock Comment Letter.

[255]    *See* ICI Comment Letter I.

[256]    The compliance date for the Settlement Cycle Adopting Release was May 28, 2024.

[257]    *See supra* section IV.B (listing recent rule adoptions and their respective compliance dates). The compliance date for the Names Rule Adopting Release is Dec. 11, 2025, for larger entities and June 11, 2026, for smaller entities. For the Tailored Shareholder Reports Adopting Release, funds will be required to transmit tailored shareholder reports following the compliance date of July 24, 2024, but the timing for funds' transmittals of these reports will depend on each fund's fiscal calendar. The compliance date for the Customer Notification Adopting Release is Dec. 3, 2025, for larger entities and June 3, 2026, for smaller entities.

[258]    *See supra* section II.E.

Where overlap in compliance periods exists, the Commission acknowledges that there may be additional costs on those entities that are subject to one or more other rules.

### D. Effects on Efficiency, Competition, and Capital Formation

1. Efficiency

As noted above, some commenters generally disagreed that a requirement of monthly public disclosure would benefit investors.[259] We disagree with this assessment and believe that monthly public disclosure may improve allocative efficiency of portfolio allocation. We also expect that the amendments will improve price efficiency of certain securities held by affected funds and price efficiency of secondary-market shares of closed-end funds.

In particular, as discussed in section IV.C.2, investors are currently not able to obtain consistent monthly portfolio data for all funds from other sources, such as funds' websites or third-party data aggregators. More frequent public disclosure of funds' portfolios will increase transparency about funds' portfolio trends and enhance the ability of investors (and data analysts and financial professionals assisting them) to monitor funds' portfolios, which will reduce information asymmetries between funds and investors. This, in turn, may increase allocative efficiency allowing investors to make more informed investment decisions in selecting funds that align with their investment objectives and risk tolerance.[260]

---

[259]    *See* section IV.C.2; *see also, e.g.*, ICE Comment Letter; Principal Comment Letter; ICI Comment Letter I.

[260]    *See, e.g.*, Ji-Woong Chung, Koren M. Jo, Sejin Kang & Jaeouk Kim, *Intended Consequences of More Frequent Portfolio Disclosure* (Mar. 2, 2024), *available at* SSRN: *https://ssrn.com/abstract=4086186* (retrieved from SSRN Elsevier database). The authors study the impact of the 2004 regulation, which mandated mutual funds to increase their portfolio disclosure frequency from semi-annual to quarterly, on actively managed U.S. domestic equity funds. The results show an improvement in capital allocation efficiency, as measured by the return predictability of money flows, due in large part to institutional investors' ability to avoid underperforming funds.

Further, monthly public Form N-PORT disclosure may also improve price efficiency for fund holdings.[261] Price efficiency is expected to improve both because Form N-PORT information will contain valuations (which may be useful for holdings that are not traded on an exchange),[262] but also because the information that a fund is holding a particular security may affect the valuation decisions of investors.[263] While monthly portfolio information will increase the number of data points available to the public, resulting in an improvement of market participants' understanding of fund holdings and, therefore, price efficiency relative to the baseline, efficiency improvements will still be limited by the fact that portfolio information is lagged by 60 days.

The amendments may also increase efficiency in the secondary market for shares of closed-end funds. Because portfolios of closed-end funds will become more transparent, to the extent that portfolio information lagged by 60 days is informative for prices of secondary market transactions in shares of closed-end funds, the dispersion between funds' NAVs and the value of their shares in the secondary market may narrow, increasing the price efficiency of closed-end fund shares traded in the secondary market.

2. Competition

The amendments will entail compliance costs, though these are not expected to be substantial because funds already gather Form N-PORT information at a monthly frequency.[264]

---

[261]    Price efficiency refers to the idea that a security's price reflects all available information about the actual value of the security available to all market participants (issuers, investors, analysts, etc.).

[262]    *See, e.g.,* Morningstar, *Bond Pricing: Agreeing to Disagree* (2021), *available at* https://www.morningstar.com/content/dam/marketing/shared/research/foundational/Bond_Pricing_2021.pdf. The study shows that funds can value the same security differently at the same time.

[263]    This is consistent with one commenter's statements that prices of new portfolio positions react upon disclosure of these positions on Form N-PORT. *See supra* note 246.

[264]    *See* discussion in section IV.C.1.

Any compliance costs a fund pays, including compliance costs from the final amendments, are borne by the fund's investors. Because compliance costs have a fixed component (*i.e.*, they do not scale perfectly with fund size), smaller funds or smaller fund complexes will have greater compliance costs as a percentage of assets under management, negatively affecting their ability to compete with larger funds. Similarly, competition between funds and other means of investing, such as collective investment trusts ("CITs")[265] or separately managed account programs, may also be affected, in that funds may incur increased costs which could lead to outflows to these other vehicles, to the extent fund expenses are a dispositive factor in a choice of an investment vehicle for some investors.[266] This effect is mitigated by the increased transparency that funds would offer. Overall, the amendments are likely to improve competition between funds by improving fund transparency and allowing investors to better understand the reasons for fund performance.

Some commenters requested the Commission consider interactions between the economic effects of the proposed rule and other recent Commission rules, as well as practical realities such as implementation timelines.[267] We have also considered the potential effects on entities that are implementing other recently adopted rules during the compliance period for

---

[265]    CITs are an alternative to mutual funds for defined contribution plans. Like mutual funds, CITs pool the assets of investors and invest those assets according to a particular strategy. Unlike mutual funds, which are regulated under the Investment Company Act, CITs are regulated under banking laws and are not marketed as widely as mutual funds. These differences reduce CITs' operational and compliance costs compared with mutual funds. According to one report, CITs made up 47% of target-date strategy assets, as of the end of 2022, and are projected to become the most popular target-date vehicle within the next two years. *See* Natalya Shnitser, *Overtaking Mutual Funds: The Hidden Rise and Risk of Collective Investment Trusts* (Boston College Law School Legal Studies Research Paper No. 612, Sept. 17, 2023), *available at https://ssrn.com/abstract=4573199* (Yale Law Journal, Forthcoming).

[266]    *Id*.

[267]    *See supra* section IV.B; *see* ICI Comment Letter I; PIMCO Comment Letter; BlackRock Comment Letter.

these amendments.[268] As discussed above, the Commission acknowledges that overlapping compliance periods may in some cases increase costs. This may be particularly true for smaller entities with more limited compliance resources. This effect can negatively impact competition because these entities may be less able to absorb or pass on these additional costs, making it more difficult for them to remain in business or compete. However, we have mitigated the potential for heightened costs by adopting a tiered transition period. Moreover, the other rules have long compliance periods to facilitate planning, preparation and investment, thereby mitigating the cost of overlapping compliance periods, which may be particularly useful for smaller entities. We therefore do not expect the risk of negative competitive effects from increased compliance costs from overlapping compliance periods to be significant.

    3.  Capital Formation

This rule is likely to promote capital formation by improving price efficiency. In particular, more information on fund holdings (monthly versus quarterly), and more timely information, will improve investors' ability to value securities. These pricing signals from the market will lead to better decisions by issuers on how to allocate capital, namely to its most efficient uses. This effect is limited to the extent that investors already have access to data from Form N-PORT, and to the extent that there are numerous pricing signals available to investors in the market beyond those in Form N-PORT data. Nonetheless, the observation that there is a price response to publication of N-PORT data[269] suggests that there is valuable information in these filings that will improve the valuation of securities and thereby promote capital formation.

---

[268]    *See supra* sections IV.B and IV.C.5.

[269]    *See supra* note 263 and accompanying text.

