# United States Court of Appeals for the Fifth Circuit

---

REGISTERED FUNDS ASSOCIATION,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

On Petition for Review of an Order of the
Securities & Exchange Commission

---

## PETITIONER'S OPENING BRIEF

---

RORY SKOWRON
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

JEREMIAH WILLIAMS
   *Counsel of Record*
DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 508-4600

*Counsel for Petitioner*

December 23, 2024

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60550

REGISTERED FUNDS ASSOCIATION,

*Petitioner,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are either parents of the petitioner or that own stock in the petitioner.

## A.   Petitioner

I.   Registered Funds Association

II.   Others who are not participants in this matter but may be financially interested in its outcome include investment advisers and registered funds subject to the agency action at issue.

## B.   Attorneys for Petitioner

Jeremiah Williams
Douglas Hallward-Driemeier
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Rory Skowron
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199

## C.    Respondent

Securities and Exchange Commission

## D.    Attorney for Respondent

John Robert Rady
Jeffrey Alan Berger
Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549-1090

Dated: December 23, 2024          Respectfully Submitted,

*/s/ Jeremiah Williams*
JEREMIAH WILLIAMS
*Counsel of Record for Petitioner*

## STATEMENT REGARDING ORAL ARGUMENT

This important case concerns the Securities and Exchange Commission's unlawful and arbitrary imposition of new reporting and disclosure requirements that promise to inflict great harm on registered funds, their shareholders, and the companies in which they invest. Because these new requirements will have significant effects on the registered funds industry, Petitioner submits that oral argument would aid the Court's consideration of this case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ............................... iii

TABLE OF AUTHORITIES ..................................................................vi

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES PRESENTED ....................................4

STATEMENT OF THE CASE ................................................................4

    A.  Portfolio Holdings Reveal Valuable Information About The Proprietary Investment Strategies That Registered Funds Employ ............................................................................................ 4

    B.  Public Companies Rely On Market Prices To Make Informed Decisions About Capital Investments ...........................................5

    C.  Congress Imposes Clear Limits On The SEC's Authority To Require Registered Funds To Report Their Portfolio Holdings ........................................................................................................ 7

    D.  The SEC Adopts A Longstanding Policy In Favor Of Quarterly Reporting and Limited Disclosure. ................................................9

    E.  The SEC Abandons Its Longstanding Policy And Requires Public Disclosure Of All Monthly Portfolio Holdings Reports ...... 13

SUMMARY OF ARGUMENT ............................................................... 18

STANDARD OF REVIEW ....................................................................20

ARGUMENT ........................................................................................21

    I.  THE RULE EXCEEDS THE SEC'S AUTHORITY ........................21

        A.  The Rule Ignores The Limitations Of Section 80a-29(c)...........21

        B.  The SEC Failed To Adequately Consider The Rule's Impact On Efficiency, Competition, And Capital Formation.................24

    II.  THE RULE IS ARBITRARY, CAPRICIOUS, AND OTHERWISE UNLAWFUL.................................................................28

   A.   The SEC Abandoned Its Longstanding View About Monthly Disclosure Without Adequate Explanation .................................. 28

   B.   The Rule Inexplicably Treats Different Types Of Registered Funds As If They Were The Same ............................................. 33

   C.   The SEC Overlooked A Significant Harm Caused By More Frequent Disclosure .................................................................. 38

III. THE RULE MUST BE VACATED ............................................ 41

CONCLUSION ...................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocs. for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ..................................... 36, 41

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998) .................................................. 28

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) ........................................ 20

*Anna Jaques Hosp. v. Sebelius*,
583 F.3d 1 (D.C. Cir. 2009) ......................................... 33

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
105 F.4th 691 (5th Cir. 2024) ....................................... 32, 33

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ........................................ 35

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ...................................... 25, 26

*Calumet Shreveport Refin., L.L.C. v. EPA*,
86 F.4th 1121 (5th Cir. 2023) ....................................... 28

*Chamber of Com. v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) ....................................... 25

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) ........................................ 26

*Data Mktg. P'ship, LP v. DOL*,
45 F.4th 846 (5th Cir. 2022) ........................................ 42

*Davidson v. Glickman*,
169 F.3d 996 (5th Cir. 1999) ........................................ 20

*El Paso Elec. Co. v. FERC,*
    76 F.4th 352 (5th Cir. 2023) ......................................... 21

*FCC v. Fox Tele. Stations, Inc.,*
556 U.S. 502 (2009) ..................................................... 29

*Franciscan All., Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ......................................... 41

*Getty v. Fed. Sav. & Loan Ins. Corp.,*
    805 F.2d 1050 (D.C. Cir. 1986) ..................................... 27

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ................................................. 20

*Louisiana v. U.S. Dep't of Energy,*
    90 F.4th 461 (5th Cir. 2024) ................................... 37, 40

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..................................................... 28

*Midship Pipeline Co. v. FERC,*
    45 F.4th 867 (5th Cir. 2022) ......................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto Ins. Co.,* 463 U.S. 29 (1983) ............................ 28, 38

*Nat'l Ass'n of Mnfrs. v. SEC,*
    105 F.4th 802 (5th Cir. 2024) ....................................... 29

*Nat'l Ass'n of Priv. Fund Managers v. SEC,*
    103 F.4th 1097 (5th Cir. 2024) ............................. 3, 41, 42

*Nat'l Ass'n of Reg. Util. Comm'rs v. FCC,*
    533 F.2d 601 (D.C. Cir. 1976) ..................................... 23

*Organized Vill. of Kake v. USDA,*
    795 F.3d 956 (9th Cir. 2015) ....................................... 33

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
    374 F.3d 1209 (D.C. Cir. 2004) ................................... 23

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ............................................................. 41

*Tex. Med. Ass'n v. HHS*,
110 F.4th 762 (5th Cir. 2024) ........................................................... 23

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ...................................................... 27, 37

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ....................................................... 41

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
985 F.3d 472 (5th Cir. 2021) ............................................................. 38

*Wages & White Lion Invs., L.L.C. v. FDA*,
90 F.4th 357 (5th Cir. 2024) (en banc) ...................................... 28, 32

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................................................... 22

**Statutes**

5 U.S.C.

§ 706 ............................................................................................. 20, 41

15 U.S.C.

§ 80a-2 ................................................................................. 9, 21, 24, 27

§ 80a-29 ........................................................................... 8, 9, 21, 22, 24

§ 80a-42 ................................................................................................ 2, 3

§ 80a-44 .................................................................................................... 7