### E. Alternatives

1. Form N-PORT Filing Frequency

The Commission is adopting the amendment to require funds to file Form N-PORT reports with the Commission within 30 days after the end of each month. As an alternative, we considered a longer filing deadline (*e.g.*, 45 or 60 days after each month end), as was suggested by some commenters.[270] We recognize that a 30-day filing deadline will impose costs on funds and their shareholders and that a longer filing deadline may mitigate such costs and could also reduce the risks associated with data security risks because the confidential portfolio data maintained on EDGAR would be less sensitive, to the extent that such risks are significant. However, as discussed above, because funds are currently required to maintain in their records monthly information that is required to be reported on Form N-PORT within 30 days after the end of each month, we do not expect that these costs will be substantial, while the 30-day deadline will provide the Commission with more timely information about funds' portfolio holdings and enhance its ability to oversee such funds, ultimately benefitting investors. In particular, any delays in receipt of information can affect the Commission and the staff's ability to use Form N-PORT information to carry out the Commission's regulatory function for the asset management industry, especially during periods of stress in which analysis of potential issues and development of any regulatory responses are particularly time sensitive endeavors. Thus, the benefits of the information decline as the filing deadline extends.

As another alternative, we could have adopted a shorter filing deadline, such as one week or fifteen days after the end of each month, to reduce the delay of the data, as suggested by some

---

[270]   *See, e.g.*, Dodge & Cox Comment Letter I (suggesting 60 days); ICI Comment Letter I (suggesting 45 days); Invesco Comment Letter (suggesting 45 days).

commenters.[271] Under this alternative, the Commission would receive data on a timelier basis and would be able to respond to market events more effectively. However, a shorter filing timeframe would require funds to collect information more quickly than they currently do, which would result in additional costs and could also present greater data security risks because the confidential portfolio data maintained on EDGAR would be more sensitive.

2.   Form N-PORT Publication Frequency

The Commission is adopting the amendment which will make funds' reports on Form N-PORT public on a monthly basis 60 days after the end of each monthly reporting period. As an alternative, we considered requiring the Form N-PORT filings to become public with a shorter than 60-day delay. For example, we could match the publication date with the Commission filing deadline that we are adopting, which would mean that a fund's filing would be due and become public 30 days after the end of the reporting period. Making filings public immediately upon filing could improve investor understanding of fund portfolios because investors would be able to review the information closer to real time (though still with a substantial delay). This alternative could enhance the ability of investors to use more timely information when making investment allocation decisions and to choose the right fund that suits their portfolio construction goals.[272] This approach would also reduce the amount of information the Commission would be required to keep confidential.[273] On the other hand, to the extent funds are at risk of predatory

---

[271]   *See, e.g.*, Hof zum Ahaus Comment Letter (suggesting weekly filing deadline with instant publishing); Myers Comment Letter (suggesting a 15-day reporting period if not weekly).

[272]   Some commenters generally suggested that the information would be stale and less useful to investors if delayed by 60 days. *See, e.g.*, Hof zum Ahaus Comment Letter (suggesting a one-week delay between the end of the month and publication of that month's Form N-PORT report); Brandano Comment Letter (suggesting a five-day delay); Gershon Comment Letter; Myers Comment Letter (suggesting a lag time before a report is available to the public of either 15 days or a week).

[273]   Certain data would remain confidential, such as the composition of the fund's "miscellaneous securities." *See supra* section IV.B.1.

trading or copycatting when their portfolios become public sooner, this approach would increase those risks.[274]

We also considered providing a longer period between the time information is filed and when it is made public. The benefits and costs of these alternatives would be the reverse of the publication-upon-filing alternative. Namely, this alternative could reduce the risks of predatory trading or copycatting because by the time the information became public, it would be staler. On the other hand, it would also be less useful to investors seeking to understand their funds and, if we paired a delay in publication with a delay in the deadline for filing with the Commission, it would be less useful to the Commission as well.

3.    Other Alternatives

Part F of Form N-PORT requires a fund to attach a complete schedule of portfolio holdings for the end of the first and third quarters of the fund's fiscal year, presented in accordance with Regulation S-X, within 60 days after the end of the reporting period. As an alternative, we considered requiring funds to post Regulation S-X compliant portfolio information on their websites on a monthly basis. This alternative could make the monthly disclosure more usable, particularly for individual investors, to the extent that they are less likely to use the information in Form N-PORT because of its structured data format. However, in response to the Proposing Release, some commenters argued that investor demand for more frequent Regulation S-X compliant portfolio holdings information is small and that investors do not express preference for Regulation S-X disclosures over Form N-PORT portfolio disclosures.[275]

---

[274]    *See supra* section IV.C.2.

[275]    *See, e.g.*, ICI Comment Letter I; Principal Comment Letter (stating that only a small percentage of its

In addition, this alternative may involve significant costs and increase operational

inefficiencies for funds, which could be passed on to investors, as raised by commenters.[276] For

example, because funds use portfolio positions as of the previous day (T+1 accounting) for their

Form N-PORT portfolio disclosures but Regulation S-X requires accounting records to be

presented in a trade-date format, funds would have to create two different portfolio disclosures

on a monthly basis, which may be operationally inefficient.[277]

## V. PAPERWORK REDUCTION ACT

### A. Introduction

Certain provisions of the final amendments contain "collection of information"

requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[278] The

Commission published a request for comment on changes to these collection of information

requirements in the Proposing Release and submitted these requirements to the Office of

Management and Budget ("OMB") for review in accordance with the PRA.[279] The titles for the

existing collections of information we are amending are: (1) "Rule 30b1-9 and Form N-PORT"

(OMB control number 3235-0730); and (2) "Form N-CEN" (OMB control number 3235-0729).

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of

information unless it displays a currently valid OMB control number. We discuss below the

collection of information burdens associated with the final amendments.

---

website visitors review the existing Regulation S-X compliant schedules of investments); T. Rowe Comment Letter (stating that its funds' shareholders have not expressed a preference for Regulation S-X compliant schedules).

[276]    *See* section II.A.3 for a detailed discussion of commenter feedback on this alternative.

[277]    *See, e.g.*, Capital Group Comment Letter; ICI Comment Letter I; SIFMA AMG Comment Letter.

[278]    44 U.S.C. 3501 through 3521.

[279]    44 U.S.C. 3507(d); 5 CFR 1320.11.

**B. Form N-PORT**

Form N-PORT requires registered management investment companies (except for money market funds and small business investment companies) and ETFs that are organized as unit investment trusts to report portfolio holdings information in a structured, XML data language. The form is filed electronically using the Commission's electronic filing system, EDGAR. We are adopting the following amendments to Form N-PORT:

- *Filing frequency*. The final amendments to Form N-PORT will require filing Form N-PORT reports on a monthly basis, within 30 days after the end of each month. Currently, a fund must maintain in its records the information that is required to be included on Form N-PORT not later than 30 days after the end of each month, but is only required to file that information within 60 days after the end of every third month.

- *Other amendments*. We are adopting conforming amendments to certain existing items, including amendments related to certain entity identifiers and amendments regarding miscellaneous holdings disclosure to account for the adopted amendments making monthly Form N-PORT information available to the public.

In a change from the proposal, we are not adopting the following proposed amendments to Form N-PORT at this time:

- *Public reporting of aggregate liquidity classifications*. The proposed amendments would have required certain open-end funds to aggregate information they report about liquidity classifications of their investments, make certain derivatives- and liabilities-related adjustments, and report the adjusted aggregate information as well as information about the adjustments that were made. The proposed amendments to

Form N-PORT also would have included certain changes to conform to the proposed amendments to the liquidity rule in that release (*e.g.*, changes to the liquidity categories).

- *Swing pricing information*. The proposed amendments would have required funds to report certain swing pricing information related to the size and frequency of price adjustments a fund made during each reporting period.