Investment Company Act of 1940, Pub. L. No. 76-768, 54
Stat. 789 (1940) ..................................................................................... 8

National Securities Markets Improvement Act of 1996, Pub.
L. No. 104-290, 110 Stat. 3416 (1996) .................................................. 8

**Other Authorities**

Amendments to the Timing Requirements for Filing Reports
on Form N–Port, 84 Fed. Reg. 7,980 (Mar. 6, 2019) ................... 12, 13

Chair Gary Gensler, *New Registered Fund Statistics Report*,
Securities and Exchange Commission (Apr. 24, 2024) ...................... 4

Dissent of Comm'r Peirce (Aug. 28, 2024) ...................................... 18, 37

Dissent of Comm'r Uyeda (Aug. 28, 2024) ...................................... 18, 36

Form N-PORT and Form N-CEN Reporting; Guidance on
Open-End Fund Liquidity Risk Management Programs,
89 Fed. Reg. 73,764 (Sept. 11, 2024) ....................................... *passim*

*Investment Company Fact Book*, Investment Company
Institute (2024) ........................................................................... 38

Investment Company Reporting Modernization, 81 Fed. Reg.
81,870 (Nov. 18, 2016) .................................................... 11, 12, 30, 31

Investment Company Reporting Modernization, 82 Fed. Reg.
58,731 (Dec. 14, 2017) ....................................................................... 12

Jalal Sani et al., *Spillover Effects of Mandatory Portfolio
Disclosures on Corporate Investment*, 76 J. OF ACCT. &
ECON. 2 (2023) ..................................................................... 7, 27, 40

Liang Xu, *Stock Price Informativeness and Managerial
Inefficiency*, 74 Int'l Rev. of Econ. and Fin. 348 (2021) ...................... 39

Open-End Fund Liquidity Risk Management Programs and
Swing Pricing; Form N-PORT Reporting, 87 Fed. Reg.
77,172 (Dec. 16, 2022) ................................................................ 13, 14

Shareholder Reports and Quarterly Portfolio Disclosure of
  Registered Management Investment Companies, 69 Fed.
  Reg. 11,244 (Mar. 9, 2004)...................................8, 9, 10, 11, 29, 30, 32

# INTRODUCTION

This case is about certain information that registered funds must file with the Securities and Exchange Commission and disclose to the public, namely, their portfolio holdings.

Portfolio holdings can reveal sensitive information about certain funds' proprietary investment strategies. If the market can see that a fund is building its position in an undervalued investment, then other investors will inevitably seek to "front run" or "free ride" on that strategy by also building a position in that investment. As a result, prices will rise, the fund's ability to achieve favorable returns for its shareholders will be frustrated, and the costly market research in which the fund invested to develop and execute the strategy will have gone to waste.

The SEC has long been sensitive to the fact that predatory trading is an inevitable consequence of frequent public disclosure of portfolio holdings. When it first required quarterly reporting of portfolio holdings in 2004, the SEC provided that only the report for every third month of each fiscal quarter would be publicly disclosed. It explained that any public-information benefits from requiring disclosure for more than four months of the year would be outweighed by the harm to funds that such

additional disclosure would enable. The SEC repeatedly affirmed that position over the next two decades.

Then, on August 28, 2024, the SEC drastically reversed course. In a final rulemaking, the SEC announced that registered funds will now be required to report their portfolio holdings to the SEC on a monthly basis—and that all such monthly reports will be publicly disclosed. In other words, the SEC now effectively forces actively managed funds to disclose their confidential trading strategies to the public for free, while leaving them more vulnerable than ever to the threat of predatory trading.

The SEC lacked authority to impose these harmful changes, and it provided no serious justification for reversing the position it has held for two decades. This agency action should therefore be vacated.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 80a-42(a) because Petitioner challenges "an order issued by the Commission under [the Investment Company Act]." The petition is timely under 15 U.S.C. § 80a-42(a) because it was filed on October 28, 2024—"within sixty days" of the

Commission's "entry" of the order on August 28, 2024, as calculated per Federal Rule of Appellate Procedure 26(a)(1).

Petitioner has standing because it represents its members, which include registered funds and investment advisers directly subject to the challenged agency action. And because the challenged action targets the registered fund industry as a whole, Petitioner need not identify any particular members to demonstrate its standing. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1109 (5th Cir. 2024) ("Regarding standing, NAPFM need not identify particular members 'when all the members of an organization are affected' because the challenged rule targets an entire industry.") (brackets and citations omitted).

Venue is proper in this Court because Petitioner is incorporated, and has its principal place of business, in Texas. *See* 15 U.S.C. § 80a-42(a); *Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1109.

## STATEMENT OF THE ISSUES PRESENTED

**I.    Whether the Rule exceeds the SEC's statutory authority.**

**II.   Whether the Rule is arbitrary, capricious, or otherwise unlawful.**

**III.  Whether the Rule should be vacated.**

## STATEMENT OF THE CASE

### A.    Portfolio Holdings Reveal Valuable Information About The Proprietary Investment Strategies That Registered Funds Employ.

Hundreds of millions of ordinary Americans own shares in registered investment funds—most commonly, mutual funds. A pillar of the national economy, the registered funds industry comprises more than 12,000 separate funds and some $25 trillion in total net assets.[1]

A registered fund's performance depends on the effective execution of its investment strategies. Without effective execution, a fund cannot create favorable returns for its shareholders. For many actively managed funds, the manner in which investment strategies are executed is a confidential, closely guarded key to success in a very competitive marketplace. These funds hire sophisticated investment advisers to

---

[1] Chair Gary Gensler, *New Registered Fund Statistics Report*, Securities and Exchange Commission (Apr. 24, 2024), https://bit.ly/4gEpXzL.

formulate strategies and manage their portfolio holdings through intensive market research.

Information about changes in a fund's portfolio holdings, *i.e.*, its trading activity, provides direct insight into the fund's investment strategies. The more information that is disclosed, the greater the insight. This is especially true of actively managed funds that aim to build an asset position incrementally over time in order to buy or sell within narrow price ranges. If it becomes known that an actively managed fund is increasing its position in a particular investment, other market participants may seek to "free ride" on that strategy by also buying stakes in that same investment. As a result of such predatory practices, the cost of that investment will rise, and the fund's ability to execute its strategy by buying within a target price range will become frustrated. This reduces a fund's incentive to invest in proprietary market research, as such research may simply be exploited by other market participants.