- *Additional reporting of Regulation S-X compliant portfolio information.* The proposed amendments would have increased the filing frequency of Regulation S-X compliant portfolio information on Part F of Form N-PORT.

The respondents to these collections of information will be management investment companies (other than money market funds and small business investment companies) and ETFs that are organized as unit investment trusts. We estimate that there are 12,561 such funds required to file on Form N-PORT.[280] The final collections of information are mandatory for the identified types of funds. Certain information reported on the form is currently kept confidential, and this will continue to be the case under the final amendments.[281] All other responses to Form N-PORT reporting requirements will not be kept confidential, and instead will be made public 60 days after the end of the month to which they relate. Currently, only the report for every third month is made public. The final amendments are designed to assist the Commission in its regulatory, disclosure review, inspection, and policymaking roles, and to help investors and other market participants better assess different funds.

---

[280]    This estimate of the number of funds required to file on Form N-PORT is as of Dec. 31, 2023, and based on data from filings with the Commission.

[281]    *See* General Instruction F of Form N-PORT; General Instruction F of amended Form N-PORT.

In our most recent PRA submission for Form N-PORT, we estimated the annual

aggregate compliance burden to comply with the current collection of information requirements

in Form N-PORT is 1,929,237 burden hours with an internal cost burden of $690,927,892 and an

external cost burden estimate of $136,290,893.[282] We estimate that funds prepare and file their

reports on Form N-PORT either by (1) licensing a software solution and preparing and filing the

reports in house, or (2) retaining a service provider to provide data aggregation, validation,

and/or filing services as part of the preparation and filing of reports on behalf of the fund. We

estimate that 35% of funds subject to the Form N-PORT filing requirements will license a

software solution and file reports on Form N-PORT in house, and the remaining 65% will retain

a service provider to file reports on behalf of the fund.

The Commission received one comment suggesting that the PRA estimates for the

proposed amendments, including those unrelated to the proposed reporting requirements, were

too low.[283] The Commission also received comments not specifically addressing the estimated

PRA burdens, but stating that the costs associated with implementing the proposed amendments

to Form N-PORT would be significant. Some of these commenters suggested that funds will

experience increased costs related to the collection of Form N-PORT information due to the

increased frequency of filing, especially when combined with the proposals to increase the

---

[282]   The most recent Form N-PORT PRA submission was approved in 2023 (OMB Control No. 3235-0730). The estimates in the Proposing Release were based on earlier approved estimates (1,848,326 hours and $108,457,536 external cost burden), and these earlier approved estimates are reflected in the "Proposed Estimates" section of the below table.

[283]   *See* Comment Letter of Calamos Investments LLC (Feb. 14, 2023) ("Calamos Comment Letter") (stating that the proposal significantly underestimated the time and costs involved in implementing the proposed amendments, and providing an example related to the proposed swing pricing requirement, which we are not adopting). This commenter did not expressly state that the proposal underestimated the time and costs involved in implementing the proposed reporting requirements that we are adopting, but the commenter did separately state that the shorter time frame for filing and the requirement to make additional filings would increase costs to fund shareholders.

frequency of reporting Regulation S-X compliant portfolio holdings and to require aggregate liquidity and swing pricing reporting.[284] However, the final amendments reduce many of the burdens raised by commenters (as compared to the proposal) because we are not adopting increased frequency of Regulation S-X compliant portfolio holding reporting and swing pricing and aggregate liquidity classification reporting. One commenter stated that some of its members estimated that filing Form N-PORT monthly would increase costs by $5,000 per fund per year.[285] Another commenter estimated internal staffing costs of $900,000 per year for the accelerated filing requirements and the proposed increase in frequency of Regulation S-X compliant portfolio information reporting.[286] This estimate appears to reflect the total cost for the fund group (and not per fund) and given that the commenter stated that it manages 197 funds that file Form N-PORT reports, the average per fund internal staffing cost for this commenter would be approximately $4,569 per year. Because we are not adopting the amendments to require more frequent reporting of Regulation S-X compliant schedules of investments, and the commenter did not separately provide a cost for the acceleration of the filing deadline, this numerical estimate of internal staffing costs should be adjusted down.

After considering comments, we are adjusting upward the proposal's estimated collection of information burden in connection with the requirement to file Form N-PORT reports within

---

[284] *See, e.g.,* ICI Comment Letter I (stating that funds aggregate Form N-PORT information within 30 days for internal collection purposes, but funds would need to take additional steps to validate and tag the data for filing on that same time frame and indicating that funds also would be required to report aggregate liquidity bucketing and swing pricing-related information and provide a Regulation S-X compliant schedule of investments each month.); Brighthouse Comment Letter (stating that a monthly reporting regime as well as the proposal to increase the frequency of reporting Regulation S-X compliant portfolio holdings would dramatically increase the costs associated with the preparation, review, and filing of the form due to new human resources requirements, vendors, systems, processes, and procedures).

[285] *See* SIFMA AMG Comment Letter.

[286] *See* T. Rowe Price Comment Letter.

30 days of month end. In the Proposing Release, the Commission estimated that the reduction in the recordkeeping burden would be commensurate with the increased burden of filing the information that previously would have been preserved as a record.[287] We recognize that, as commenters suggested, there is an additional burden associating with filing information more frequently than with recordkeeping and are updating our burden estimates accordingly.

We have adjusted the proposal's estimated annual burden hours and external costs to reflect changes from the proposal (including, as noted in the chart below, aspects of the proposal that we are not adopting at this time), changes in the number of funds, and updated wage rates. The below table summarizes our initial and ongoing annual burden estimates associated with the amendments to Form N-PORT.

### Table 3: Form N-PORT PRA Estimates

| | Initial internal burden hours | Internal annual burden hours[1] | Wage rate[2] | Internal time costs | Annual external cost burden |
|---|---|---|---|---|---|
| **PROPOSED ESTIMATES[3]** | | | | | |
| **[Aggregate Liquidity Classification Reporting] [Not Adopted]** | | | | | |
| Funds that license a software solution to prepare Form N-PORT | 3 hours | 2 hours | x     $381 | $762 | $250 |
| Number of funds | | × 4,021 funds | | × 4,021 funds | × 4,021 funds |
| Funds that retain the services of a third-party vendor to prepare Form N-PORT | 3 hours | 2 hours | $381 | $762 | $286 |
| Number of funds | | × 7,467 funds | | × 7,467 funds | × 7,467 funds |
| Subtotal: Aggregate Liquidity Classification | | 22,976 hours | | $8,753,856 | $3,140,819 |

---

[287]     *See* Proposing Release, *supra* note 11, at n.539 and accompanying text (stating that the Commission similarly did not adjust the PRA burden estimate when it amended Form N-PORT in 2019 to move from a requirement to file reports monthly to a requirement to prepare the information monthly but file it quarterly).