## B. Public Companies Rely On Market Prices To Make Informed Decisions About Capital Investments.

Reducing a fund's incentive to invest in proprietary market research has broader implications for markets and capital formation. A

market price provides information about the underlying asset. This information reflects the aggregate views of market participants, and it becomes less useful if fewer participants are engaged in proprietary research. Accordingly, more frequent public disclosure means that market prices will become less meaningful.

This hurts public companies, many of whom look to market prices for feedback on their capital allocation decisions. When a company's management is planning capital expenditures, often it will preview its intentions to the market and look to the stock price for feedback. Companies sometimes make adjustments based on the market reaction. But this feedback is useful only if market participants spend time and money evaluating a company's capital investments. Otherwise, public companies do not get the feedback that they need to make optimal capital allocation decisions.

This is exactly what happened when the SEC moved from semi-annual to quarterly reporting of portfolio holdings in 2004. Experts studied funds that were required to increase their disclosure frequency because of the new SEC rule. They analyzed the stock prices for the public companies held by these funds, measuring the "informativeness"—

*i.e.*, the degree to which the stock price conveys useful information about a company's capital investments. Jalal Sani et al., *Spillover Effects of Mandatory Portfolio Disclosures on Corporate Investment*, 76 J. OF ACCT. & ECON. 2, 8 (2023). These experts determined that the SEC rule reduced informativeness, which made it harder for company management to allocate capital effectively. *Id*. at 10. This led to lower profits for the affected public companies. *Id*. at 17.

### C. Congress Imposes Clear Limits On The SEC's Authority To Require Registered Funds To Report Their Portfolio Holdings.

In 1940, Congress enacted the Investment Company Act, under which registered funds are subject to extensive reporting obligations. *See* 15 U.S.C. § 80a, *et seq*. Although information reported to the SEC pursuant to the Investment Company Act is generally available to the public, the SEC can, and frequently does, withhold such information where disclosure "is neither necessary nor appropriate in the public interest or for the protection of investors." § 80a–44(a).

As relevant here, Section 30(b) of the Investment Company Act requires registered funds to file with the SEC "such information, documents, and reports (other than financial statements), as the

Commission may require to keep reasonably current the information and documents contained in the registration statement" of the fund. § 80a-29(b)(1). The SEC has long interpreted such "information, documents, and reports" to include a fund's portfolio holdings. *See Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies*, 69 Fed. Reg. 11,244, 11,255 (Mar. 9, 2004).

Initially, Congress gave the SEC only two options regarding how often registered funds must file the "information, documents, and reports" required by Section 30(b): "semi-annual[ly] or quarterly." *See* Investment Company Act of 1940, Pub. L. No. 76-768, § 30(b)(1), 54 Stat. 789, 836 (1940). Congress removed this limitation in 1996, striking these words from the statute. *See* National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, § 206, 110 Stat. 3416, 3430 (1996).[2] At the same time, however, it inserted a new presumption in favor of semi-annual filing, providing that, "if the Commission requires . . . filing . . . on a basis more frequently than semiannually," then the Commission "shall take such action as it deems necessary or appropriate . . . to avoid unnecessary reporting by, and minimize the compliance burdens on,

---

[2] Despite the 1996 amendment, the U.S. Code heading associated with § 80a-29(b) still refers to "semi-annual or quarterly filing of information."

registered investment companies and their affiliated persons." § 80a-29(c).  Similarly, whenever the SEC engages in rulemaking under the Act—which it must do in order to specify a filing frequency—Congress provided that the SEC "shall . . . consider . . . whether the action will promote efficiency, competition, and capital formation." § 80a-2(c).

### D. The SEC Adopts A Longstanding Policy In Favor Of Quarterly Reporting and Limited Disclosure.

For more than sixty years, the SEC required only that funds disclose their portfolio holdings in semi-annual shareholder reports, which are then filed with the SEC.  *See* Shareholder Reports and Quarterly Portfolio Disclosure, 69 Fed. Reg. at 11,245; *see also* § 80a-29(b)(2) (requiring funds to file with the SEC, within ten days of transmission, "copies of every periodic or interim report or similar communication containing financial statements and transmitted to any class of such company's security holders"); § 80a-29(e)(1)-(2) (requiring funds to transmit to shareholders semi-annual reports that include "a balance sheet accompanied by a statement of the aggregate value of investments on the date of such balance sheet" and "a list showing the amounts and values of securities owned on the date of such balance sheet").

Then, in 2004, the SEC adopted Rule 30b1–5, mandating that certain registered funds file their portfolio holdings with the SEC on a quarterly basis. *See* Shareholder Reports and Quarterly Portfolio Disclosure, 69 Fed. Reg. at 11,244. Under Rule 30b1–5, funds were required to file such quarterly reports within sixty days of the close of each fiscal quarter of the year, at which point they would become public. *Id.* So-called "miscellaneous securities" satisfying a host of conditions could be exempted from public disclosure.[3]

In adopting the 2004 rule, the SEC explained that more frequent reporting and disclosure would have harmed funds: "[W]e take seriously concerns that more frequent portfolio holdings disclosure . . . may expand the opportunities for predatory trading." *Id.* at 11,252. Disclosure of quarterly reports sixty days after quarter end, the SEC said, "strike[s] an appropriate balance between investors' interest in more frequent portfolio information and the costs associated with disclosing and making

---

[3] To count as a miscellaneous security, the security must have been not restricted, not held for more than one year prior to the date of the portfolio holding report, and not previously reported by name to the shareholders, nor set forth in any registration statement, application, or annual report or otherwise made available to the public. *Id.* at 11,250.

that information available to investors, which are ultimately borne by investors." *Id.*

In 2016, the SEC rescinded Rule 30b1–5 and issued Rule 30b1–9, requiring funds to report their portfolio holdings on the new Form N-PORT. *See* Investment Company Reporting Modernization, 81 Fed. Reg. 81,870 (Nov. 18, 2016). As adopted, Rule 30b1–9 would have required funds to file with the Commission monthly portfolio holding reports within thirty days of month end. *Id.* at 81,874. Crucially, however, the first two months of each fiscal quarter would be kept confidential, and only the third month would be available to the public. *Id.* "Miscellaneous securities" would again be exempted. *Id.* at 81,910.