| [Swing Pricing Reporting] [Not Adopted] | | | | | | |
|---|---|---|---|---|---|---|
| Funds that license a software solution to prepare Form N-PORT | 9 hours | 4 hours | x | $381 | $1,524 | $250 |
| Number of funds | | × 3,165 funds | | | × 3,165 funds | × 3,165 funds |
| Funds that retain the services of a third-party vendor to prepare Form N-PORT | 9 hours | 4 hours | x | $381 | $1,524 | $286 |
| Number of funds | | × 5,878 funds | | | × 5,878 funds | × 5,878 funds |
| Subtotal: Swing Pricing Reporting | | 36,172 hours | | | $13,781,532 | $2,472,356 |
| **[Other Proposed Amendments to Form N-PORT] [Adopted]** | | | | | | |
| Funds that license a software solution to prepare Form N-PORT | | 1 hours | x | $381 | $381 | |
| Number of funds | | × 4,254 funds | | | × 4,254 funds | |
| Funds that retain the services of a third-party vendor to prepare Form N-PORT | | 1 hours | x | $381 | $381 | |
| Number of funds | | × 7,899 funds | | | × 7,899 funds | |
| Subtotal: Other Proposed Amendments | | 12,153 hours | | | $4,630,293 | |
| **Total Estimated Burdens for Proposed Amendments** | | | | | | |
| Total new annual burden | | 71,301 hours | | | $27,165,681 | $5,613,175 |
| **Total Estimated Burdens, Including Proposed Amendments** | | | | | | |
| **Current burden estimates** | | 1,848,326 hours | | | | $108,457,536 |
| **Revised burden estimates** | | **1,919,627 hours** | | | | **$114,070,711** |
| **FINAL ESTIMATES** | | | | | | |
| Funds that license a software solution to prepare Form N-PORT | 6 hours | 7 hours[4] | x | $420[5] | $2,940 | $2,000 |
| Number of funds | | × 4,396 funds[6] | | | × 4,396 funds[6] | x 4,396 funds[6] |
| Funds that retain the services of a third-party vendor to prepare Form N-PORT | 6 hours | 5 hours[7] | x | $420[5] | $2,100 | $4,000 |
| Number of funds | | × 8,165 funds[6] | | | × 8,165 funds[6] | x 8,165 funds[6] |

| Total new annual burden | 71,597 hours | $30,070,740 | $41,452,000 |
|---|---|---|---|
| **Total Estimated Burdens, Including Final Amendments** | | | |
| **Current burden estimates** | 1,929,237 hours | | $136,290,893 |
| **Revised burden estimates** | **2,000,834 hours** | | **$177,742,893** |

Certain products and sums do not tie to rounding.

Notes:

1. Includes initial burden estimates annualized over a 3-year period.

2. The Commission's estimates of the relevant wage rates are based on the salary information for the securities industry compiled by Securities Industry and Financial Markets Association's Office Salaries in the Securities Industry 2013, as modified by Commission staff ("SIFMA Wage Report"). The estimated figures are modified by firm size, employee benefits, overhead, and adjusted to account for the effects of inflation.

3. For additional detail about the proposed estimates, see Proposing Release, *supra* note 11, at section IV.D.

4. Reflects an initial burden of 6 hours, annualized over a 3-year period, with an estimated ongoing annual burden of 5 hours.

5. The $420 wage rate reflects current estimates of the blended hourly rate for a senior programmer ($399) and a compliance attorney ($440).

6. Based on Commission filings, we estimate that there are 12,561 funds that file reports on Form N-PORT. We estimate that 35% of these funds (or 4,396) would license a software solution to prepare Form N-PORT while 65% (or 8,165) would rely on a third-party vendor.

7. Reflects an initial burden of 6 hours, annualized over a 3-year period, with an estimated ongoing annual burden of 3 hours.

## C.  Form N-CEN

Form N-CEN requires registered investment companies, other than face-amount certificate companies, to report annual, census-type information. Filers must submit this report electronically using the Commission's EDGAR system in a structured XML data language. We are amending Form N-CEN to require that an open-end fund that uses a liquidity classification service provider report certain information. Specifically, a fund will be required to report: (a) the name each liquidity service provider; (b) identifying information, including the legal entity identifier and location, for each liquidity service provider; (c) if the liquidity service provider is affiliated with the fund or its investment adviser; (d) the asset classes for which that liquidity service provider provided classifications; and (e) whether the service provider was hired or terminated during the reporting period. We are also revising the approach to certain entity

identifiers.[288] Unlike the proposal, we are not removing requirements that a filer report certain information regarding its use of swing pricing.

The respondents to these collections of information will be registered investment companies with the exception of face amount certificate companies. We estimate that there are 2,749 such registrants required to file on Form N-CEN.[289] The final collections of information are mandatory. Responses are not kept confidential. The purpose of Form N-CEN is to satisfy the filing and disclosure requirements of section 30 of the Investment Company Act, and of 17 CFR 270.30a-1 (rule 30a-1) thereunder. The amendments are designed to facilitate the Commission's oversight of registered funds and its ability to assess trends and risks.

The Commission received one comment suggesting that the PRA estimates for the proposed amendments were too low.[290] However, the context of the letter does not suggest that the commenter was referring to the Form N-CEN amendments, as the commenter did not discuss that aspect of the proposal. We did not receive any comments specific to the proposed PRA estimates for the Form N-CEN amendments. We also did not receive any comments discussing the potential costs or burdens of the amendments to Form N-CEN. We have adjusted the proposal's estimated annual burden hours and external costs to reflect changes from the proposal, changes in the number of funds, and updated wage rates.

In our most recent PRA submission for Form N-CEN, we estimated the annual aggregate compliance burden to comply with the current collection of information requirements in Form N-

---

[288]   We do not believe that the amendments to separate the concepts of LEI and RSSD ID more clearly in the form will change the burdens of the current form, as the form already requires a fund to report the RSSD ID, if any, if a financial institution does not have an assigned LEI.

[289]   This estimate, which is as of Dec. 31, 2023, is based on Form N-CEN filings.

[290]   *See* Calamos Comment Letter.

CEN is 59,490 burden hours with an internal cost burden of $24,152,940 and an external cost burden estimate of $605,520.[291]

The below table summarizes our initial and ongoing annual burden estimates associated with the amendments to Form N-CEN.

### Table 4: Form N-CEN PRA Estimates

| | Initial internal burden hours | Internal annual burden hours[1] | | Wage rate[2] | Internal time costs | Annual external cost burden |
|---|---|---|---|---|---|---|
| **PROPOSED ESTIMATES[3]** | | | | | | |
| Liquidity Service Provider Reporting | 1.5 hours | 1 hour | X | $381 | $381 | |
| Number of registrants | | x 2,754 registrants | | | x 2,754 registrants | |
| Subtotal: Liquidity Service Provider Reporting | | 2,754 hours | | | $1,049,274 | |
| Removal of Swing Pricing Reporting [not adopted] | | (0.5) hours | x | $351 | $(175.5) | |
| Number of funds | | x 9,854 funds | | | x 9,854 funds | |
| Subtotal: Removal of Swing Pricing Reporting | | (4,927 hours) | | | ($1,729,377) | |
| Total new annual burden | | (2,173 hours) | | | ($680,103) | |
| **Total Estimated Burdens, Including Proposed Amendments** | | | | | | |
| **Current burden estimates** | | 54,890 hours | | | | $1,344,981 |

---

[291] The most recent Form N-CEN PRA submission was approved in 2024 (OMB Control No. 3235-0729). The estimates in the Proposing Release were based on earlier approved estimates (54,890 hours and $1,344,981 external cost burden), and these earlier approved estimates are reflected in the "Proposed Estimates" section of the below table.

| Revised burden estimates | 52,718 hours | | | | $1,344,981 |
|---|---|---|---|---|---|
| **FINAL ESTIMATES** | | | | | |
| Liquidity Service Provider Reporting | 1.5 hours | 1 hour[4] | x | $420[5] | $420 |
| Number of registrants | x 2,749 registrants | | | x 2,749 registrants | |
| Subtotal: Liquidity Service Provider Reporting | 2,749 hours | | | $1,154,580 | |
| **Total Estimated Burdens, Including Final Amendments** | | | | | |
| Current burden estimates | 59,490 hours | | | | $605,520 |
| Revised burden estimates | 62.239 hours | | | | $605,520 |

Notes:

1. Includes initial burden estimates annualized over a 3-year period.

2. *See supra* Table 3, at note 2.