In adopting Rule 30b1–9, the SEC described in detail the harms of more frequent disclosure, just as it had done in adopting Rule 30b1–5 twelve years earlier:

> We continue to recognize . . . that more frequent portfolio disclosure than is currently required could potentially harm fund shareholders by expanding the opportunities for professional traders to exploit this information by engaging in predatory trading practices, such as trading ahead of funds, often called "front-running." Similarly, the Commission is sensitive to concerns that more frequent portfolio disclosure may facilitate the ability of non-investors to "free ride" on a mutual fund's investment research, by allowing those investors to reverse engineer and "copycat" the fund's

investment strategies and obtain for free the benefits of fund research and investment strategies that are paid for by fund shareholders. Both front-running and copycatting can adversely affect funds and their shareholders.

*Id.* at 81,909-10.

In 2017, the SEC determined to delay the new Form N-PORT filing requirements until 2019, citing cybersecurity concerns with the Commission's EDGAR system, through which funds submit reports. *See* Investment Company Reporting Modernization, 82 Fed. Reg. 58,731 (Dec. 14, 2017). Two years later, when the delay period expired, the SEC announced that an evaluation of its cybersecurity risk profile had led it to reconsider the need for funds to submit portfolio holding information on a monthly basis. *See* Amendments to the Timing Requirements for Filing Reports on Form N–Port, 84 Fed. Reg. 7,980, 7,982 (Mar. 6, 2019). The SEC thus again amended Rule 30b1–9 to require that reports for each month be filed with the Commission on a quarterly basis, within sixty days of quarter-end—the same timeline as under the 2004 amendment. *Id.* Further, as with the 2004 and 2016 amendments,

portfolio holding information for the first and second months of each quarter would remain non-public. *Id.*[4]

## E. The SEC Abandons Its Longstanding Policy And Requires Public Disclosure Of All Monthly Portfolio Holdings Reports.

In 2022, the SEC proposed a series of radical changes to its rules for certain registered funds that would have mandated "swing pricing" for certain funds and significantly altered the operation of funds' liquidity risk management programs. *See* Open-End Fund Liquidity Risk Management Programs and Swing Pricing; Form N-PORT Reporting, 87 Fed. Reg. 77,172 (Dec. 16, 2022).[5] Alongside these proposals, the SEC

---

[4] The 2019 amendment did not, however, alter the requirement, introduced in 2016, that funds maintain in their records, no later than thirty days after the end of each month, the portfolio holding information that is required to be included in Form N–PORT, and to submit such information to the Commission upon request. *Id.*

[5] Specifically, the SEC proposed a rigid framework for requiring that, under certain conditions, all registered open-end funds, other than money-market funds and exchange-traded funds, must engage in swing pricing, a mechanism by which a fund artificially changes its net asset value ("NAV") on a day where flows exceed certain levels. *Id.* The SEC also proposed to amend the liquidity rule, a rule that had only been in operation for three years, to (i) mandate the assumption of certain trade sizes in making liquidity calculations, (ii) eliminate one of the four liquidity classifications, (iii) mandate what a fund would have to consider a significant change in market value, (iv) change the framework for counting classification days, and (v) introduce the U.S. GAAP concept of Level 3 assets into a liquidity regime. *Id.* Accompanying the swing-pricing proposal, the SEC proposed to mandate a "hard close" whereby the direction to purchase or redeem a fund's shares would be eligible for same-day pricing only if received before a fund established its net asset value. *Id.* This "hard close" proposal would have removed the current market mechanism, according to which certain intermediaries can transmit orders after NAV is struck, so long as the underlying investor order was submitted before NAV was struck. *Id.*

proposed a stark amendment to Rule 30b1–9 and Form N-PORT: Instead of filing monthly portfolio holdings on a quarterly basis within sixty days of quarter end, with only information from the third month of each quarter disclosed to the public, funds would be required to file monthly reports within thirty days of month end, and *every monthly report* would be disclosed to the public sixty days after month end. *Id.* at 77,184. The SEC claimed it could make this change "under the authority set forth in the Investment Company Act, particularly sections 6, 8, 22, 24, 30, 31, 34, 38, and 45 thereof." *Id.*

The SEC's sweeping proposals triggered public uproar. While commenters understandably focused largely on the SEC's misguided proposal to alter funds' liquidity risk management, many noted the harm posed by the proposed changes to Form N-PORT reporting. These commenters explained that requiring monthly reporting within thirty days of month end would overburden funds and their service providers, and that the costs necessary to overcome these resource strains would be passed on to shareholders. AR.190:34-35; AR.236:87-90; AR.155:28.[6]

---

[6] The administrative record is cited as AR.[document]:[page range].

More crucially, though, commenters explained that public disclosure of monthly portfolio holdings would facilitate predatory trading and misappropriation of proprietary investment strategies— harms to which actively managed funds are especially vulnerable. AR.236:90-93; AR.247:9-11. These commenters cited, among other things, the ability of market participants to use automated tools like artificial intelligence to expose portfolio decisions before they are fully implemented and thereby "free ride" on funds' valuable intellectual property. *Id.* By *tripling* the amount of publicly available portfolio holdings information, commenters warned, the proposed amendments to Rule 30b1–9 and Form N-PORT would make it substantially harder for a whole class of registered funds to successfully execute their investment strategies—and shareholders would pay the price. *Id.*

On August 28, 2024, in a 3-2 vote, the SEC adopted a final rule. *See* Form N-PORT and Form N-CEN Reporting; Guidance on Open-End Fund Liquidity Risk Management Programs, 89 Fed. Reg. 73,764 (Sept. 11, 2024) (the "Rule"). Although it dropped the proposed changes regarding liquidity risk management, swing pricing, and the "hard close,"

the Rule adopted the proposed amendments to Rule 30b1–9 and Form N-PORT, without material alteration.

In the adopting release, the SEC went into great detail about how its experience confronting major recent market events—the COVID-19 pandemic, the Russian invasion of Ukraine, among others—had demonstrated that quarterly reporting of portfolio holdings with a sixty-day delay was limiting its ability to timely respond to market stresses. *See id.* at 73,766. The SEC did not explain why *nonpublic* reporting to its staff could not address these concerns about market stresses. Instead, the SEC merely said that more frequent reporting, with less stale information, is necessary. *Id.* While conceding that more frequent reporting would mean greater costs for funds and their shareholders, as well as greater data security risks, the SEC stated that these were necessary tradeoffs to make in exchange for better oversight and monitoring abilities. *Id.* at 73,772.

The SEC's response to commenters' more pressing concerns over monthly public disclosure was similarly cursory. Although it acknowledged that some funds do not volunteer their portfolio holdings to the public, the SEC emphasized that "many funds" do. *Id.* at 73,774.