3. For additional detail about the proposed estimates, see Proposing Release, *supra* note 11, at section IV.D.

4. Reflects an initial burden of 1.5 hours, annualized over a 3-year period, with an estimated ongoing annual burden of 0.5 hours.

5. The $420 wage rate reflects current estimates of the blended hourly rate for a senior programmer ($399) and a compliance attorney ($440).

## VI. FINAL REGULATORY FLEXIBILITY ANALYSIS

The Commission has prepared the following Final Regulatory Flexibility Analysis ("FRFA") in accordance with section 604 of the Regulatory Flexibility Act ("RFA").[292] It relates to the final amendments to Form N-PORT and Form N-CEN. The Proposing Release included an Initial Regulatory Flexibility Act Analysis ("IRFA"), which solicited comment and was prepared in accordance with the RFA.

---

[292]    5 U.S.C. 604.

**A. Need for and Objectives of the Rule and Form Amendments**

The Commission is adopting amendments to reporting requirements that will apply to certain registered investment companies, including registered open-end funds, registered closed-end funds, and unit investment trusts. The final amendments to rule 30b1-9 and Form N-PORT are designed to improve transparency and facilitate better monitoring of funds by requiring more timely reporting of monthly portfolio holdings and related information to the Commission and the public. The final amendments to Form N-CEN are designed to provide the Commission with information about fund service providers used to comply with liquidity risk management program requirements. This information will allow the Commission and other participants to track certain liquidity risk management practices. Each of these objectives is discussed in detail in section II above.

**B. Significant Issues Raised by Public Comments**

In the Proposing Release, the Commission requested comment on every aspect of the IRFA, including the number of small entities that would be affected by the proposed amendments, the existence or nature of the potential impact of the proposed amendments on small entities, and how to quantify the impact of the proposed amendments. The Commission also requested comment on the proposed compliance burdens and the effect these burdens would have on small entities.

The Commission did not receive comments specifically addressing the IRFA. However, one commenter suggested that filing Form N-PORT reports within 30 days of month end would present significant resource issues for small funds for certain months, such as the months following a fund's annual and semiannual reporting periods.[293] This commenter also stated that

---

[293]     *See* Singer Comment Letter.

additional time would be needed for eight months of the year if funds are required to include

Regulation S-X compliant portfolio schedules with more frequency, as proposed. The

commenter suggested that the Commission provide 60 days after month end to file reports on

Form N-PORT, at least for small funds. Another commenter suggested that the Commission

should provide an extended compliance period for smaller funds, which would ease compliance

burdens because smaller funds can leverage the experiences and learning gained by larger funds

going first.[294] The only commenter that addressed the proposed Form N-CEN amendments was

supportive.[295]

In addition, a number of commenters stated that requiring monthly reporting within 30

days of month end would overburden funds, service providers, or funds' internal systems and

processes.[296] Some commenters had concerns that the other amendments to Form N-PORT

would also result in significant burdens for funds and additional costs to fund shareholders.[297]

We recognize that filing the recorded information within the 30-day deadline will

increase burdens for funds and their service providers, including for small entities. To mitigate

costs, we are providing an extended implementation period for smaller funds during which funds

will be able to update their Form N-PORT reporting processes to prepare for the requirement to

file monthly information within 30 days of month end and potentially benefit from the lessons

learned by larger funds during the implementation period. Additionally, we are persuaded by

---

[294]   *See* ICI Comment Letter I.

[295]   *See* Myer Comment Letter.

[296]   *See, e.g.,* Fidelity Comment Letter; ICI Comment Letter I; Singer Comment Letter; T. Rowe Comment Letter.

[297]   *See, e.g.,* Capital Group Comment Letter; ICI Comment Letter I (stating that, because a Regulation S-X compliant schedule of investments is not necessary for fund shareholders to understand a fund's portfolio holdings, requiring the schedule of investments on a monthly basis would provide little benefit to investors); SIFMA AMG Comment Letter.

commenters who expressed that the costs of the proposed requirement to attach a Regulation S-X compliant schedule of portfolio investments may not justify the benefits, particularly given the costs and time currently involved with preparing such a schedule and the other sources of portfolio information available to investors. Therefore, we are not adopting the proposed amendments to require funds to present portfolio holdings in accordance with Regulation S-X more frequently than currently required.

### C.  Small Entities Subject to Rule Amendments

An investment company is a small entity if, together with other investment companies in the same group of related investment companies, it has net assets of $50 million or less as of the end of its most recent fiscal year. Commission staff estimates that, as of December 2023, there were 40 open-end management investment companies that would be considered small entities; this number includes 2 money market funds and 9 ETFs. Commission staff also estimates that, as of December 2023, there were 29 closed-end registered management investment companies and 3 unit investment trusts that would be considered small entities.

### D.  Projected Reporting, Recordkeeping, and Other Compliance Requirements

We are adopting final amendments to reporting requirements on Forms N-PORT and N-CEN. The final amendments will require more frequent reporting of monthly portfolio holdings and related information, amend reporting requirements regarding certain identifiers, and require open-end funds to report information about service providers used to comply with liquidity risk management program requirements.

Form N-PORT requires open-end and closed-end funds, as well as ETFs organized as UITs, to report monthly portfolio holdings information in a structured, XML data language. We estimate that 67 small funds will be subject to the amendments to Form N-PORT. The final

amendments will require funds to file reports on Form N-PORT on a monthly basis within 30 days after the end of the month to which they relate. Monthly reporting rather than quarterly reporting will provide more timely information to the Commission, which will enhance the Commission staff's ability to oversee and monitor the activities of funds effectively to better carry out our regulatory functions, consistent with the goals of Form N-PORT reporting.

Funds are already required to produce monthly data upon request by Commission staff and to adhere to the 30-day deadline for recordkeeping purposes.[298] We recognize, however, that filing the recorded information within the 30-day deadline will increase burdens for funds and their service providers relative to the current quarterly filing requirement. Because funds, including small funds, currently are required to gather the Form N-PORT data and ensure its accuracy within 30 days of month end, the costs involved with the final amendments are limited to those associated with a more condensed filing process.

In addition to the amendments requiring more timely reporting of information, we are amending the existing requirements related to the reporting of certain flow information and regarding the "miscellaneous securities" bucket to align with the new monthly filing cadence and public availability of Form N-PORT.

Form N-CEN is used to collect annual, census-type information for all registered investment companies, other than face-amount certificate companies. Filers must submit this report electronically using the Commission's EDGAR system in XML data language. We estimate that 72 small funds will be subject to the amendments to Form N-CEN, but some of the amendments apply only to 38 small funds that are subject to the liquidity rule. We are adopting amendments to Form N-CEN to require funds that are subject to the liquidity rule to identify and

---

[298]   Rule 30b1-9.

provide certain information about service providers that a fund uses to fulfill the requirements of that rule. This information will allow the Commission and other participants to track certain liquidity risk management practices and will help us better understand potential trends or outliers in funds' liquidity classifications.

We are also adopting amendments to Form N-PORT and Form N-CEN to revise the definition of LEI to require funds to identify specifically whether they are reporting an LEI or an RSSD ID, although the amendments will not change the circumstances in which a fund is required to report an LEI or an RSSD ID, if available. The change is designed to improve consistency and comparability of information funds report about the instruments they hold, including issuers of those instruments and counterparties to certain transactions. Funds already report the information to which these amendments relate, so these amendments will not have a significant economic impact.

The final amendments will impose burdens on all Form N-PORT and Form N-CEN filers, including those that are small entities. We discuss the specifics of these burdens in the Economic Analysis and Paperwork Reduction Act sections. These sections also discuss the professional skills that we believe compliance with the final amendments will require. We recognize that, due to economies of scale, the costs associated with the final amendments to Form N-PORT and Form N-CEN may be more easily borne by larger fund complexes than smaller ones, and that costs borne by funds may be passed along to investors in the form of higher fees and expenses.