And although it acknowledged that more frequent disclosure would make some funds that build an investment position over a longer time horizon particularly vulnerable to predatory trading, the SEC declared that any such harm is mitigated by the sixty-day lag between month end and disclosure—the same lag time that has been in place for twenty years under the existing quarterly disclosure regime. *Id.* at 73,772-73. Funds' continued ability to designate certain investments as "miscellaneous securities" and withhold from public disclosure, too, "will help deter predatory trading," the SEC claimed. *Id.* at 73,774. Ultimately, according to the SEC, any harm to funds is justified because monthly disclosure will "assist[] investors in making more informed investment decisions," including by "reducing the imbalance of information between fund investors and managers." *Id.* at 73,772, 73,774.

SEC Commissioners Hester Peirce and Mark Uyeda dissented from the Rule, zeroing in on the harm to funds from monthly disclosure. Both emphasized the value that many funds place on formulating successful investment strategies that often require intensive and arduous market research. As Commissioner Peirce put it, the Rule "undervalue[s] the

work that goes into deciding which securities to buy and sell."[7] "Contrary to the comfort the Commission draws from the existing voluntary disclosure practices," Commissioner Peirce continued, "the variation in practice suggests that the costs of monthly public disclosure outweigh the benefits for some funds."[8]

Striking a similar tone, Commissioner Uyeda noted that "[t]he capital markets function efficiently because there are financial incentives to conduct value-adding fundamental research for securities and their prices"—incentives that the new amendments would significantly curtail.[9] The strategies developed from that research "are the intellectual work product of the fund manager and its skill; that information is not a public good to which everyone may have access for free."[10]

## SUMMARY OF ARGUMENT

The Rule is unlawful for two independent reasons.

---

[7] Dissent of Comm'r Peirce (Aug. 28, 2024), https://bit.ly/4gJntAu.

[8] *Id.*

[9] Dissent of Comm'r Uyeda (Aug. 28, 2024), https://bit.ly/4iFKlCx.

[10] *Id.*

**I.** *It exceeds the SEC's statutory authority.* The Investment Company Act strictly limits the SEC's authority to dictate how often funds must report their portfolio holdings. Congress established a presumption that two filings per year would be sufficient, providing that if the SEC chooses to require funds to file more frequently, it must take specific action to minimize funds' compliance burdens. Yet, in mandating that portfolio holdings be submitted on a monthly basis, the SEC failed to rebut Congress's presumption and made no serious effort to minimize compliance burdens, thereby ignoring the clear statutory limitations on its authority. On top of that, the SEC failed to meaningfully consider the effect of monthly reporting and disclosure on "efficiency, competition, and capital formation," as the Investment Company Act further requires. The Rule therefore exceeds the SEC's statutory authority.

**II.** *It is arbitrary, capricious, and otherwise unlawful.* For twenty years, the SEC affirmed that the harms of requiring disclosure of more than four portfolio holdings reports per year outweighed the benefits. The Rule departs from that longstanding policy without a satisfactory explanation. Moreover, despite conceding that more frequent disclosure will harm certain funds by expanding opportunities

for predatory trading, the SEC incredibly claims that the same features of the disclosure regime that it has long found inadequate are somehow now sufficient to protect funds from predatory trading. Additionally, in weighing the costs and benefits of the Rule, the SEC effectively treated all funds the same, inexplicably downplaying that actively managed funds face unique harm from more frequent disclosure. And finally, the SEC completely overlooked a significant harm caused by more frequent disclosure: the loss of stock price informativeness, on which public company managers depend.

**III.** Accordingly, the Court must vacate the Rule.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, this Court "shall . . . hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). This Court's review is "searching and careful." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 245 (5th Cir. 2023). It reviews legal issues *de novo*, *Davidson v. Glickman*, 169 F.3d 996, 1000 (5th Cir. 1999), without affording any deference to agency interpretations of

statutes, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024), and seeks to ensure that agency decisions are "reasonable and reasonably explained," *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023) (citation omitted).

## ARGUMENT

## I.  THE RULE EXCEEDS THE SEC'S AUTHORITY.

The SEC purported to issue the Rule "under the authority set forth in the Investment Company Act," including Section 30.  *See* 89 Fed. Reg. at 73,797.  Yet the Rule violates both the SEC's obligation under that Section to (1) "avoid unnecessary reporting by, and minimize the compliance burdens on, registered investment companies and their affiliated persons," § 80a-29(c), as well as its obligation under Section 2 to (2) "consider . . . whether [rulemaking] will promote efficiency, competition, and capital formation," § 80a-2(c).[11]  Accordingly, the Rule exceeds the SEC's statutory authority.

### A.  The Rule Ignores The Limitations Of Section 80a-29(c).

The SEC's authority to dictate the frequency with which registered funds must report their portfolio holdings is strictly limited.  Although

---

[11] Although the adopting release also referenced the SEC's authority under sections 6, 8, 22, 24, 30, 31, 34, 38, and 45 of the Act, only section 30 concerns the SEC's ability to dictate the frequency of funds' portfolio holdings reports.

the SEC can require reporting on a monthly basis, it can do so only if it "take[s] such action as it deems necessary or appropriate . . . to avoid unnecessary reporting by, and minimize the compliance burdens on, registered investment companies and their affiliated persons." § 80a-29(c). Indeed, the SEC must "take such action" whenever it "requires . . . filing . . . on a basis more frequently than semiannually." *Id.*

In inserting this statutory obligation in the Investment Company Act, Congress presumed that semi-annual reporting would be sufficient. The SEC's duty to "take such action . . . to avoid unnecessary reporting" and to "minimize [funds'] compliance burdens" reflects the clear legislative directive that any reporting frequency greater than semi-annual requires a compelling justification that balances the need for the increase against the costs of additional reporting. *See Midship Pipeline Co. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.") (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)).

The Rule's requirement that funds must report their portfolio holdings to the SEC on a monthly basis does not overcome Congress's

presumption in favor of semi-annual filing, as it fails to comport with the SEC's statutory obligation under Section 80a-29(c). In fact, it appears that the SEC promulgated the Rule in flagrant disregard of this statutory provision. Not once does the adopting release even mention it. Such failure by an agency to explicitly acknowledge a clear statutory limitation on its power is *prima facie* evidence that its action has been taken in excess of statutory authorization. *See Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*, 533 F.2d 601, 618 (D.C. Cir. 1976) (noting that, even where deference to an agency's statutory interpretation is appropriate, such deference "is not a license . . . to ignore explicit statutory limitations on [agency] authority"); *see also Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 778 (5th Cir. 2024) ("When Congress orders a decisionmaker to 'consider' a list of factors, Congress is instructing that 'each factor must be given genuine consideration and some weight' in the final determination.") (citation and alteration omitted)); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) ("'[T]he complete absence of any discussion' of a statutorily mandated factor 'leaves us with no alternative but to conclude that the agency failed to take account of

this statutory limit on its authority . . . .'") (citation and alteration omitted)).