### E. Agency Action to Minimize Effect on Small Entities

The Regulatory Flexibility Act directs the Commission to consider significant alternatives that would accomplish our stated objective, while minimizing any significant

economic impact on small entities. We considered the following alternatives for small entities in relation to our proposal: (1) exempting funds that are small entities from all or part of the proposed reporting requirements, to account for resources available to small entities; (2) establishing different reporting requirements or frequency, to account for resources available to small entities; (3) clarifying, consolidating, or simplifying the compliance and reporting requirements under the proposal for small entities; and (4) using performance rather than design standards.

We do not believe that exempting small funds from the provisions of the final amendments, or providing different requirements or reporting frequencies for small funds, will permit us to achieve our stated objectives. If the final rules were to include different requirements for small funds or exempt small funds, this could raise investor protection concerns for investors in small funds, for example if Commission staff were not able efficiently to identify small funds affected in a market stress event. This also would result in the Commission, investors, and other users of Form N-PORT data having less transparency and insight with respect to those smaller funds. The potential staleness of Form N-PORT data for small entities (if small entities were exempted from the final amendments) would, among other things, limit the Commission staff's ability to develop a more complete understanding of the market on a timely basis and impede our ability to contribute fully to interagency discussions and responses to market events.

Finally, we do not believe that clarifying, consolidating, or simplifying the compliance requirements under the final amendments for small funds, beyond those already required for all funds, would permit us to achieve our stated objectives. Again, this approach would raise investor protection concerns for investors in small funds, reduce transparency, and hinder the

Commission staff's monitoring of small funds. With respect to using performance rather than design standards, the amendments primarily use design rather than performance standards to promote more consistent and uniform reporting standards for all funds.

The costs associated with the final amendments will vary depending on a fund's particular circumstances, and thus the amendments may result in different burdens on funds' resources. We recognize that filing the recorded information within the 30-day deadline will increase burdens for funds and their service providers. Because funds, including small funds, currently are required to gather the Form N-PORT data within 30 days of month end, the costs involved with the final amendments are limited to those associated with a more condensed filing process. To mitigate costs, we are providing an extended implementation period during which small funds will be able to update their Form N-PORT reporting processes to prepare for the requirement to file monthly information within 30 days of month end and potentially benefit from the lessons learned by larger funds during the implementation period. In addition, we are not adopting certain of the proposed amendments to Form N-PORT, such as the proposed requirement to report Regulation S-X compliant portfolio schedules more frequently, which commenters stated would be burdensome for funds, including small funds.

**STATUTORY AUTHORITY**

The Commission is adopting the rule and form amendments contained in this document under the authority set forth in the Investment Company Act, particularly sections 8, 24, 30, 31, and 38 thereof [15 U.S.C. 80a-1 *et seq.*].

**List of Subjects in 17 CFR Parts 270 and 274**

Investment companies, Reporting and recordkeeping requirements, Securities.

For the reasons set forth in the preamble, title 17, chapter II of the Code of Federal Regulations is amended as follows:

**PART 270—RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940**

1. The authority citation for part 270 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 80a-1 *et seq.*, 80a-34(d), 80a-37, 80a-39, 1681w(a)(1), 6801-6809, 6825, and Pub. L. 111-203, sec. 939A, 124 Stat. 1376 (2010), unless otherwise noted.

* * * * *

2. Effective November 17, 2025, amend § 270.30b1-9 by revising it to read as follows:

**§ 270.30b1-9 Monthly report.**

Each registered management investment company or exchange-traded fund organized as a unit investment trust, or series thereof, other than a registered open-end management investment company that is regulated as a money market fund under §270.2a-7 or a small business investment company registered on Form N-5 (§§239.24 and 274.5 of this chapter), must file a monthly report of portfolio holdings on Form N-PORT (§274.150 of this chapter), current as of the last business day, or last calendar day, of the month. A registered investment company that has filed a registration statement with the Commission registering an offering of its securities for the first time under the Securities Act of 1933 is relieved of this reporting obligation with respect to any reporting period or portion thereof prior to the date on which that registration statement becomes effective or is withdrawn. Reports on Form N-PORT must be filed with the Commission no later than 30 days after the end of each month. Each registered investment company that is required to file reports on Form N-PORT and that does not file monthly reports within 30 days after the end of each month must maintain in its records the information that is required to be included on Form N-PORT no later than 30 days after the end

of each month for which it does not file a monthly report within that period. Such information shall be treated as a record under section 31(a)(1) of the Act [15 U.S.C. 80a-30(a)(1)] and §270.31a-1(b) subject to the requirements of §270.31a-2(a)(2).

**§ 270.30b1-9 [Amended]**

3. Effective May 18, 2026, further amend § 270.30b1-9 by removing the last two sentences.

**PART 274—FORMS PRESCRIBED UNDER THE INVESTMENT COMPANY ACT OF 1940**

4. The general authority citation for part 274 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 78c(b), 78*l*, 78m, 78n, 78n-1, 78o(d), 80a-8, 80a-24, 80a-26, 80a-29, and sec. 939A, Pub. L. 111-203, 124 Stat. 1376, unless otherwise noted.

* * * * *

5. Amend Form N-CEN (referenced in § 274.101) by:

a. Revising General Instruction E and Items B.16, B.17, C.5, C.6, C.9, C.10, C.11, C.12, C.13, C.14, C.15, C.16, and C.17;

b. Adding Item C.22; and

c. Revising Items D.12, D.13, D.14, E.2, F.1, F.2, F.4, and Instructions to Item G.1.

**Note: Form N-CEN is attached as Appendix A to this document. Form N-CEN will not appear in the Code of Federal Regulations.**

6. Amend § 274.150, by revising paragraph (a) to read as follows:

**§ 274.150 Form N-PORT, Monthly portfolios holdings report.**

(a) Except as provided in paragraph (b) of this section, this form shall be used by registered management investment companies or exchange-traded funds organized as unit investment trusts, or series thereof, to file reports pursuant to §270.30b1-9 of this chapter not later than 30 days after the end of each month.

\* \* \* \* \* \*

7. Amend Form N-PORT (referenced in § 274.150) by revising General Instructions A, E, and F and Items B.4, B.5, B.6, C.1, C.10, C.11, and Part D.

**Note: Form N-PORT is attached as Appendix B to this document. Form N-PORT will not appear in the Code of Federal Regulations.**

By the Commission.

**Dated:** August 28, 2024.

**Vanessa A. Countryman,**

*Secretary.*

Note: The following appendices will not appear in the Code of Federal Regulations.

**Appendix A–Form N-CEN**

## FORM N-CEN

\* \* \* \* \*

## GENERAL INSTRUCTIONS

\* \* \* \* \*

**E.    Definitions**

Except as defined below or where the context clearly indicates the contrary, terms used in Form N-CEN have meanings as defined in the Act and the rules and regulations thereunder. Unless otherwise indicated, all references in the form or its instructions to statutory sections or to rules are sections of the Act and the rules and regulations thereunder.

In addition, the following definitions apply:

**"Class"** means a class of shares issued by a Fund that has more than one class that represents interest in the same portfolio of securities under rule 18f-3 under the Act (17 CFR 270.18f-3) or under an order exempting the Fund from provisions of section 18 of the Act (15 U.S.C. 80a-18).

**"CRD number"** means a central licensing and registration system number issued by the Financial Industry Regulatory Authority.