But the adopting release does not just ignore the SEC's obligations under Section 80a-29(c) in form; it ignores them in substance. Despite recognizing that going from quarterly to monthly filing will likely overburden funds and their service providers, not to mention raise the likelihood of reporting errors, the Rule does nothing to "minimize the[se] compliance burdens." § 80a-29(c). Indeed, the SEC rejected many proposals that would have allayed the costs to funds of monthly reporting while still enabling the SEC to obtain portfolio holding information more frequently than under the previous, quarterly reporting regime. *See* 89 Fed. Reg. at 73,768. In particular, the SEC rejected out of hand the suggestion of numerous commenters to give funds more than thirty days after month end in which to file. *Id.* The Rule simply treats Section 80a-29(c) as if it did not exist.

## B. The SEC Failed To Adequately Consider The Rule's Impact On Efficiency, Competition, And Capital Formation.

The SEC's authority to require monthly reporting of portfolio holdings is subject to an additional statutory limitation: the duty to

consider "whether [such reporting requirement] will promote efficiency, competition, and capital formation." 15 U.S.C. § 80a-2(c). This duty requires the SEC to, at a minimum, "apprise itself" of the "economic consequences" of its rules, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (citation omitted), and "determine as best it can [its rules'] economic implications," *Chamber of Com. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). The SEC failed to fulfill this statutory duty in issuing the Rule.

Just two pages of the adopting release are dedicated to an analysis of the Rule's promotion of efficiency, competition, and capital formation. *See* 89 Fed. Reg. at 73,789-73,791. And this analysis scarcely points to any meaningful benefits to two of these three factors: competition and capital formation.

Regarding competition, the SEC actually *admits* that the increased costs of monthly reporting will "negatively affect[]" the ability of smaller funds to compete, but then follows that concession with a non-sequitur, declaring that monthly reporting is "likely to improve competition between funds by improving fund transparency and allowing investors to better understand the reasons for fund performance." *Id.* at 73,790. Such

incoherence undermines any claim that the SEC properly "apprise[d]" itself" of the "economic consequences" of monthly reporting. *See Bus. Roundtable*, 647 F.3d at 1148. "The SEC cannot have it both ways": it cannot simultaneously claim to be expanding competition among funds while also acknowledging that the Rule will impair the ability of small funds to compete. *See Chamber of Com. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023).

Regarding capital formation, the SEC states only that "more information on fund holdings . . . and more timely information, will improve investors' ability to value securities[,] [which] will lead to better decisions by issuers on how to allocate capital, namely to its most efficient uses." 89 Fed. Reg. at 73,790. Yet the SEC points to no support, empirical or otherwise, for the proposition that more disclosure of fund holdings will improve public companies' decisionmaking around capital investment. *See Bus. Roundtable*, 647 F.3d at 1150 (concluding that SEC failed to properly consider a rule's effect on efficiency, competition, and capital formation where it "relied upon insufficient empirical data" in concluding that a rule would "improve board performance and increase shareholder value").

Moreover, academic research actually suggests the opposite of the SEC's *ipse dixit*, that is, that more frequent mandatory disclosure lowers funds' incentives to engage in costly market research, which reduces the stock-price informativeness of their portfolios, and thus public company managers' ability to learn from their companies' stock prices when deciding how to allocate capital. *See* Sani et al. *supra*, at 21. Put simply, monthly reporting will reduce price informativeness and make it harder for public companies to allocate resources and build capital. *See id.*[12] The SEC's apparent ignorance of such dynamics renders its economic analysis fundamentally flawed, further underscoring its failure to actually consider "whether [the Rule] will promote efficiency, competition, and capital formation," as Section 80a-2(c) requires. *See Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) ("Stating that a factor was considered is not a substitute for considering it.") (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)).

\*     \*     \*

Accordingly, the Rule exceeds the SEC's authority and should be set aside on that basis.

---

[12] *See infra* Part II.C of Argument.

## II. THE RULE IS ARBITRARY, CAPRICIOUS, AND OTHERWISE UNLAWFUL.

At bottom, the APA requires agency action to be the product of "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). This means that an agency must "examine[] the relevant data and articulate[] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Calumet Shreveport Refin., L.L.C. v. EPA*, 86 F.4th 1121, 1133 (5th Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). When an agency "fails to account for relevant factors or evinces a clear error of judgment," its action is arbitrary and capricious and must be set aside. *Id.* (citation omitted).

Here, the Rule is arbitrary and capricious in at least three ways.

### A. The SEC Abandoned Its Longstanding View About Monthly Disclosure Without Adequate Explanation.

When an agency's new rule "rests upon factual findings that contradict those which underlay its prior policy," the APA requires the agency to "display awareness that it is changing position" and provide a "detailed justification" for the change. *Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc) (quoting *FCC v. Fox*

*Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009)), *cert. granted*, 144 S. Ct. 2714. "An agency's failure to explain its decision to 'disregard facts that underlay the prior policy' is arbitrary and capricious." *Nat'l Ass'n of Mnfrs. v. SEC*, 105 F.4th 802, 811 (5th Cir. 2024) (quoting *Fox Tele. Stations,* 556 U.S. at 516) (alteration in original).

In the two decades prior to the Rule, the SEC held a consistent position regarding public disclosure of funds' portfolio holdings: making information for one month of each fiscal quarter public sixty days after month end, while keeping the other two months confidential, "strike[s] an appropriate balance between investors' interest in more frequent portfolio information and the costs associated with disclosing and making that information available to investors." *See* Shareholder Reports and Quarterly Portfolio Disclosure, 69 Fed. Reg. at 11,252. It announced that position in 2004 and reaffirmed it twice, in 2016 and 2019. Its reasoning was clear—"more frequent portfolio disclosure than is currently required," *i.e.*, four months of the year, "could potentially harm fund shareholders by expanding the opportunities for professional traders to exploit this information by engaging in predatory trading practices." *See* Investment Company Reporting Modernization, 81 Fed. Reg. at 81,909-

10.   Moreover, the SEC long maintained that requiring funds to disclose their portfolio holdings for more than four months of the year would effectively deprive funds of the benefit of their market research and investment strategies:

> [M]ore frequent portfolio disclosure may facilitate the ability of non-investors to "free ride" on a mutual fund's investment research, by allowing those investors to reverse engineer and "copycat" the fund's investment strategies and obtain for free the benefits of fund research and investment strategies that are paid for by fund shareholders.