**"Exchange-Traded Fund"** means an open-end management investment company (or Series or Class thereof) or unit investment trust (or series thereof), the shares of which are listed and traded on a national securities exchange at market prices, and that has formed and operates under an exemptive order under the Act granted by the Commission or in reliance on rule 6c-11 under the Act (17 CFR 270.6c-11).

**"Exchange-Traded Managed Fund"** means an open-end management investment company (or Series or Class thereof) or unit investment trust (or series thereof), the shares of which are listed and traded on a national securities exchange at net asset value-based prices, and that has formed and operates under an exemptive order under the Act granted by the Commission or in reliance on an exemptive rule under the Act adopted by the Commission.

**"Fund"** means the Registrant or a separate Series of the Registrant.  When an item of Form N-CEN specifically applies to a Registrant or Series, those terms will be used.

**"LEI"** means, with respect to any company, the "legal entity identifier" as assigned by a utility endorsed by the Global LEI Regulatory Oversight Committee or accredited by the Global LEI Foundation.

**"Money Market Fund"** means an open-end management investment company registered under the Act, or Series thereof, that is regulated as a money market fund pursuant to rule 2a-7 under the Act (17 CFR 270.2a-7).

**"PCAOB number"** means the registration number issued to an independent public accountant registered with the Public Company Accounting Oversight Board.

**"Registrant"** means the investment company filing this report or on whose behalf the report is filed.

**"RSSD ID"** means the identifier assigned by the National Information Center of the Board of Governors of the Federal Reserve System, if any.

**"SEC File number"** means the number assigned to an entity by the Commission when that entity registered with the Commission in the capacity in which it is named in Form N-CEN.

**"Series"** means shares offered by a Registrant that represent undivided interests in a portfolio of investments and that are preferred over all other Series of shares for assets specifically allocated to that Series in accordance with rule 18f-2(a) (17 CFR 270.18f-2(a)).

* * * * *

**Item B.16.**    Principal underwriters.

a.    * * *

    iv.    LEI, if any: ___ or

        If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item B.17.**    Independent public accountant.  Provide the following information about each independent public accountant:

* * * * *

c.    LEI, if any: ___ or

    If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.5.**    Investments in certain foreign corporations.

* * * * *

b.    * * *

    ii.    LEI of subsidiary, if any: ___ or

        If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.6.**    Securities lending.

* * * * *

c.      \* \* \*

     ii.      LEI, if any: _____ or

        If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

     v.      \* \* \*

        2.      LEI, if any, of person providing indemnification: _____ or

          If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

d.      \* \* \*

     ii.      LEI, if any: _____ or

        If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

**Item C.9.**      Investment advisers.

a.      \* \* \*

     iv.      LEI, if any: _____ or

        If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

b.      \* \* \*

     iv.      LEI, if any: _____ or

        If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

c.      \* \* \*

     iv.      LEI, if any: _____ or

If no LEI is provided, RSSD ID, if any: ___

* * * * *

d.    * * *

iv.    LEI, if any: _____ or

If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.10.**    Transfer agents.

a.    * * *

iii.    LEI, if any: _____ or

If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.11.**    Pricing services

a.  * * *

ii.    LEI, if any: _____ or

If no LEI is provided, RSSD ID, if any: ___ or

Provide and describe other identifying number: _____

* * * * *

**Item C.12.**    Custodians

a.    * * *

ii.    LEI, if any: _____ or

If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.13.**    Shareholder servicing agents.

a.        * * *

    ii.        LEI, if any: ____ or

          If no LEI is provided, RSSD ID, if any: ___ or

          Provide and describe other identifying number: ____

* * * * *

**Item C.14.**    Administrators

a.        * * *

    ii.        LEI, if any: ____ or

          If no LEI is provided, RSSD ID, if any: ___ or

          Provide and describe other identifying number: ____

* * * * *

**Item C.15.**    Affiliated broker-dealers. Provide the following information about each affiliated

broker-dealer:

* * * * *

d.    LEI, if any: ____ or

    If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.16.**    Brokers.

a.        * * *

iv.    LEI, if any: ____ or

    If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.17.**    Principal transactions.

a.      * * *

    iv.      LEI, if any: _____ or

        If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item C.22.**      Liquidity classification services. For open-end management investment

companies subject to rule 22e-4 (17 CFR 270.22e-4), respond to the following:

    a.  Provide the following information about each person that provided liquidity classification

        services to the Fund during the reporting period:

        i.  Full name: _____

        ii.  LEI, if any: _____ or

        If no LEI is provided, RSSD ID, if any: ___ or

        Provide and describe other identifying number: _____

        iii.  State, if applicable: _____

        iv.  Foreign country, if applicable: _____

        v.  Is the liquidity classification service an affiliated person of the Fund or its investment

            adviser(s)?  [Y/N]

        vi.  Asset class(es) for which liquidity classification services were provided to the Fund:

            _____

    b.  Was a liquidity classification service hired or terminated during the reporting period?

        [Y/N]

* * * * *

**Item D.12.**      Investment advisers (small business investment companies only).

    a.  * * *

      iv.    LEI, if any: _____ or

           If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

  b.  \* \* \*

      iv.    LEI, if any: _____ or

           If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

  c.  \* \* \*

      iv.    LEI, if any: _____ or

           If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

  d.  \* \* \*

      iv.    LEI, if any: _____ or

           If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

**Item D.13.**    Transfer agents (small business investment companies only).

  a.  \* \* \*

      iii.    LEI, if any: _____ or

           If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

**Item D.14.**    Custodians (small business investment companies only).

  a.  \* \* \*

      ii.    LEI, if any: _____ or

If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item E.2.**     Authorized participants. For each authorized participant of the Fund, provide the following information:

* * * * *

    d.  LEI, if any: ____ or

       If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item F.1.**     Depositor. Provide the following information about each depositor:

* * * * *

    c.     LEI, if any: ____ or

       If no LEI is provided, RSSD ID, if any: ___

* * * * *

**Item F.2.**     Administrators.

a.     * * *

    ii.  LEI, if any: ____ or

       If no LEI is provided, RSSD ID, if any: ___ or

       Provide and describe other identifying number: ____

* * * * *

**Item F.4.**     Sponsor. Provide the following information about each sponsor:

* * * * *

c.     LEI, if any: ____ or

    If no LEI is provided, RSSD ID, if any: ___

\* \* \* \* \*

**Item G.1.**     Attachments.

\* \* \* \* \*

*Instructions.*

\* \* \* \* \*

2. \* \* \*

> (f) Security supported (if applicable). Disclose the full name of the issuer, the title of the issue (including coupon or yield, if applicable) and at least two identifiers, if available (*e.g.*, CIK, CUSIP, ISIN, LEI, RSSD ID).

\* \* \* \* \*

**Appendix B–Form N-PORT**

## FORM N-PORT

* * * * *

## GENERAL INSTRUCTIONS

### A.     Rule as to Use of Form N-PORT

Form N-PORT is the reporting form that is to be used for monthly reports of Funds other than money market funds and SBICs under section 30(b) of the Act, as required by rule 30b1-9 under the Act (17 CFR 270.30b1-9). Funds must report information about their portfolios and each of their portfolio holdings as of the last business day, or last calendar day, of each month, other than the information reported in Items B.11 and C.2.e, which Funds must report quarterly about their portfolios and each of their portfolio holdings as of the last business day, or calendar day, of the third month of the quarter. A registered investment company that has filed a registration statement with the Commission registering an offering of its securities for the first time under the Securities Act of 1933 is relieved of this reporting obligation with respect to any reporting period or portion thereof prior to the date on which that registration statement becomes effective or is withdrawn.

Reports on Form N-PORT must disclose portfolio information as calculated by the fund for the reporting period's ending net asset value (commonly, and as permitted by rule 2a-4, the first business day following the trade date). Reports on Form N-PORT for each month must be filed with the Commission no later than 30 days after the end of such month. If the due date falls on a weekend or holiday, the filing deadline will be the next business day.