> *Id.*

The Rule abandoned this longstanding position.  Whereas, before, requiring disclosure for four months of the year, sixty days after month end, "strike[s] [the] appropriate balance between investors' interest in more frequent portfolio information and the costs associated with disclos[ure]," *i.e.*, predatory trading, *see* Shareholder Reports and Quarterly Portfolio Disclosure, 69 Fed. Reg. at 11,252, now, requiring disclosure *for each month of the year*, sixty days after month end, "appropriately balances the benefits to investors of receiving additional data on portfolio holdings while mitigating the concerns raised by commenters about predatory trading," 89 Fed. Reg. at 73,773.  And whereas, before, the sixty-day lag between month end and disclosure, as

well as funds' ability to designate certain investments as undisclosed "miscellaneous securities," would not sufficiently mitigate the harm to funds of mandatory monthly disclosure, now, these same features will somehow stanch the tide of predatory trading enabled by monthly disclosure. *See id.* at 73,774.

What "detailed justification" did the SEC provide for changing its mind about where the proper "balance" lies? The only explanation it gave is that requiring disclosure for each month of the year instead of for just four months of the year will "assist[] investors in making more informed investment decisions." *Id.* at 73,773. Yet this was equally true before the Rule: As the SEC said in 2016, "public availability of information, including the types of information that will be collected on Form N–PORT that may not currently be reported or disclosed by funds, can benefit investors and other potential users by assisting them in making more informed investment decisions." *See* Investment Company Reporting Modernization, 81 Fed. Reg. at 81,909.

Nowhere does the SEC present evidence that investors stand to benefit *more* from increased public disclosure now than in years past. Neither does the SEC claim that predatory trading is *less* of a threat now

than before—or that predatory market participants are less likely to "obtain for free the benefits of fund research and investment strategies that are paid for by fund shareholders" if holdings for more than four months of the year are disclosed to the public. Without making these determinations, the SEC cannot adequately explain why quarterly disclosure no longer strikes the proper balance between benefitting investors and protecting funds. *See Wages & White Lion Invs.*, 90 F.4th at 381; *BNSF Ry. Co. v. Fed. R.R. Admin.*, 105 F.4th 691, 698-99 (5th Cir. 2024) (holding that the agency's about-face concerning the same factual circumstances, without an adequate explanation, rendered the agency action arbitrary and capricious).

Likewise, the SEC gives no explanation for why the sixty-day lag between month end and disclosure, and the ability to keep some "miscellaneous" securities from disclosure, will now suddenly mitigate the harms of monthly disclosure. These same features were in place in 2016, when the SEC determined that requiring monthly disclosure would unacceptably expand opportunities for predatory trading. *See* Shareholder Reports and Quarterly Portfolio Disclosure, 69 Fed. Reg. at 11,252. Absent some justification for concluding that these features are

no longer inadequate, the SEC cannot plausibly rely on them as mitigating the harms to funds of monthly disclosure. *See Organized Vill. of Kake v. USDA*, 795 F.3d 956, 969 (9th Cir. 2015) (holding that it was arbitrary and capricious for USDA to conclude that existence of separate protection plan would adequately protect forest such that forest could be exempted from environmental rule, where USDA previously concluded that, even with that separate protection plan, exempting forest from rule would inadequately protect forest).

In short, the SEC simply changed its position about how to balance between benefits and burdens, without demonstrating that those benefits and burdens have themselves changed. That is quintessentially arbitrary decisionmaking under the APA. *See id.*; *BNSF Ry. Co.*, 105 F.4th at 698-99.

**B.     The Rule Inexplicably Treats Different Types Of Registered Funds As If They Were The Same.**

It is fundamental that, absent some "reasoned explanation and substantial evidence," an agency cannot apply the same standards and requirements to differently situated entities. *Cf. Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009) ("Where an agency applies different standards to similarly situated entities and fails to support this

disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.") (citation omitted)).  Yet, in purporting to weigh the benefits and harms of making funds' portfolio holdings for each month public, the Rule unreasonably treats materially different types of registered funds the same, overlooking the unique harm that actively managed funds face from monthly disclosure.

As multiple commenters explained in response to the monthly disclosure proposal, actively managed funds are essentially different from other funds.  Unlike standard index funds that invest in a static list of securities and aim simply to keep pace with market returns, actively managed funds employ expensive and labor-intensive market research to invest in a carefully curated and evolving list of undervalued securities with the goal of achieving better-than-market returns.  AR.236:90-93; AR.247:9-11.  Thus, actively managed funds have a unique interest in keeping their portfolio holdings confidential:  disclosure of their investment activity allows other market participants to free-ride off of their research and thwart the execution of their investment strategies.

*Id.* Index funds face no similar threat from predatory trading, and thus do not consider their portfolio holdings to be competitively sensitive.

The Rule glosses over this basic distinction. According to the adopting release, because "many funds" voluntarily disclose their monthly portfolio holdings "on their websites or through third party data aggregators," a "monthly, rather than a quarterly, Form N–PORT disclosure regime is now consistent with many funds' existing practice." 89 Fed. Reg. at 73,774. In other words, if many funds see no harm in disclosing their portfolio holdings on a monthly basis, the SEC is justified in requiring all funds to do so. *See id*.