A Fund may file an amendment to a previously filed report at any time, including an amendment to correct a mistake or error in a previously filed report. A Fund that files an

amendment to a previously filed report must provide information in response to all items of Form N-PORT, regardless of why the amendment is filed.

* * * * *

### E.    Definitions

References to sections and rules in this Form N-PORT are to the Act, unless otherwise indicated. Terms used in this Form N-PORT have the same meanings as in the Act or related rules (including rule 18f-4 solely for Items B.9 and 10 of the Form), unless otherwise indicated.

As used in this Form N-PORT, the terms set out below have the following meanings:

"Absolute VaR Test" has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"Class" means a class of shares issued by a Fund that has more than one class that represents interests in the same portfolio of securities under rule 18f-3 [17 CFR 270.18f-3] or under an order exempting the Fund from provisions of section 18 of the Act [15 U.S.C. 80a-18].

"Controlled Foreign Corporation" has the meaning provided in section 957 of the Internal Revenue Code [26 U.S.C. 957].

"Derivatives Exposure" has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"Designated Index" has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"Designated Reference Portfolio" has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"Exchange-Traded Fund" means an open-end management investment company (or Series or Class thereof) or unit investment trust (or series thereof), the shares of which are listed and traded on a national securities exchange at market prices, and that has formed and operates under an exemptive order under the Act granted by the Commission or in reliance on rule 6c-11 [17 CFR 270.6c-11].

"Fund" means the Registrant or a separate Series of the Registrant.  When an item of Form N-PORT specifically applies to a Registrant or a Series, those terms will be used.

"Highly Liquid Investment Minimum" has the meaning defined in rule 22e-4(a)(7) [17 CFR 270.22e-4(a)(7)].

"Illiquid Investment" has the meaning defined in rule 22e-4(a)(8) [17 CFR 270.22e-4(a)(8)].

"ISIN" means, with respect to any security, the "international securities identification number" assigned by a national numbering agency, partner, or substitute agency that is coordinated by the Association of National Numbering Agencies.

"LEI" means, with respect to any company, the "legal entity identifier" as assigned by a utility endorsed by the Global LEI Regulatory Oversight Committee or accredited by the Global LEI Foundation.

"Multiple Class Fund" means a Fund that has more than one Class.

"Registrant" means a management investment company, or an Exchange-Traded Fund organized as a unit investment trust, registered under the Act.

"Relative VaR Test" has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"Restricted Security" has the meaning defined in rule 144(a)(3) under the Securities Act of 1933 [17 CFR 230.144(a)(3)].

"RSSD ID" means the identifier assigned by the National Information Center of the Board of Governors of the Federal Reserve System, if any.

"Securities Portfolio" has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"Series" means shares offered by a Registrant that represent undivided interests in a portfolio of investments and that are preferred over all other series of shares for assets specifically allocated to that series in accordance with rule 18f-2(a) [17 CFR 270.18f-2(a)].

"Swap" means either a "security-based swap" or a "swap" as defined in sections 3(a)(68) and (69) of the Securities Exchange Act of 1934 [15 U.S.C. 78c(a)(68) and (69)] and any rules, regulations, or interpretations of the Commission with respect to such instruments.

"Value-at-Risk" or VaR has the meaning defined in rule 18f-4(a) [17 CFR 270.18f-4(a)].

"VaR Ratio" means the value of the Fund's portfolio VaR divided by the VaR of the Designated Reference Portfolio.

## F.    Public Availability

Information reported on Form N-PORT will be made publicly available 60 days after the end of the reporting period.

The SEC does not intend to make public the information reported on Form N-PORT with respect to a Fund's Highly Liquid Investment Minimum (Item B.7), derivatives transactions (Item B.8), Derivatives Exposure for limited derivatives users (Item B.9), median daily VaR (Item B.10.a), median VaR Ratio (Item B.10.b.iii), VaR backtesting results (Item B.10.c), country of risk and economic exposure (Item C.5.b), delta (Items C.9.f.v, C.11.c.vii, or C.11.g.iv), liquidity classification for portfolio investments (Item C.7), or miscellaneous securities (Part D), or explanatory notes related to any of those topics (Part E) that is identifiable to any particular fund or adviser. However, the SEC may use information reported on this Form in its regulatory programs, including examinations, investigations, and enforcement actions.

\* \* \* \* \*

**Item B.4.**    Securities Lending

   a.  \* \* \*

      ii.  LEI (if any) of borrower.

        If the borrower does not have an LEI, provide the borrower's RSSD ID, if any.

\* \* \* \* \*

**Item B.5.**     Return Information

    a.  Total return of the Fund during the reporting period.  If the Fund is a Multiple Class Fund, report the return for each Class.  Such return(s) shall be calculated in accordance with the methodologies outlined in Item 26(b)(1) of Form N-1A, Instruction 13 to sub-Item 1 of Item 4 of Form N-2, or Item 26(b)(i) of Form N-3, as applicable.

\* \* \* \* \*

    c.  Net realized gain (loss) and net change in unrealized appreciation (or depreciation) attributable to derivatives for each of the following asset categories during the reporting period:  commodity contracts, credit contracts, equity contracts, foreign exchange contracts, interest rate contracts, and other contracts.  Within each such asset category, further report the same information for each of the following types of derivatives instrument:  forward, future, option, swaption, swap, warrant, and other.  Report in U.S. dollars.  Report losses and depreciation as negative numbers.

    d.  Net realized gain (loss) and net change in unrealized appreciation (or depreciation) attributable to investments other than derivatives during the reporting period.  Report in U.S. dollars.  Report losses and depreciation as negative numbers.

**Item B.6.**     Flow information.  Provide the aggregate dollar amounts for sales and redemptions/repurchases of Fund shares during the reporting period.  If shares of the Fund are held in omnibus accounts, for purposes of calculating the Fund's sales, redemptions, and repurchases, use net sales or redemptions/repurchases from such omnibus accounts.  The amounts to be reported under this Item should be after any front-end sales load has been deducted and before any deferred or contingent deferred sales load or charge has been deducted.

Shares sold shall include shares sold by the Fund to a registered unit investment trust. For mergers and other acquisitions, include in the value of shares sold any transaction in which the Fund acquired the assets of another investment company or of a personal holding company in exchange for its own shares. For liquidations, include in the value of shares redeemed any transaction in which the Fund liquidated all or part of its assets. Exchanges are defined as the redemption or repurchase of shares of one Fund or series and the investment of all or part of the proceeds in shares of another Fund or series in the same family of investment companies.

* * * * *

**Item C.1.**      Identification of investment.

* * * * *

   b.  LEI (if any) of issuer. In the case of a holding in a fund that is a series of a series trust, report the LEI of the series.

     If the issuer does not have an LEI, provide the issuer's RSSD ID, if any.

* * * * *

**Item C.10.**      For repurchase and reverse repurchase agreements, also provide:

* * * * *

   b.  * * *

     ii.  If N, provide the name and LEI (if any) of counterparty.

     If the counterparty does not have an LEI, provide the counterparty's RSSD ID, if any.

* * * * *

**Item C.11.**      For derivatives, also provide:

* * * * *

   b.  * * *

i.   Provide the name and LEI (if any) of counterparty (including a central counterparty).

If the counterparty does not have an LEI, provide the counterparty's RSSD ID, if any.

* * * * *

## Part D: Miscellaneous Securities

Report miscellaneous securities, if any, using the same Item numbers and reporting the same information that would be reported for each investment in Part C if it were not a miscellaneous security.  Information reported in this Item will be nonpublic.