This "one-size-fits-all" approach is purely arbitrary. Requiring monthly disclosure for all funds merely for the sake of "consistenc[y]" with what "many funds" choose to do makes little sense considering that the funds that *do not* voluntarily disclose their portfolio holdings— particularly, actively managed funds—are the ones that face unique harm from the Rule. *Cf. BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021) (finding OSHA vaccine mandate arbitrary and capricious where it made "little attempt to account for the obvious differences between the risks facing, say, a security guard on a lonely night shift,

and a meatpacker working shoulder to shoulder in a cramped warehouse"). As Commissioner Uyeda explained in dissent, "just because some funds have decided that the benefits of public disclosure outweigh the harm does not mean that we should mandate more frequent disclosure for all funds."[13] Instead of concluding that *many funds already do this, therefore all funds should be required to do this*, the SEC should have more seriously considered how different fund types have different voluntary disclosure practices and face very different degrees of harm from mandatory disclosure. *Cf. Advocs. for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150-51 (D.C. Cir. 2005) (upholding rule applying to all commercial drivers because the agency adequately disaggregated the costs associated with each regulated sector and concluded that the agency's reasoning was sound as applied to motor coach industry). Commissioner Peirce explained as much in her dissent: "Contrary to the comfort the Commission draws from the existing voluntary disclosure practices, the variation in practice

---

[13] Uyeda, *supra.*

suggests that the costs of monthly public disclosure outweigh the benefits for some funds."[14]

To be sure, the SEC claims to recognize the difference between actively managed funds and other funds, conceding in the adopting release that "publishing monthly Form N–PORT portfolio holdings information may result in a higher risk of predatory trading for certain kinds of funds as compared to other funds; for example, funds that are more likely to build or liquidate their positions over a longer time horizon." *See* 89 Fed. Reg. at 73,774.  But this concession simply "dots i's and crosses t's without actually saying anything." *See Texas,* 40 F.4th at 228; *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024) (explaining that merely acknowledging concerns with a rule "[does] not constitute adequate consideration of an important aspect of a problem"). Indeed, despite paying lip service to the peculiar harm that actively managed funds face from more frequent disclosure, the SEC ultimately concludes that such harm does not matter, because it is limited to "a small universe of funds." 89 Fed. Reg. at 73,788.  Actively managed funds

---

[14] Peirce, *supra.*

are not a "small universe"; they comprise 52% of the market.[15]  Yet the SEC did not attempt to quantify the proportion of funds harmed by the Rule.  Nor did it justify the serious harm that such funds face from monthly mandatory disclosure.

### C. The SEC Overlooked A Significant Harm Caused By More Frequent Disclosure.

It is axiomatic that an agency acts arbitrarily and capriciously when it "'entirely fail[s] to consider an important aspect of the problem' that it seeks to address."  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *State Farm*, 463 U.S. at 43).  By dictating mandatory disclosure requirements while ignoring the unique harm public companies face from more frequent disclosure, the SEC did just that.

As explained, actively managed funds and their shareholders face unique harm from predatory trading occasioned by frequent mandatory disclosure of their portfolio holdings—a phenomenon which the SEC purported to recognize but ultimately dismissed without explanation.  *See* 89 Fed. Reg. at 73,774.  The more portfolio holdings information is

---

[15] *See 2024 Investment Company Fact Book*, Investment Company Institute, 28 (2024), https://www.icifactbook.org/pdf/2024-factbook.pdf.

publicly available, the more predatory market participants can exploit fund investment strategies before they are executed. And when that inevitably happens, shareholders receive lower returns than they otherwise would.

But actively managed funds and their shareholders are not the only ones that face harm from monthly disclosure. The companies in which these funds invest also face harm.

When the managers of a public company are planning decisions about how to allocate capital, they often signal their intentions to the market so they can see how it responds. The stock price is a valuable source of feedback on a company's capital expenditure plans.[16] But, as economists understand, stock prices can be more or less *informative*—in other words, they vary in how accurately they reflect useful information about a company's capital investments. A highly informative stock price—and thus a highly useful guide for management in making capital investments—requires that a large number of market participants engage in proprietary research analyzing those capital investments.

---

[16] Liang Xu, *Stock Price Informativeness and Managerial Inefficiency*, 74 Int'l Rev. of Econ. and Fin. 348 (2021).

Because requiring frequent portfolio holding disclosure creates greater opportunities for predatory trading, it ultimately lowers funds' incentive to pay for expensive and time-consuming market research. And without such research, the stock prices of public companies lose their informativeness. As a result, public company managers who rely on stock prices are less able to allocate resources efficiently, ultimately reducing their profitability. *See* Sani et al., *supra*, at 1.

Ample academic research demonstrates the connection between frequent mandatory disclosure of portfolio holdings and reduced profitability for public companies. *See id.* Yet, despite its availability, the SEC cited none of it. Indeed, nothing in the adopting release indicates that the SEC ever considered whether requiring more frequent disclosure would harm public companies. Such failure to consider the regulatory harms to a key stakeholder further demonstrates the irretrievably flawed nature of the SEC's analysis of the benefits and harms of monthly disclosure. *See Louisiana*, 90 F.4th at 469-73 ("[C]hanges [in policy] require careful comparison of the agency's statements at T0 and T1 to ensure that the agency has . . . balanced all

relevant interests affected by the change."); *Advocs. for Highway and Auto Safety*, 429 F.3d at 1150-51.

\*　　\*　　\*

Accordingly, in addition to exceeding the SEC's statutory authority, the Rule is arbitrary, capricious, and otherwise contrary to law. It should be set aside on this basis as well.

## III. THE RULE MUST BE VACATED.

"Under [S]ection 706 of the APA, when a court holds that an agency rule violates the APA, it 'shall—not may—hold unlawful and set aside the agency action.'" *Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1114 (quoting *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019)). Although "[i]n rare cases" some courts have remanded a rule or regulation to the agency to cure its defects, *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), this Court has made clear that vacatur, not remand, is "the only statutorily prescribed remedy for a successful APA challenge to a regulation," *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022). Moreover, an unlawful rule or regulation must be vacated *in toto*; where agency action

is unauthorized, as here, "no part of it can stand." *Nat'l Ass'n of Priv. Fund Managers*, 103 F.4th at 1114.

Because the Rule exceeds the SEC's authority and is arbitrary, capricious, and otherwise contrary to law, this Court should apply its "default" remedy and vacate it. *See Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022).

## CONCLUSION

The Court should grant the petition for review and vacate the Rule.

Dated: December 23, 2024      Respectfully Submitted,

*/s/ Jeremiah Williams*
JEREMIAH WILLIAMS
   *Counsel of Record for Petitioner*

RORY SKOWRON
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

DOUGLAS HALLWARD-DRIEMEIER
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 508-4600
jeremiah.williams@ropesgray.com

*Counsel for Petitioner*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2024, I caused the foregoing

brief to be electronically filed with the United States Court of Appeals for

the Fifth Circuit by using the Court's CM/ECF system.

Dated: December 23, 2024        Respectfully Submitted,

<u>/s/ Jeremiah Williams</u>
JEREMIAH WILLIAMS
*Counsel of Record for Petitioner*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 7,562 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.


Dated: December 23, 2024                    Respectfully Submitted,

                                            */s/ Jeremiah Williams*
                                            JEREMIAH WILLIAMS
                                            *Counsel of Record for Petitioner*